1  DOUGLAS M. NEISTAT, ESQ. (State Bar No. 055961)
   dneistat@gblawllp.com
2  JEREMY H. ROTHSTEIN, ESQ. (State Bar No. 316140)
   jrothstein@gblawllp.com
3  G&B LAW LLP
   16000 Ventura Boulevard, Suite 1000
4  Encino, California 91436
   Tel: (818) 382-6200 • Fax: (818) 986-6534
5
   Attorneys for Debtor and Debtor-in-Possession
6  Crown Jewel Properties, LLC

7

8                **UNITED STATES BANKRUPTCY COURT**

9                **CENTRAL DISTRICT OF CALIFORNIA**

10                    **LOS ANGELES DIVISION**

| 11 | In re | Case No.: 2:21-bk-17872-NB |
|----|-------|----------------------------|
| 12 | CROWN JEWEL PROPERTIES, LLC, | (Chapter 11) |
| 13 | Debtor and Debtor-in-Possession. | **NOTICE OF MOTION AND MOTION FOR ENTRY OF AN ORDER AUTHORIZING POST-PETITION FINANCING PURSUANT TO 11 U.S.C. §364(d), AND, DISMISSING THIS BANKRUPTCY PROCEEDING PURSUANT TO 11 U.S.C. §§ 105(a) AND 1112(b) UPON CLOSING OF THE LOAN, AND GRANTING RELATED RELIEF; MEMORANDUM OF POINTS AND AUTHORITIES** |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | [Declarations of James Eleopoulos, Ben Schwartz and Ira Gaines filed concurrently herewith] |
| 21 | | |
| 22 | | <u>Hearing:</u> |
| 23 | | Date:      April 26, 2022<br>Time:      1:00 p.m. |
| 24 | | Ctrm:      "1545" (or via ZoomGov)<br>            255 E. Temple Street<br>            Los Angeles, CA 90012 |
| 25 | | |
| 26 | | Please see Judge's procedures for additional information on ZoomGov appearances: |
| 27 | | https://www.cacb.uscourts.gov/judges/honorable-neil-w-bason |
| 28 | | |

G&B LAW

1

1   TO THE HONORABLE NEIL W. BASON, UNITED STATES BANKRUPTCY JUDGE,

2   THE UNITED STATES TRUSTEE, AND ALL PARTIES ENTITLED TO NOTICE:

3   PLEASE TAKE NOTICE that, pursuant to oral motion for shortened notice under Rule 9006

4   of the Federal Rules of Bankruptcy Procedure (the "Rules"), on April 26, 2022 at 1:00 p.m., before

5   the Honorable Neil Bason, United States Bankruptcy Judge, in Courtroom 1545 of the above-entitled

6   Court at 255 East Temple Street, Los Angeles, California 90012, or via ZoomGov, Debtor and Debtor-

7   in-Possession Crown Jewel Properties LLC (the "Debtor") will and hereby does move (the "Motion")

8   for entry of an order, substantially in the form attached hereto as Exhibit "A" (the "Proposed Order"),

9   (i) approving debtor-in-possession financing (the "Exit Financing Facility") on the terms of the Loan

10  Agreement substantially in the form attached to the Proposed Order as Exhibit "1"; (ii) authorizing

11  the payment of certain pre-petition secured claims against the Debtor (the "Payoff Payments"); (iii)

12  dismissing this chapter 11 proceeding upon closing of the Exit Financing Facility; and (iv) granting

13  related relief.



14  The Motion is brought under sections 105, 363, 364(d) and 1112(b) of title 11 of the United

15  States Code, 11 U.S.C. §§101-1532 (the "Bankruptcy Code"), Rules 1017, 4001 and 6004 of the

16  Federal Rules of Bankruptcy Procedure, and Rule 4001-2 of the Local Bankruptcy Rule for the Central

17  District of California (the "LBR").

18  This Motion is based upon these moving papers, the attached Memorandum of Points and

19  Authorities, the concurrently filed declarations of James Eleopoulos ("Eleopoulos Decl."), Ben

20  Schwartz ("Schwartz Decl."), and Ira Gaines ("Gaines Decl."), the concurrently filed *Statement*

21  *Regarding Cash Collateral or Debtor in Possession Financing* filed pursuant to LBR 4001-2, the

22  records and pleadings in this case, and the arguments of counsel at any hearing on this Motion.

23  PLEASE TAKE FURTHER NOTICE that a response, if any, must be filed and served before

24  **April 21, 2022**.  A response must be a complete written statement of all reasons in support or

25  opposition thereto, declarations and copies of all evidence on which the responding party intends to

26  rely, and any responding memorandum of points and authorities. Replies, if any, will be made orally

27  at the hearing.

28

2214010.3 - 32278.0003

1    WHEREFORE, the Debtor respectfully requests that the Court enter an order granting the

2    Motion and approving the Exit Financing Facility.

3    Dated: April 14, 2022                    G&B LAW, LLP

4

5                                            By: _____
                                                 JEREMY H. ROTHSTEIN, ESQ.
6                                                Attorneys for Debtor and Debtor-in-Possession
                                                 Crown Jewel Properties, LLC
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## TABLE OF CONTENTS

**I.    INTRODUCTION** .............................................................................................. 1

**II.   CONCISE STATEMENT PURSUANT TO Rule 4001(c)** ......................... 2

**III.  JURISDICTION, VENUE AND STATUTORY PREDICATES** .................. 5

**IV.   FACTUAL BACKGROUND** .......................................................................... 5

    A.    The Debtor's Prepetition Business ......................................................... 5

    B.    The Debtor's Prepetition Secured Indebtedness ................................... 6

    C.    Retention of Cushman & Wakefield ...................................................... 7

    D.    Efforts to Obtain Post-Petition Financing ............................................. 7

    E.    Overview of the Exit Financing Facility ................................................ 8

**V.    ARGUMENT** ................................................................................................... 8

    A.    Post-Petition Financing Should Be Approved Pursuant to Sections 105(A), 363 and 364(D) of the Bankruptcy Code .................... 8

        1.    No Adequate Alternative to the Exit Financing Facility is Available ....... 10

        2.    Adequate Protection is Sufficient because the Prepetition Secured Creditors will Either be Paid in Full, or have Consented to Priming, to the Extent Necessary, and to Release Their Liens .................................... 10

        3.    Exit Financing Facility is Necessary to Preserve the Value of the Debtor's Estate ........................................................................................... 11

        4.    The Terms of the Loan Agreement are Fair, Reasonable and Appropriate ................................................................................................. 11

        5.    Payoff Payments are Necessary, Appropriate and the Result of Sound Business Judgment .......................................................................... 12

        6.    14-Day Stay Period Should Be Waived ..................................................... 13

    B.    The Case Should Be Dismissed Upon Closing of the Exit Financing Facility ...... 13

**IV.   CONCLUSION** .............................................................................................. 16

2214010.3 - 32278.0003

# **TABLE OF AUTHORITIES**

## **Cases**

*Carolin Corp. v. Miller*, (1993) 886 F.2d 693, 699 (4th Cir.) ............................................ 14

*Group of Inst'l Investors v. Chicago Mil. St. Paul & Pac. Ry.* (1943), 318 U.S. 523, 550 ................. 9

*In re 240 N. Brand Partners, Ltd*., (1996) 200 B.R. 653, 659 (9th Cir.BAP) ................................... 12

*In re 495 Cent. Park Ave. Corp.* (1992), 136 B.R. 626, 631-32 (Bankr. S.D.N.Y.)........................... 9

*In re A & D Care, Inc.,* (1988) 90 B.R. 138, 141 (Bankr. W.D. Pa.) ............................................... 14

*In re Ames Dep't Stores, Inc.* (1990), 115 B.R. 34, 38 (Bankr. S.D.N.Y.)......................................... 9

*In re California Devices, Inc*., (1991) 126 B.R. 82, 85 (Bankr. N.D. Ca.)........................................ 11

*In re Claar Cellers LLC*, (2020) Bankr. LEXIS 682, at *9 ........................................................... 13

*In re Equity Funding corp. of Am*., (1975) 519 F.2d 1274, 1277 (9th Cir.) ..................................... 13

*In re Fax Station, Inc.,* (1990) 118 B.R. 176, 177 (Bankr. D.R.I.)................................................... 14

*In re Hollister*, (2021) 628 B.R. 154, 157-158 (Bankr. C.D. Ca.), *aff'd* 2021 WL 6124757 (9th Cir.)
.................................................................................................................................... 10

*In re Lionel*, (1983) 722 F.2d 1063, 1070 (2nd Cir.) ..................................................................... 12

*In re Mazzocone*, (1995) 183 B.R. 402, 412-13 (E.D. Pa.)............................................................ 14

*In re Sun Healthcare Groups, Inc*., (2000) 245 B.R. 779, 781 (Bankr. D. Del.).............................. 11

*In re Wilde Horse Enters., Inc*., (1991) 136 B.R. 830, 841 (Bankr.C.D.Cal.)................................... 12

*In re Yellowstone Mountain Club, LLC*, (2008) WL 5869859 (Bankr. D. Montana, November 26,
2008)........................................................................................................................... 9

*Official Comm. of Unsecured Creditors v. Nucor Corp. (In re SGL Carbon Corp.)*, (1999) 200 F.3d
154, 160-61 (3d Cir.)..................................................................................................... 14

*Sullivan v. Harnisch (In re Sullivan)*, (2014) 522 B.R. 604, 612 (B.A.P. 9th Cir.)............................ 14

## **Statutes**

11 U.S.C. § 349 ............................................................................................................. 4

11 U.S.C. § 363(b) ......................................................................................................... 12

11 U.S.C. § 364(d) ....................................................................................................... 4, 9

11 U.S.C. § 364(e) ........................................................................................................... 4

11 U.S.C. § 105(a) ......................................................................................................... 13

11 U.S.C. § 1112(b) ....................................................................................................... 14

G&B LAW

1  11 U.S.C. § 1112(b)(1) ........................................................................................................ 13

2  11 U.S.C. § 1112(b)(4) ........................................................................................................ 14

3  11 U.S.C. § 305(a)(1) .......................................................................................................... 14

4  11 U.S.C. §§101-1532 ........................................................................................................... ii

5  28 U.S.C. § 157(b)(2) ............................................................................................................ 5

6  28 U.S.C. §§ 1408 and 1409 .................................................................................................. 5

7  28 U.S.C. §§ 157 and 1334 .................................................................................................... 5

8  **<u>Rules</u>**

9  Bankruptcy Code § 1112(b) ........................................................................................... 13, 14

10  Bankruptcy Code § 1112(b)(4) ........................................................................................... 14

11  Bankruptcy Code § 361(a) .................................................................................................... 8

12  Bankruptcy Code § 363(b) .................................................................................................. 12

13  Bankruptcy Code § 364(c)(2) ................................................................................................ 8

14  Bankruptcy Code § 364(d) ................................................................................................. 8, 9

15  Bankruptcy Code §§ 105(a) and 363 ............................................................................... 12, 13

16  Bankruptcy Code §§ 1107(a) and 1108 ................................................................................ 5

17  Bankruptcy Code §§ 1112(b)(4)(A)–(P) .............................................................................. 14

18  Bankruptcy Code and Rule 1017 § 1112(b) .......................................................................... 1

19  Bankruptcy Code and Rule 4001(d) § 364(b) ....................................................................... 1

20  Bankruptcy Code and Rule 6004 § 363(b) ............................................................................ 1

21  Local Bankruptcy Rule 4001-2 .............................................................................................. 2

22  Rule 4001(c)(1)(B) ................................................................................................................. 2

23

24

25

26

27

28



# MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## INTRODUCTION

By this Motion,[1] the Debtor seeks Court approval of the Exit Financing Facility pursuant to the Bankruptcy Code and Rule 4001(d) § 364(b), authority to use a portion of the Exit Financing Facility to satisfy prepetition secured indebtedness pursuant to the Bankruptcy Code and Rule 6004 § 363(b), and, upon the closing of the Exit Financing Facility, dismissal of this bankruptcy case pursuant to the Bankruptcy Code and Rule 1017 § 1112(b).

The Debtor owns a single asset, real estate, and filed this case on the eve of a foreclosure sale scheduled by its first lien lender to obtain the breathing space necessary to refinance its obligations. After extensive negotiations with third party lenders, the Debtor has obtained financing from lender Buchanan Mortgage Holdings LLC (the "Lender"). The relief sought by way of this Motion is the result of extensive good faith, arm's length negotiations between and among the Debtor, the Lender and the Debtor's secured creditors, all of which will be satisfied in full and/or consent to extinguishing their liens and claims effective upon the closing of the Exit Financing Facility.

The Debtor respectfully submits that the relief requested is necessary and appropriate, supported by sound business reasons and the Debtor's business judgment, and should be granted for the reasons set forth more fully below. Upon the closing of the Exit Financing Facility (to which this Court's approval is a condition precedent), the Debtor will have achieved its reorganization purpose and, with no further benefit to be derived from remaining in chapter 11, the interest of creditors and the estate are best served by dismissal. Accordingly, upon closing of the Exit Financing Facility, with the consent of all of the Debtor's secured and unsecured creditors, the chapter 11 case should be dismissed.



---

[1] Capitalized terms used but not defined herein have the meaning ascribed to such terms in the Motion.

## II.

## CONCISE STATEMENT PURSUANT TO Rule 4001(c)

Pursuant to and in accordance with Rule 4001(c)(1)(B) and LBR 4001-2, the material terms of the Exit Financing Facility, and the location of such provisions therein, is as follows:[2]

| Borrower | Crown Jewel Properties LLC |
|---|---|
| Lender | Buchanan Mortgage Holdings, LLC |
| Guarantor | James Eleopoulos |
| Borrowing Limits | Term loan credit facility in the maximum aggregate principal amount of $12,250,000.<br><br>Loan Agreement § 2.1. |
| Non-Default Interest Rate. | Loan Agreement provides for Greater of (i) 1M Ameribor plus 11.75%, or (ii) 12.00%. Interest to be paid current monthly from the interest holdback and calculated on an Actual/360 schedule. Interest to be charged on funded Loan proceeds only.<br><br>Loan Agreement § 2.2. |
| Fees | $245,000 Origination Points; $122,500 Exit Points.<br><br>Loan Agreement §§ 2.3.4, 2.3.5. |
| Maturity Date or Termination Date. | The Exit Financing Facility will mature 12 months after the Closing Date (with an extended maturity date of 18 months if certain conditions are satisfied).<br><br>Loan Agreement §§ 2.3, 2.5. |

---

[2] The Debtor filed the *Statement Regarding Cash Collateral or Debtor in Possession Financing* pursuant to Local Bankruptcy Rule 4001-2 as a separate docket entry concurrently herewith. This summary is qualified in its entirety by the terms of the Loan Agreement substantially in the form attached as Exhibit "1" to the Proposed Order. In the event that anything in this Motion is inconsistent with the terms of the Loan Agreement, the terms of the Loan Agreement, shall control. Capitalized terms used in the section are defined in the body of the Memorandum of Points and Authorities or the Loan Agreement.

2214010.3 - 32278.0003

| | |
|---|---|
| **Security, Liens and Priorities.** | The Exit Financing Facility shall be secured among other things, the Security Instrument creating a first Lien on the Project, and the other Collateral.<br><br>Loan Agreement §2.4. |
| **Use of Loan Proceeds/Payoff Payments** | The proceeds of the Exit Financing Facility shall be used by the Debtor to repay the Senior Secured Lender and the Secured Tax Claim in full, Loan Agreement §12.1, and to provide cash payment to the Second Lienholders and Third Lienholders in exchange for release of their claims and liens. See Gaines Decl..<br><br>Interest Reserve. $1,380,000, Loan Agreement § 3.1; Tax Reserve (including Extension Tax reserve), Loan Agreement § 3.2; Restriction on use of Proceeds during the term of the Loan, Loan Agreement § 6.17; Proposed Order ¶5. |
| **Consent to Priming Lien** | All existing liens against the Property are to be released as a condition precedent to the Exit Financing Facility and, as such, no liens are being primed.  The existing secured liens are either being paid in full or are being released with the consent and agreement of the holder of such liens.<br><br>Loan Agreement § 12.1; Gaines Decl. *generally*; Proposed Order ¶5. |
| **Adequate Protection** | All existing liens against the Property are to be released as a condition precedent to the Exit Financing Facility and, as such, no liens are being primed.  The existing secured liens are either being paid in full or in part and are being released with the consent and agreement of the holder of such liens.<br><br>Loan Agreement § 12.1; Gaines Decl. *generally*; Proposed Order ¶5. |
| **Covenants.** | Loan Agreement provides usual and customary affirmative and negative covenants.<br><br>Loan Agreement Article 6. |



2214010.3 - 32278.0003

| | |
|---|---|
| **Conditions Precedent.** | The Loan Agreement contains multiple conditions precedent, including without limitation, the payment of property taxes and the elimination of all liens encumbering the Property.<br><br>The Loan Agreement provides that entry of a final order in form and substance acceptable to the Lender which shall (a) (i) approve the Loan pursuant to 11 U.S.C. § 364(d), (ii) grant Lender a senior and first priority security interest in and to the collateral, and (iii) find that Lender is making the Loan in good faith pursuant to 11 U.S.C. § 364(e), and (b) (i) dismiss the Bankruptcy Case and (ii) provide that the orders of the Bankruptcy Court entered pursuant to this Agreement are not impacted or altered by such dismissal as provided in 11 U.S.C. § 349.<br><br>Loan Agreement §§ 12.1 (preamble), 12.1.6, 12.1.11 |
| **Events of Default** | Loan Agreement provides usual and customary events of default. As the case is to be dismissed as a condition to the Exit Financing Facility, there are no bankruptcy milestones as events of default.<br><br>Loan Agreement § 10.1 – 10.3 |
| **Remedies / Automatic Stay** | Loan Agreement provides usual and customary remedies in the event of a default. The automatic stay is being terminated as necessary to consummate the closing of the Exit Financing Facility on the terms and conditions of the Loan Agreement and the automatic stay will terminate upon dismissal of the case as required by the Loan Agreement.<br><br>Loan Agreement Article 11; Proposed Order ¶3. |
| **Indemnification** | The Debtor shall indemnify the Lender in various circumstances, provided that the Debtor shall have no obligation to the extent obligation is caused by the Lender's gross negligence or willful misconduct. Loan Agreement § 6.16 |

4

### III.

### <u>JURISDICTION, VENUE AND STATUTORY PREDICATES</u>

This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

The statutory predicates for the relief requested herein are sections 105(a), 361, 363, 364 and 1112(b) of the Bankruptcy Code, Rules 1017(a), 2002, 4001, 6004 and 9014, and Local Bankruptcy Rule of the Central District of California 4001-2.

### IV.

### <u>FACTUAL BACKGROUND</u>

On October 21, 2021 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtor continues manage its affairs as a debtor-in-possession pursuant to the Bankruptcy Code §§ 1107(a) and 1108. No committee or chapter 11 trustee has been appointed in this case. Eleopoulos Decl. ¶3.

**A.      The Debtor's Prepetition Business**

The Debtor is a single asset real estate entity that owns a vacant 12.5-acre contiguous site, APN's 165-120-56-00 and 156-301-17-00 located in Northern San Diego County, California (the "Property"). The Debtor purchased the Property to develop a hotel project that would include three hotels and a parking structure.  Eleopoulos Decl. ¶4.

James Eleopoulos is the sole member of the Debtor. He is also the sole shareholder of Jenna Development, Inc. ("Jenna"), an affiliate and insider of the Debtor that paid all expenses of developing the Property. Vendors for that development contracted directly with Jenna. The Debtor and Jenna treated all such advances as unsecured debt. Jenna is the Debtor's largest unsecured creditor. Id.

The entitlement process took much longer than expected, and the Debtor defaulted on its obligations to its prepetition senior lender, SMS Investments VI, LLC ("SMS" or the "Senior Secured Lender"). SMS recorded a notice of trustee's sale for October 13, 2021, the day after the Petition Date. Despite the default, the Debtor has significant equity in the Property. Eleopoulos Decl. ¶5.

2214010.3 - 32278.0003

**B.     The Debtor's Prepetition Secured Indebtedness**

As of the Petition Date, the Debtor was obligated to SMS pursuant to that certain Promissory Note, dated February 28, 2018, in the original principal amount of $7.6 million. The obligations under the Promissory Note are secured by a Deed of Trust, Assignment of Rents and Leases, and a Security and Fixture Filing all dated as of February 28, 2018. As of the Petition Date, SMS asserts a claim in the sum of $8,494,902 against the Debtor under the Promissory Note.  Eleopoulos Decl. ¶6.

In addition to the Senior Secured Lender, there are three other liens recorded against the Property. Eleopoulos Decl. ¶7.

On March 22, 2018, the Ira J. Gaines Revocable Trust (50% interest) and David S. Nagelberg 2003 Revocable Trust (50% interest) recorded that certain Deed of Trust against the Property, along with an Assignment of Rents and Leases, Security and Fixture Filing. This obligation secured by this lien was satisfied on April 2018 and, as a result, this lien will be released prior to the closing of the Exit Financing Facility. Eleopoulos Decl. ¶8.



On December 4, 2018, Paradise Wire & Cable Defined Benefit Pension Plan and Lisa I. Khan (collectively, the "Second Lienholders") recorded a Deed of Trust, Assignment of Rents and Leases, Security and Fixture Filing against the Property in connection with that certain Real Estate Loan Agreement, dated as of December 4, 2018, in the original principal amount of $1,057,081.44. James Eleopoulos is named as borrower. Eleopoulos Decl. ¶9.

On June 17, 2019, Ira Gaines (50% interest) and David S. Nagelberg 2003 Revocable Trust (50% interest) (collectively, the "Third Lienholders") recorded a Deed of Trust, Assignment of Rents and Leases, Security and Fixture Filing dated as of June 17, 2019 in connection with that certain Real Estate Loan Agreement, dated as of June 17, 2019, in the original principal amount of $1.0 million. The Debtor and James Eleopoulos are the named borrowers. Eleopoulos Decl. ¶10.

Finally, the San Diego County Treasurer-Tax Collector asserts a prepetition secured tax claim against the Property in the amount of $347,118.97 including applicable fees and penalties ("Secured Tax Claim" and together with the Senior Secured Lender, the Second Lienholders and the Third Lienholders, the "Prepetition Secured Creditors" and the liens of such Prepetition Secured Creditors, collectively, the "Prepetition Liens"). Eleopoulos Decl. ¶11.

The claims of the Prepetition Secured Creditors can be summarized in the following chart:

| Creditor | Amount due as of the Petition Date |
|---|---|
| **SMS Investments VI, LLC** <br> (the "Senior Secured Lender") | $8,494,902.22 |
| **Paradise Wire & Cable Defined Benefit Pension Plan (50% interest) and Lisa I. Khan (50% interest) (the "Second Lienholders")** | $1,091,215.00 |
| **Ira Gaines (50% interest) and David S. Nagelberg 2003 Revocable Trust (50% interest) (collectively, the "Third Lienholders")** | $1,122,898.92 |
| **San Diego County Treasurer-Tax Collector** | $347,118.97 |
| **Total** | $11,056,135.11 |

**C.    Retention of Cushman & Wakefield**

On March 8, 2022, the Debtor retained Cushman and Wakefield ("C&W"), effective as of December 15, 2021, to obtain a commitment or commitments for financing for the Property. Financing included, equity and debt, in whatever form, provided in any single transaction or a combination of transactions, including, but not limited to, secured or unsecured loans, secondary or subordinate financing, guarantees or other credit enhancements, lease and/or lease financing, a refinancing or extension by the current lender(s), mezzanine financing, bridge financing or any other vehicle or transaction by which money or credit is raised. Eleopoulos Decl. ¶¶13,14, Schwarz Decl. *generally*.

**D.    Efforts to Obtain Post-Petition Financing**

The Debtor began this case by evaluating its potential sale and refinancing options. Eleopoulos Decl. ¶12. It soon became clear that a sale would not be a value-maximizing strategy, so the Debtor decided to refinance. Id. After engaging C&W and evaluating four offers from potential refinancing lenders, the Debtor determined that a proposal from the JDI Loans, LLC ("JDI"), offered the best combination of favorable terms and likelihood of closing on a prompt timeline. The Debtor and JDI executed a Letter of Intent on December 14, 2021, however, on Monday, January 10, 2022, JDI informed the Debtor that it would not fund the loan.  Eleopoulos Decl. ¶15.

Next, the Debtor and C&W sought out additional refinancing proposals and explored options for a quick sale for less than market value. In consultation with its professionals, the Debtor determined that the proposal from the Lender was the best available option, considering factors such as the terms offered, the likelihood that a transaction would be consummated, the costs of a transaction, and the ultimate preservation and maximization of the value of the Property. Eleopoulos Decl. ¶¶16, 17, 19.

**E.    Overview of the Exit Financing Facility**

The Exit Financing Facility consists of a senior secured term loan credit facility in the amount of $12.25 million secured by the Property and other Collateral as defined and provided in the Loan Agreement. The Prepetition Secured Creditors shall be paid in full or have agreed to release their claims and liens upon payment from escrow upon the closing of the Exit Financing Facility. See Loan Agreement § 12.1.6; *see generally* Declaration of Ira Gaines.

Given that the Prepetition Liens will all be extinguished as a condition to the Exit Financing Facility, no adequate protection is required, but to the extent necessary, such lienholders are adequately protected by the payment of cash on their claims (in full or as agreed) pursuant to the Bankruptcy Code § 361(a). See Loan Agreement § 12.1.6; *see generally* Declaration of Ira Gaines.

The purpose of this chapter 11 case was to provide the Debtor the breathing room to refinance its secured obligations. The Debtor is now closer than ever to achieving this objective which is critical to the maintenance and preservation of its going concern value. Should the Exit Financing Facility close, the Debtor will have achieved its restructuring purpose, and this chapter 11 case should be dismissed.

V.

**<u>ARGUMENT</u>**

**A.    Post-Petition Financing Should Be Approved Pursuant to Sections 105(A), 363 and 364(D) of the Bankruptcy Code**

A debtor may obtain credit secured by a lien on property of the estate that is not otherwise subject to a lien under Bankruptcy Code § 364(c)(2) or by "priming" senior or equal lien on property of the estate that is already subject to a lien pursuant to Bankruptcy Code § 364(d). Here, the Debtor's principal asset is the Property, and the Property is encumbered by the Prepetition Liens. While the



G&B LAW

2214010.3 - 32278.0003

1    Debtor believes it has significant equity in the Property notwithstanding the Prepetition Liens, in the

2    marketing process no lender was willing to extend credit standing behind four senior lenders, and thus

3    relief under § 364(c) is unavailable to this Debtor. Further, the Exit Financing Facility is conditioned

4    on the Debtor seeking approval of the Exit Financing Facility pursuant to the Bankruptcy Code §

5    364(d) granting the Lender a senior and first priority security interest in and to the Collateral (as

6    defined in the Loan Agreement). Loan Agreement § 12.1.11.

7         Section 364(d) provides that a Court may, after notice and a hearing, authorize a debtor to

8    obtain or incur debt secured by a senior or equal lien on property of the estate that is otherwise subject

9    to a lien if: (a) The debtor is unable to obtain such credit otherwise; and (b) there is adequate protection

10    of the interest of the holder of the lien on the property of the estate on which the senior or equal lien

11    is proposed to be granted. 11 U.S.C. § 364(d); *see also In re 495 Cent. Park Ave. Corp*. (1992), 136

12    B.R. 626, 631-32 (Bankr. S.D.N.Y.) (permitting post-petition liens to prime existing security interest

13    because (i) debtor was unable to obtain financing elsewhere and (ii) debtor's use of proceeds would

14    provide adequate protection to existing secured creditors by increasing value of property securing their

15    claims). Bankruptcy courts routinely defer to a debtor's business judgment on business decisions,

16    including the decision to borrow money. *See Group of Inst'l Investors v. Chicago Mil. St. Paul & Pac.*

17    *Ry*. (1943), 318 U.S. 523, 550; *In re Ames Dep't Stores, Inc*. (1990), 115 B.R. 34, 38 (Bankr. S.D.N.Y.)

18    (in examining requests for interim financing, courts apply the same business judgment standard

19    applicable to other business decisions); *see also In re Yellowstone Mountain Club*, *LLC*, (2008) WL

20    5869859 (Bankr. D. Montana, November 26, 2008) (acknowledging the use of the business judgment

21    standard with respect to approval of Section 364 financing).

22         Here, all creditors will either be paid in full from the Exit Financing Facility at Closing, have

23    consented to the relief sought in this Motion, or both. So, no party in interest requires the protection

24    that section 364 is intended to provide.

25         Further, the Lender is a third-party to this case (as opposed to a preexisting lender), and the

26    Exit Financing Facility and Payoff Payments are the result of extensive arm's length negotiations

27    between the Debtor, its professionals, potential lenders and the Prepetition Secured Creditors. The

28    parties' hard work has culminated in the Exit Financing Facility and Payoff Payments, which the



G&B LAW

9

1  Debtor believes is its best hope for relieving its defaults, restructuring its balance sheet and moving

2  forward with its plans.

3       **1.        No Adequate Alternative to the Exit Financing Facility is Available**

4       The Debtor commenced this case on the eve of foreclosure having defaulted on its senior

5  secured debt. When the Debtor determined that it was necessary to commence this case to preserve

6  the value of its business enterprise, the Debtor endeavored to identify potential sources of post-petition

7  financing. Based on discussions with several potential third-party lenders, the Debtor determined that

8  adequate post-petition financing solely on an unsecured or a junior priority basis to the Prepetition

9  Secured Creditors was not possible. The Lender would not have agreed agree to extend financing other

10  than on a first priority basis, and any non-consensual attempt to prime the Prepetition Liens would, at

11  a minimum, engage the Debtor in a protracted priming fight with potentially disastrous consequences

12  for the Debtor.

13       On the other hand, here the parties-in-interest all agree on the best way forward. Indeed, the



14  Second Lienholders and Third Lienholders have each agreed to extinguish their liens against the

15  Property in exchange for a payment that does not satisfy their claims in full, a result that reflects the

16  parties' willingness to engage in compromise to rehabilitate this Debtor and preserve the value in the

17  Property. In sum, the Debtor currently cannot obtain adequate alternative financing terms more

18  favorable than those provided by the Exit Financing Facility.

19       **2.        Adequate Protection is Sufficient because the Prepetition Secured**

20  **Creditors will Either be Paid in Full, or have Consented to Priming, to the Extent Necessary,**

21  **and to Release Their Liens**

22       "[A]dequate protection may be provided by - (1) ... cash payment[s]...; (2) ... an additional or

23  replacement lien...; or (3) granting such other relief, other than entitling such entity to compensation

24  allowable under section 503(b)(1) of this title as an administrative expense, as will result in the

25  realization by such entity of the indubitable equivalent of such entity's interest in such property." §

26  361. *In re Hollister*, (2021) 628 B.R. 154, 157-158 (Bankr. C.D. Ca.), *aff'd* 2021 WL 6124757 (9th

27  Cir.)(finding second lien lender could not be primed in the absence of adequate protection in the form

28  of a cash payment, replacement lien or equity cushion).

10

1    To the extent adequate protection is required, the holders of Prepetition Liens will all be

2    adequately protected by the cash payments provided in the Payoff Payments.  The holders of the

3    Prepetition Liens are either being paid in full or as agreed upon the closing of the Exit Financing

4    Facility. Further, by consenting to the terms of the Exit Financing Facility, the holders of the

5    Prepetition Liens have essentially stipulated that their interests are adequately protected. *See In re*

6    *California Devices, Inc*., (1991) 126 B.R. 82, 85 (Bankr. N.D. Ca.) (noting that in most cases adequate

7    protection is agreed by the parties and then presented to the court for approval). Finally, as a condition

8    to the Exit Financing Facility, there will be no further prepetition liens secured by the Property, and

9    thus no adequate protection required.

10    **3.      Exit Financing Facility is Necessary to Preserve the Value of the Debtor's**

11    **Estate**

12    The Exit Financing Facility is necessary to preserve and maintain the value of the Debtor's

13    estate and the Property. If the Debtor does not receive the additional liquidity, SMS will ultimately

14    foreclose. In that case, the Debtor's equity-holders and other secured creditors would likely receive

15    nothing. The Exit Financing Facility provides a better outcome for all. *See In re Sun Healthcare*

16    *Groups, Inc*., (2000) 245 B.R. 779, 781 (Bankr. D. Del.) (noting that the court had approved debtor-

17    in-possession financing to "permit the Debtors to continue to operate to preserve their estates").

18    **4.      The Terms of the Loan Agreement are Fair, Reasonable and Appropriate**

19    Given the Debtor's current circumstances, the terms of the Loan Agreement are fair and

20    reasonable. First, the Debtor conducted a broad search in good faith to obtain credit. The Lender

21    offered the best available combination of terms, costs, and certainty of consummation. The Debtor

22    negotiated and evaluated various proposals, and, eventually, reached agreement on the terms of the

23    Exit Financing Facility which the Debtor believes best suits its current and pressing need for new

24    funding. The Loan Agreement was negotiated by the parties at arms' length and in good faith, reflects

25    the exercise of the Debtor's sound business judgment, and is consistent with the Debtor's fiduciary

26    duties.

27

28



**5.    Payoff Payments are Necessary, Appropriate and the Result of Sound Business Judgment**

In order to effectuate the Payoff Payments, by this Motion, the Debtor also seeks authority pursuant to the Bankruptcy Code §§ 105(a) and 363 to use proceeds of the Exit Financing Facility to repay the Senior Secured Lender and the Secured Tax Claim in full and to pay the Second Lienholders and Third Lienholders an agreed amount in exchange for release of their claims and liens. Such payments would be made through escrow upon the closing of the Exit Financing Facility and approval of such payments is a condition precedent to the closing.  The amounts to be paid to each lienholder are as follows:



| Creditor | Payoff Payment |
|---|---|
| **SMS Investments VI, LLC (the "Senior Secured Lender")** | $8,976,201.22 (through April 15, 2022) |
| **Paradise Wire & Cable Defined Benefit Pension Plan (50% interest) and Lisa I. Khan (50% interest) (the "Second Lienholders")** | $100,000 |
| **Ira Gaines (50% interest) and David S. Nagelberg 2003 Revocable Trust (50% interest) (collectively, the "Third Lienholders")** | $500,000 |
| **San Diego County Treasurer-Tax Collector** | $347,118.97 |
| **Total** | $9,342,021.19 |

Bankruptcy Code § 363(b) permits a debtor to use, sell or lease property, other than in the ordinary course of business, with court approval. 11 U.S.C. § 363(b). Section 363(b) is designed to protect creditors' interests in the assets of the estate. *In re 240 N. Brand Partners, Ltd.*, (1996) 200 B.R. 653, 659 (9th Cir.BAP). Moreover, it is well settled that transactions should be approved when they are supported by a sound business purpose. Id. *In re Wilde Horse Enters., Inc.*, (1991) 136 B.R. 830, 841 (Bankr.C.D.Cal.); *In re Lionel*, (1983) 722 F.2d 1063, 1070 (2nd Cir.). "Bankruptcy courts typically review a transaction proposed under section 363(b)(1) using a 'business judgment standard.'"

2214010.3 - 32278.0003

*In re Claar Cellers LLC*, (2020) Bankr. LEXIS 682, at *9, citing *In re Equity Funding corp. of Am.*, (1975) 519 F.2d 1274, 1277 (9th Cir.).

Significantly, the Payoff Payments are supported by every holder of a secured claim, along with the Debtor's principals, and there are no non-insider holders of general unsecured claims against the estate.   That is, the only pre-petition general unsecured debt of the Debtor are held by insiders, who support the Motion. Moreover, in the absence of the Exit Financing Facility, the Secured Senior Lender would likely eventually foreclose on the Property, and it is likely that substantial value would be lost. In connection with the financing provided by the Exit Financing Facility, the Prepetition Secured Creditors will either be paid in full or be paid an agreed amount in exchange for the release of liens against the Property. At the same time, the Exit Financing Facility will offer the Debtor much-needed funds to continue operating its business with a clean balance sheet. Therefore, the Debtor believes that the Payoff Payments are a necessary component to the Exit Financing Facility and to the Debtor's prospects overall.

### 6.    14-Day Stay Period Should Be Waived

To implement the foregoing successfully, the Debtor requests that the Court enter an order providing that notice of the relief requested herein satisfies Rule 6004(a) and that the Debtor has established cause to exclude such relief from the 14- day stay period under Rule 6004(h) and any other applicable Rule.

### B.    The Case Should Be Dismissed Upon Closing of the Exit Financing Facility

Bankruptcy Code § 105(a) provides, in pertinent part, that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

Bankruptcy Code § 1112(b) provides, in pertinent part, that "on request if a party in interest . . . the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause . . ." 11 U.S.C. § 1112(b)(1). Where a party in interest requests that the court dismiss or convert the case and establishes one of the enumerated bases for cause by a preponderance of the evidence, the court "shall" convert or dismiss the case, whichever is in the best interests of the creditors and the estate, unless the

1  court appoints a chapter 11 trustee under section 1104 or the exception in section 1112(b)(2) applies.

2  7 Collier on Bankruptcy P 1112.04 (16th 2021); *Sullivan v. Harnisch (In re Sullivan)*, (2014) 522 B.R.

3  604, 612 (B.A.P. 9th Cir.).[3]

4      Bankruptcy Code § 1112(b)(4) identifies certain examples of "cause" for dismissal of a chapter

5  11 case, 11 U.S.C. § 1112(b)(4), but a bankruptcy court, is not constrained by those enumerated

6  examples and may find "cause" based on the facts and circumstances of the particular chapter 11 case.

7  The legislative history of Bankruptcy Code § 1112(b) also indicates that the list set forth in Bankruptcy

8  Code §§ 1112(b)(4)(A)–(P) is nonexclusive, such that a bankruptcy court has the ability to dismiss a

9  chapter 11 case for any reason cognizable to its equity powers. *See* H.R. Rep. No. 595, 95th Cong.,

10  2d. Sess. 405–06 (1978); *see also Official Comm. of Unsecured Creditors v. Nucor Corp. (In re SGL*

11  *Carbon Corp.)*, (1999) 200 F.3d 154, 160-61 (3d Cir.); *Carolin Corp. v. Miller*, (1993) 886 F.2d 693,

12  699 (4th Cir.).

13      The Debtor submits that, if the Exit Financing Facility and Payoff Payments are approved and

14  implemented, dismissal is in the best interest of creditors and the estate. The Debtor will have achieved

15  its reorganization purpose and there is no further benefit to the Debtor in remaining in chapter 11. *See*

16  *In re Mazzocone*, (1995) 183 B.R. 402, 412-13 (E.D. Pa.) ("[W]hen the bankruptcy purpose of a case

17

18  _____

19  [3] As an alternative to dismissal under 11 U.S.C. § 1112(b), the court may dismiss this case pursuant to

20  11 U.S.C. § 305(a)(1). In determining whether dismissal under section 305(a) is appropriate, courts
have looked to the facts of individual cases while considering a number of factors (each of which can

21  constitute "cause" under section 1112(b)). Such factors generally include: (1) economy and efficiency
of administration; (2) whether another forum is available to protect the interests of both parties or there

22  is already a pending proceeding in state court; (3) whether federal proceedings are necessary to reach
a just and equitable solution; (4) whether there is an alternative means of achieving the equitable

23  distribution of assets; (5) whether the debtor and creditors are able to work out a less expensive out-
of-court arrangement which better serves all interests in the case; (6) whether a non-federal insolvency

24  has proceeded so far in those proceedings that it would be costly and time consuming to start afresh
with the federal bankruptcy process; and (7) the purpose for which bankruptcy jurisdiction has sought.

25  See e.g. *In re Fax Station, Inc.,* (1990) 118 B.R. 176, 177 (Bankr. D.R.I.). The decision under both
section 305(a)(1) and section 1112(b) regarding whether to dismiss a case is discretionary and must

26  be made on a case-by-case basis. *In re A & D Care, Inc.,* (1988) 90 B.R. 138, 141 (Bankr. W.D. Pa.).

27  The factors present in this case overwhelmingly demonstrate that dismissal is in the best interest of
creditors, the estate, and the Debtor and that, accordingly, the Debtor's motion to dismiss should be

28  granted.



1  no longer exists …, a creditor should not be permitted to prolong or sustain a case ….".) As noted

2  above, since the Petition Date, the Debtor preserved and maximized the value of its estate for the

3  benefit of creditors. In furtherance of this goal, the Debtor negotiated a complex consensual payoff of

4  its secured debt obligations and obtained additional working capital to satisfy all administrative and

5  priority claims.[4] The Debtor will satisfy all allowed professional fees and any outstanding U.S. Trustee

6  fees from the proceeds of the Exit Financing Facility. Except for those expenses, there are no other

7  known or anticipated administrative expenses or general unsecured claims, other than those general

8  unsecured claims held by insiders and who consent to the relief requested herein.

9         Based on the foregoing, the Debtor has determined, in its business judgment, that there is no

10  further benefit to remaining in chapter 11. There are no claims to be adjudicated, assets to be liquidated

11  or recovered for the benefit of the Debtor's creditors, there are no litigation claims to pursue, and the

12  Debtor is solvent. In other words, the Debtor would continue to remain obligated for the same

13  obligations whether or not a plan is confirmed. There is no benefit to the expense of confirming a plan,

14  remaining in chapter 11, and incurring administrative expenses when this is the result. Further,

15  dismissal of this case after approval and implementation of the Exit Financing Facility is a condition

16  to the Exit Financing Facility. Loan Agreement §12.1.11. On the other hand, dismissal of this chapter

17  11 case is supported by the Debtor and the Lender, the sole remaining non-administrative non-insider

18  creditor. Moreover, neither the Payoff Payments, nor dismissal, would alter the priority distribution

19  scheme established by the Bankruptcy Code without the consent of the affected parties. Further,

20  dismissal will eliminate the accrual of ongoing administrative expense obligations and U.S. Trustee

21  fees and bring closure to this case in a timely and efficient manner. Accordingly, the Debtor submits

22  that sufficient cause exists to dismiss this chapter 11 case, and that doing so is in the best interests of

23  the Debtor's estate and creditors.

24

25  _____

26  [4] In accordance with section 349(b)(3), upon dismissal, the property of the estate shall revest in the entity in which such property was vested immediately before the Petition Date. For the avoidance of doubt, all orders entered in this case, including the Proposed Order, shall remain in full force and effect

27  after dismissal of this case, notwithstanding the provisions of section 349(b) to the extent applicable. Pursuant to LBR 1017-2, notwithstanding any dismissal, this Court shall retain jurisdiction regarding

28  all issues arising under 11 U.S.C. §§ 105, 107, 109(g), 110, 303, 329, 330, 349, 362, and 364, and to any additional extent permissible under applicable law.

2214010.3 - 32278.0003

## IV.

## **CONCLUSION**

WHEREFORE, the Debtor respectfully requests that the Court enter the proposed order attached hereto as Exhibit "A" granting the Motion and dismissing this case.

Dated: April 14, 2022                                    G&B LAW, LLP

By: _____
JEREMY H. ROTHSTEIN, ESQ.
Attorneys for Debtor and Debtor-in-Possession
Crown Jewel Properties, LLC

16

**EXHIBIT A**

1   DOUGLAS M. NEISTAT, ESQ. (State Bar No. 055961)
    dneistat@gblawllp.com
2   JEREMY H. ROTHSTEIN, ESQ. (State Bar No. 316140)
    jrothstein@gblawllp.com
3   G&B LAW, LLP
    16000 Ventura Boulevard, Suite 1000
4   Encino, California 91436
    Tel:  (818) 382-6200 • Fax: (818) 986-6534
5

6   Attorneys for Debtor and Debtor-in-Possession
    Crown Jewel Properties, LLC
7

8                 UNITED STATES BANKRUPTCY COURT

9                 CENTRAL DISTRICT OF CALIFORNIA

10                    LOS ANGELES DIVISION

11  In re                                  Case No.: 2:21-bk-17872-NB

12  CROWN JEWEL PROPERTIES, LLC,           (Chapter 11)

13          Debtor.

14                                          **ORDER AUTHORIZING DEBTOR TO
                                            OBTAIN POST-PETITION FINANCING,
15                                          AND DISMISSING THIS BANKRUPTCY
                                            PROCEEDING UPON THE CLOSING OF
16                                          THE EXIT FINANCING FACILITY AND
                                            GRANTING RELATED RELIEF**

17

18

19

20

21

22

23

24

25

26

27

28

                                   1

2213791.3 - 32278.0003

Upon consideration of the Motion filed by Crown Jewel Properties, LLC (the "<u>Debtor</u>"), debtor and debtor-in-possession in the above captioned case pending under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code") (the "<u>Motion</u>"); the Declarations of James Eleopolous, Ben Schwartz and Ira Gaines in Support of the Motion; the record established at the hearing on the Motion; and the evidence and arguments of counsel; and it appearing that the notice of the Motion was adequate and proper under the circumstances and no further notice need be given; and it appearing that the relief requested by the Motion and granted by this Order is appropriate and in the best interests of the Debtor, its bankruptcy estate (collectively, the "<u>Bankruptcy Estate</u>"), its creditors, and all other parties-in-interest, as contemplated by Federal Rule of Bankruptcy Procedure (a "<u>Bankruptcy Rule</u>") 4001 and Local Bankruptcy Rule for the Central District of California ("<u>LBR</u>") 4001-2, and all objections, if any, to the entry of this Order having been withdrawn, resolved, or overruled by this Court; and, after due deliberation and consideration, the Court having found that good and sufficient cause exists for granting the Motion;

**THE COURT HEREBY FINDS:**

**A.  Jurisdiction and Venue.**

This Court has jurisdiction to hear the Motion pursuant to 28 U.S.C. § 1334. Consideration of the Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2). Venue for the Bankruptcy Cases and proceedings on the Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

**B.  Notice.**

Notice of the Motion and the Hearing thereupon has been provided by the Debtor as set forth in the proof of service filed with the Motion, constitutes due, sufficient, and appropriate notice and complies with section 102(1) of the Bankruptcy Code, Bankruptcy Rules 2002, 4001(b), 9006, and 9014.

**C. Need for Exit Financing Facility.**

The Debtor needs to obtain funds to satisfy its prepetition indebtedness and preserve the value of its assets. This requires the availability of new capital under the terms of the debtor-in-possession financing transactions described in the Loan Agreement substantially in the form attached hereto as Exhibit "1" (the "Loan Agreement"). In the absence of the availability of such funds in accordance



1  with the terms hereof and the Loan Agreement, immediate and irreparable harm to the Debtor and its

2  Bankruptcy Estate and creditors would occur.

3    **D.  No Credit Available on More Favorable Terms.**

4    The Debtor has been unable to obtain (a) adequate unsecured credit allowable under section

5  503(b)(1) of the Bankruptcy Code as an administrative expense; (b) credit with priority over any or all

6  administrative expenses of the kind specified in sections 503(b) or 507(b); (c) credit secured solely by

7  a lien on or security interest in property of its Bankruptcy Estate that is not otherwise subject to a lien

8  or security interest; or (d) credit secured by a junior lien on or security interest in property of its

9  Bankruptcy Estate which is subject to a lien or security interest, in each case, on more favorable terms

10 and conditions than those set forth in the Loan Agreement.

11   **E.  Exit Financing Facility.**

12   Pursuant to the Motion the Debtor seeks the Court's authorization to obtain credit and incur

13 debt pursuant to section 363 and section 364 (d) of the Bankruptcy Code, upon entry of this Final

14 Order as set forth in the Loan Agreement.

15   **F.  Use of Proceeds of the Exit Financing Facility.**

16   The proceeds of the loan to be made by Lender to the Debtor pursuant to the Loan Agreement

17 in the maximum principal amount of $12,250,000 ("Exit Financing Facility") (net of any amounts

18 used to pay fees, costs, and expenses as provided under the Loan Agreement) shall be used, in each

19 case in a manner consistent with, and as permitted by, the Loan Agreement, to satisfy the claims and

20 liens of the Senior Secured Lender and the Secured Tax Claim (each as defined in the Motion), and to

21 make payments in the amounts set forth in the Motion to the Second Lienholders and Third

22 Lienholders in satisfaction of the Debtor's obligation thereto and to satisfy all allowed professional

23 fees and outstanding U.S. Trustee fees (if any).

24   **G.  Business Judgment and Good Faith Pursuant to Section 364(e).**

25   The terms and conditions of the Exit Financing Facility, as set forth in the Loan Agreement,

26 and the fees and other amounts paid and to be paid thereunder to Lender (i) are fair, reasonable, and

27 the best available under the circumstances; (ii) reflect the Debtor's exercise of prudent business

28 judgment consistent with its fiduciary duties; and (iii) are supported by reasonably equivalent value



2213791.3 - 32278.0003

and consideration from Lender. The Exit Financing Facility, the Loan Agreement, and the "Loan Documents" (as defined in the Loan Agreement) were negotiated in good faith and at arm's length between the Debtor and Lender. The funds to be extended under the Exit Financing Facility are being extended by the Lender in good faith, and for valid business purposes and uses by the Debtor, and, as a consequence, the Lender is entitled to the protection and benefits afforded by section 364(e) of the Bankruptcy Code. Specifically, the Lender's claims and security interests and liens and other protections granted to Lender pursuant to the Loan Agreement and other Loan Documents will not be affected by any subsequent reversal, modification, vacatur or amendment of this Order or any other order, as provided in section 364(e) of the Bankruptcy Code.

**H.  Relief Essential; Best Interests.**

The relief requested in the Motion and granted by this Order is necessary, essential, and appropriate for the continued operation of the Debtor's business and management and preservation of its Bankruptcy Estate. It is in the best interests of the Bankruptcy Estate, the creditors, equity holders, and all other parties-in-interest that the Debtor be allowed to incur the Exit Financing Facility on the terms and conditions of the Loan Agreement.

**I.  Entry of Final Order.**

For the reasons stated above, the Debtor requested and is entitled to immediate entry of this Order pursuant to Bankruptcy Rule 4001(c).

**J.  Dismissal is Warranted Upon Closing of the Exit Financing Facility.**

Dismissal of this case is warranted under §§ 1112(b) and 305(a), as serving the best interests of creditors and the Debtor. Dismissal maximizes the amounts available to satisfy the claims of creditors and in doing so reduces the Debtor's overall debt. Liquidation of the Debtor's estate in chapter 7 would lead to an inferior recovery for all creditors, destruction of the Debtor's going concern value and is opposed by all the significant constituencies in this case.

**NOW, THEREFORE,** upon the Motion and the record before this Court with respect to the Motion, and good and sufficient cause appearing therefor,



2213791.3 - 32278.0003

**IT IS HEREBY ORDERED** that:

1.    **Motion Granted.**  The Motion is granted in accordance with the terms and conditions set forth in this Order and the Loan Agreement. Any objections to the Motion with respect to the entry of this Order to the extent not withdrawn, waived, or otherwise resolved, and all reservations of rights included therein, if any, are hereby denied and overruled.

2.    **Loan Documents.**

(a) *Approval of Entry into the Loan Documents.* The Debtor is expressly and immediately authorized, empowered, and directed to execute, and deliver to Lender, the Loan Agreement, the Loan Documents, and any other documents requested by Lender related thereto and to incur and perform the obligations of the Debtor in accordance therewith, and to execute and deliver all instruments, certificates, agreements, and documents which may be requested by Lender or be required or necessary for the performance by the Debtor of its obligations under the Loan Documents or in connection with the Exit Financing Facility and for the creation and perfection of the liens and security interests granted to Lender pursuant to the Loan Documents. The Debtor is hereby authorized and directed to do and perform all acts, satisfy all obligations, and to pay to Lender all principal, interest, fees, expenses, and other amounts described in or required by the Loan Documents as such become due (collectively, with all "Indebtedness" as defined in the Loan Documents, the "Exit Financing Obligations"), which shall not be subject to or require further approval of this Court. Upon execution and delivery, the Loan Documents shall represent valid and binding obligations of the Debtor enforceable in accordance with their respective terms against the Debtor and the Bankruptcy Estate.

(b) *Authorization to Borrow.* Upon the entry of this Order, the Debtor is immediately authorized to borrow and incur, subject to, and in accordance with, the terms and conditions of the Loan Documents, (i) the Exit Financing Facility in the aggregate maximum principal amount of $12,250,000 and (ii) all other Exit Financing Obligations.

(c) *Exit Financing Facility Lien.* Effective immediately upon the entry of this Order, and subject to the terms of the Loan Documents, the Lender, as security for the Exit Financing Obligations, is hereby granted immediately valid, binding, permanent, continuing, enforceable, perfected, and non-



G&B LAW

5

avoidable first-priority and senior liens on the Property and all "Collateral" (as defined in the Loan Documents) (collectively, the "Exit Financing Liens").

3.      **Modification of the Automatic Stay Imposed Under Section 362(a) of the Bankruptcy Code.** The automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby modified and terminated as necessary to effectuate the terms of this Order and to close and consummate the Exit Financing Facility on the terms of the Loan Documents.

4.      **Enforceable Obligations.** The Loan Documents shall constitute and evidence the valid and binding obligations of the Debtor, which obligations shall be enforceable in accordance with their terms against the Debtor, its Bankruptcy Estate, and any successors thereto.

5.      **Authorization to Use Proceeds of Exit Financing Facility.** Pursuant to the terms and conditions of this Order, the Debtor is authorized to the use the proceeds of the Exit Financing Facility as permitted in the Loan Agreement pursuant to section 363 of the Bankruptcy Code and to satisfy allowed professional fees and U.S. Trustee fees.

6.      **Lien Priority and Perfection.** The Exit Financing Liens are first priority and senior secured liens against the Property and all "Collateral" (as defined in the Loan Documents) and secure all Exit Financing Obligations.

This Order shall be sufficient and conclusive evidence of the validity, the perfection, and the first and senior priority of the Exit Financing Liens without the necessity of any party filing or recording any financing statement, deed of trust, mortgage, security agreement, notice of lien, or other instrument or document which may otherwise be required under the law of any jurisdiction or the taking of any other action to validate or perfect the Exit Financing Liens or to entitle the Exit Financing Liens to the first and senior priorities granted herein.

Notwithstanding the foregoing, the Lender may, in its sole discretion, file such financing statements, deeds of trust, mortgages, security agreements, notices of lien, and other instruments or documents and take such other actions, and is hereby granted relief from the automatic stay of section 362(a) of the Bankruptcy Code in order to do so, and all such financing statements, mortgages, security agreements, notices of lien, and other instruments or documents shall be deemed to have been filed or recorded at the time and on the date of the entry of this Order.

2213791.3 - 32278.0003

The Debtor shall execute and deliver to the Lender all such financing statements, mortgages, security agreements, notices of lien, and other instruments and documents as the Lender may reasonably request to evidence, confirm, validate, perfect, or insure the contemplated priority of the Exit Financing Liens. The Lender, in its sole discretion, may file a photocopy of this Order as a financing statement with any recording officer designated to file financing statements or with any registry or recorder of deeds or similar office in any jurisdiction in which any of the Debtor has real or personal property, and in such event, the subject filing or recording officer shall be authorized to file or record such copy of this Order. The Lender shall also be deemed to be the loss payee under any of the Debtor's insurance policies, and shall have all rights and powers attendant to that position (including, without limitation, rights of enforcement), and shall act in that capacity and distribute any proceeds recovered or received by them in accordance with the terms of the Loan Documents.  Upon the "Closing Date" (as defined in the Loan Documents), the Lender, in its sole discretion may, file such termination and releases of lien as necessary to cause the release or termination of the Prepetition Liens.

7.      **Good Faith Finding.**  Lender is a "good faith" lender for purposes of 11 U.S.C. § 364(e) and Lender is extending the credit set forth in the Loan Agreement in "good faith" for purposes of 11 U.S.C. § 364(e) and, as such, the reversal or modification of the Order and the authorizations provided herein does not affect the validity of (i) the Exit Financing Facility Obligations to be incurred by the Debtor and the Bankruptcy Estate under the Loan Agreement or (ii) the claims, security interests, priorities, liens, and/or other protections granted to Lender pursuant to the Loan Documents.

8.      **No Third Party Rights.** Except as explicitly provided for herein, this Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect, or incidental beneficiary.

9.      **Survival of Final Order.** The provisions of this Order and any actions taken pursuant hereto shall survive, and shall **control** notwithstanding, entry of any other order which may be subsequently entered (i) confirming any chapter 11 plan in the Bankruptcy Case, (ii) converting the Bankruptcy Case to a case under chapter 7 of the Bankruptcy Code, (iii) dismissing the Bankruptcy Case, (iv) withdrawing of the reference from the Bankruptcy Court, or (v) providing for abstention

7

from handling or retaining of jurisdiction of the Bankruptcy Court. The terms and provisions of this Order, including the Exit Financing Liens granted pursuant to this Order and the Loan Documents and any other protections granted to Lender, shall continue in full force and effect notwithstanding the entry of such order, and such Exit Financing Liens shall maintain their priority and validity as provided by this Order until all the Exit Financing Obligations have been indefeasibly paid in cash in full and discharged.

10.    **Inconsistency.** In the event of any inconsistency between the terms and conditions of the Loan Documents and of this Order, the provisions of the Loan Documents shall govern and control. Nothing in this Order requires Lender to extend the Exit Financing Facility and the Lender's willingness to provide the Exit Financing Facility on the terms and conditions of the Loan Agreement remains subject to the satisfaction of all conditions precedent in the Loan Agreement.

11.    **Enforceability.** This Order shall constitute findings of fact and conclusions of law pursuant to the Bankruptcy Rule 7052 and shall take effect and be fully enforceable immediately upon execution hereof.

12.    **Waiver of any Applicable Stay, including Bankruptcy Rule 6004(h).** Any applicable stay (including, without limitation, under Bankruptcy Rule 6004(h)) is hereby waived and shall not apply to this Order.

13.    **Retention of Jurisdiction.** The Bankruptcy Court has and will retain jurisdiction to enforce this Order according to its terms.

14.    **Dismissal of Chapter 11 Case.** Upon the "Closing Date" (as defined in the Loan Documents), the chapter 11 case of Debtor, Crown Jewel Properties, LLC shall be, and hereby is, dismissed. Within 3 business days after the Closing Date, the Debtor shall file a notice that the Closing Date occurred and of the effectiveness of the dismissal of this case pursuant to this Order. The Clerk of the Court is directed to close this case upon the filing of such notice by the Debtor. The orders entered by this Court in this case, including this Order and its provisions, the validity and enforceability of the Loan Documents, the Exit Financing Liens and other relief and protections granted to Lender, and the obligations of the Debtor pursuant to this Order and under the Loan Documents shall remain

1  in full force and effect notwithstanding this dismissal and the provisions of section 349(b) of the

2  Bankruptcy Code.

3

4                                                    # # #

# EXHIBIT 1

**LOAN AGREEMENT**

**between**

**CROWN JEWEL PROPERTIES, LLC,**
**a California limited liability company**
**as Borrower**

**and**

**BUCHANAN MORTGAGE HOLDINGS, LLC,**
**a Delaware limited liability company**
**as Lender**

**April 14, 2022**

TABLE OF CONTENTS

ARTICLE 1    DEFINITIONS AND INTERPRETATIONS ....................................................1

    1.1    Defined Terms ..........................................................................................1
    1.2    Singular and Plural ...................................................................................1
    1.3    Phrases ......................................................................................................1
    1.4    Exhibits and Schedules .............................................................................1
    1.5    Titles of Articles, Sections and Subsections ............................................1
    1.6    Non-Business Days ...................................................................................1

ARTICLE 2    LOAN TERMS ............................................................................................2

    2.1    The Loan ...................................................................................................2
    2.2    Interest Rate; Late Charge ........................................................................2
    2.3    Terms of Payment .....................................................................................3
    2.4    Security .....................................................................................................5
    2.5    Extension of Maturity Date ......................................................................5

ARTICLE 3    RESERVES ..................................................................................................6

    3.1    Interest Reserve .........................................................................................6
    3.2    Tax Reserve ..............................................................................................6
    3.3    General Provisions Regarding the Reserves .............................................7

ARTICLE 4    INSURANCE AND CONDEMNATION .....................................................7

    4.1    Insurance ...................................................................................................7
    4.2    Application of Loss Proceeds ....................................................................8
    4.3    Condemnation Awards ..............................................................................9
    4.4    WARNING ..............................................................................................10
    4.5    Lender's Rights Upon Foreclosure .........................................................10

ARTICLE 5    GENERAL REPRESENTATIONS AND WARRANTIES ........................10

    5.1    Organization and Power...........................................................................10
    5.2    Validity of Loan Documents....................................................................11
    5.3    Financial Condition; Litigation; Other Secured Transactions ...............11
    5.4    Taxes and Assessments............................................................................11
    5.5    Other Agreements; Defaults ....................................................................11
    5.6    Compliance with Law ..............................................................................11
    5.7    Location of Borrower................................................................................12
    5.8    ERISA ......................................................................................................12
    5.9    Margin Stock ...........................................................................................12
    5.10    Tax Filings ...............................................................................................12
    5.11    Solvency...................................................................................................12
    5.12    Full and Accurate Disclosure ..................................................................12
    5.13    Single Purpose Entity..............................................................................12

| | | |
|---|---|---|
| 5.14 | Environmental Matters | 13 |
| 5.15 | No Conflicts | 13 |
| 5.16 | Title | 14 |
| 5.17 | Use of Project | 14 |
| 5.18 | Flood Zone | 14 |
| 5.19 | Insurance | 14 |
| 5.20 | Filing and Recording Taxes | 14 |
| 5.21 | Restricted Company | 14 |
| 5.22 | Franchise Agreement | 14 |

**ARTICLE 6    GENERAL COVENANTS** ........................................................ 14

| | | |
|---|---|---|
| 6.1 | No Sale or Encumbrance; No Transfers of Equity Interests | 15 |
| 6.2 | Taxes; Charges | 16 |
| 6.3 | Control | 16 |
| 6.4 | Use; Maintenance; Inspection | 16 |
| 6.5 | Taxes on Security | 17 |
| 6.6 | Compliance with Law and Other Restrictions | 17 |
| 6.7 | Legal Existence; Name, Status, Etc | 17 |
| 6.8 | Affiliate Transactions | 17 |
| 6.9 | Limitation on Other Debt | 18 |
| 6.10 | Mechanic's Liens and Stop Payment Notices | 18 |
| 6.11 | ERISA | 18 |
| 6.12 | No Liens | 18 |
| 6.13 | Further Assurances | 19 |
| 6.14 | Estoppel Certificates | 19 |
| 6.15 | Notice of Certain Events | 19 |
| 6.16 | Indemnification | 19 |
| 6.17 | Restriction of Distributions | 20 |
| 6.18 | Material Agreements | 20 |
| 6.19 | Other Agreements; Defaults | 20 |
| 6.20 | Financial Covenants | 20 |
| 6.21 | Zoning and Use | 20 |
| 6.22 | Single Purpose Entity | 21 |
| 6.23 | Compliance with Environmental Laws; Notice; Preparation of Environmental Reports | 21 |
| 6.24 | Franchise Agreement | 21 |

**ARTICLE 7    LEASING MATTERS** ........................................................ 22

| | | |
|---|---|---|
| 7.1 | Leasing Representations and Warranties | 22 |
| 7.2 | Leasing Covenants | 22 |

**ARTICLE 8    FINANCIAL REPORTING** ........................................................ 22

| | | |
|---|---|---|
| 8.1 | Financial Statements | 22 |
| 8.2 | Accounting Principles | 22 |
| 8.3 | Other Information | 22 |

8.4     Audits ...................................................................................................23

ARTICLE 9     ANTI-MONEY LAUNDERING AND INTERNATIONAL TRADE
CONTROLS ........................................................................................23

9.1     Compliance with International Trade Control Laws and OFAC
Regulations; Borrower's Funds ..........................................................23

ARTICLE 10 EVENTS OF DEFAULT AND CURE PERIODS ...........................24

10.1    Events of Default Not Subject to Cure Periods ...................................24
10.2    Events of Default Subject to Specific Cure Periods ...........................24
10.3    Other Events of Defaults.....................................................................25

ARTICLE 11 LENDER'S REMEDIES .................................................................25

11.1    Remedies - Insolvency Events.............................................................25
11.2    Remedies - Other Events .....................................................................26
11.3    Lender's Right to Perform the Obligations..........................................26

ARTICLE 12 CONDITIONS PRECEDENT TO EFFECTIVENESS OF
AGREEMENT.....................................................................................26

12.1    Conditions Precedent to Effectiveness of Agreement .........................26

ARTICLE 13 LIMITATION ON LIABILITY .......................................................29

13.1    Limitation on Liability of Lender's Officers, Employees, Etc ...........29

ARTICLE 14 MISCELLANEOUS .........................................................................29

14.1    Notices .................................................................................................29
14.2    Amendments, Waivers, References .....................................................30
14.3    Limitation on Interest..........................................................................30
14.4    Invalid Provisions ...............................................................................31
14.5    Reimbursement of Expenses................................................................31
14.6    Approvals; Third Parties; Conditions .................................................31
14.7    Lender Not in Control; No Partnership................................................32
14.8    Time of the Essence .............................................................................32
14.9    Successors and Assigns........................................................................32
14.10   Renewal, Extension or Rearrangement................................................33
14.11   Waivers ................................................................................................33
14.12   Cumulative Rights ...............................................................................33
14.13   Promotional Material ...........................................................................33
14.14   Survival ................................................................................................34
14.15   WAIVER OF JURY TRIAL.................................................................34
14.16   Punitive or Consequential Damages; Waiver ......................................34
14.17   Governing Law .....................................................................................34
14.18   Entire Agreement .................................................................................34
14.19   Counterparts .........................................................................................35

14.20   Brokers ........................................................................................................ 35
14.21   Claims Against Lender ............................................................................... 35
14.22   Invalidated Payments ................................................................................ 35
14.23   Retention of Servicer ................................................................................ 35
14.24   Section 2822 Waiver .................................................................................. 35

## **LIST OF SCHEDULES**

SCHEDULE 1.1    –    DEFINITIONS

SCHEDULE 4.1    –    REQUIRED INSURANCE

SCHEDULE 5.1    –    ORGANIZATIONAL CHART

SCHEDULE 5.3    –    SCHEDULE OF LITIGATION

**LOAN AGREEMENT**

This Loan Agreement (this "**Agreement**") is entered into as of April 14, 2022, by and between **BUCHANAN MORTGAGE HOLDINGS, LLC**, a Delaware limited liability company (together with its successors and assigns, "**Lender**"), and **CROWN JEWEL PROPERTIES, LLC**, a California limited liability company ("**Borrower**").

**ARTICLE 1**
**DEFINITIONS AND INTERPRETATIONS**

1.1    **Defined Terms**.  All capitalized terms used in this Agreement (and in all other Loan Documents, unless otherwise defined) and not otherwise defined when first used, shall have the meanings set forth for such terms in **Schedule 1.1**.

1.2    **Singular and Plural**.  Words used in this Agreement and the other Loan Documents in the singular, where the context so permits, shall be deemed to include the plural and vice versa.  The definitions of words in the singular in this Agreement and the other Loan Documents shall apply to such words when used in the plural where the context so permits and vice versa.

1.3    **Phrases**.  Except as otherwise expressly indicated, whenever Lender's acceptance, approval, consent, determination or satisfaction is required with respect to any matter in any Loan Document, such acceptance, approval, consent, determination or satisfaction shall be in Lender's reasonable discretion if no Event of Default then exists, and shall be in Lender's sole discretion if any Event of Default then exists.  When used in any Loan Document, the word "including" shall mean "including, but not limited to," and the words "hereof," "herein," "hereunder" and similar words refer to such Loan Document as a whole and not to any particular provision thereof; and subsection, Section, Schedule and Exhibit references are to the particular Loan Document unless otherwise specified.  The use of the phrases "an Event of Default exists", "no Event of Default has occurred and is continuing" or similar phrases in the Loan Documents shall not be deemed to grant Borrower any right to cure an Event of Default, and each Event of Default shall continue unless and until the same is waived by Lender in writing in its sole discretion.  Except only as expressly required by applicable law, Borrower shall have no right to cure any Event of Default, and Lender shall not be obligated under any circumstances whatsoever to accept such cure or performance.

1.4    **Exhibits and Schedules**.  The exhibits and schedules attached to this Agreement are incorporated herein and shall be considered a part of this Agreement for the purposes stated herein.

1.5    **Titles of Articles, Sections and Subsections**.  All titles or headings to articles, sections, subsections or other divisions of this Agreement and the other Loan Documents or the exhibits hereto and thereto are only for the convenience of the parties and shall not be construed to have any effect or meaning with respect to the other content of such articles, sections, subsections or other divisions, such other content being controlling as to the agreement between the parties hereto.

1.6    **Non-Business Days**.  Except as expressly set forth elsewhere in this Agreement, if any payment to be made or item to be delivered by Borrower under any Loan Document shall come due on a day other than a Business Day, then such payment shall be made, or such item shall be delivered, on the immediately succeeding Business Day.

# ARTICLE 2
# LOAN TERMS

2.1    **The Loan**.  The Loan in the original maximum principal amount of Twelve Million Two Hundred Fifty Thousand and No/100 Dollars ($12,250,000.00) ("**Loan Amount**") shall be funded and repaid in accordance with the terms and conditions set forth in this Agreement.  Provided all of the conditions precedent set forth in Article 12 of this Agreement have been fully satisfied, on the Closing Date, Lender will disburse [Ten Million Eight Hundred Seventy Thousand and No/100 Dollars ($10,870,000.00)] **[CHECK]** to Borrower.  The remaining proceeds of the Loan shall be held back and available for disbursement subject to the terms and conditions set forth in Section 3.1 with respect to the Interest Reserve (as defined in Section 3.1 below) .  The Loan is not a revolving credit loan, and Borrower is not entitled to any readvances of any portion of the Loan which it may (or is otherwise required to) prepay pursuant to the provisions of this Agreement.

2.2    **Interest Rate; Late Charge**.

(1)    The outstanding principal balance of the Loan (including any amounts added to principal under the Loan Documents but not including any amounts not yet disbursed to Borrower pursuant to Section 3.1) shall bear interest at the Interest Rate.  The Interest Rate shall be computed as follows:

(a)    From the Closing Date to the first Interest Adjustment Date following the Closing Date, the Interest Rate shall be equal to the rate of twelve percent (12.00%) per annum.

(b)    Lender shall adjust the Interest Rate in accordance with this Section 2.2(1)(b) effective on each Interest Adjustment Date.  The adjusted Interest Rate which becomes effective on each Interest Adjustment Date shall be equal to the Then Current Index applicable to the Interest Adjustment Date plus the Margin per annum.  For purposes of clarification and notwithstanding anything to the contrary contained in this Agreement, the Interest Rate shall in no event be less than twelve percent (12.00%) per annum.

(2)    Interest owing for each month shall be computed on the basis of a fraction, the denominator of which is three hundred sixty (360) and the numerator of which is the actual number of days elapsed from the first day of such month provided that interest owing during the First Interest Period shall be computed on the number of days elapsed from the Closing Date through and including the last day of the calendar month immediately following the month in which the Closing Date occurred ("**First Interest Period**").  Principal and other amortization payments, if any, shall be applied to the outstanding principal balance as and when actually received.

(3)    If Borrower fails to pay any installment of interest or principal within five (5) days of (and including) the date on which the same is due (other than the principal payment due on the Maturity Date), Borrower shall pay to Lender a late charge on such past-due amount, as liquidated damages and not as a penalty, equal to five percent (5%) of such amount, but not in excess of the maximum amount of interest allowed by applicable law.  The foregoing late charge is intended to compensate Lender for the expenses incident to handling any such delinquent payment and for the losses incurred by Lender as a result of such delinquent payment.  Borrower agrees that, considering all of the circumstances existing on the date this Agreement is executed, the late charge represents a reasonable estimate of the costs and losses Lender will incur by reason of late payment.  Borrower and Lender further agree that proof of actual losses would be costly, inconvenient, impracticable and extremely difficult to fix.  Acceptance of the late charge shall not constitute a waiver of the default arising from the overdue installment, and shall not prevent Lender from exercising any other rights or remedies available to Lender.  While any Event of Default

exists, the outstanding principal balance of the Loan (including any amounts added to principal under the Loan Documents) shall bear interest at the Default Rate.

    2.3    **Terms of Payment**.  The Loan shall be payable as follows:

    (1)    **Monthly Interest Payments**.  Commencing on May 1, 2022 ("**First Payment Due Date**") and on the first (1st) day of each month thereafter (each a "**Payment Due Date**") until all principal and interest and other amounts due under the Loan Documents are paid in full, Borrower shall pay to Lender monthly payments of interest only in an amount equal to the monthly interest accrued on the Loan for the preceding Interest Period at the applicable Interest Rate (each a "**Monthly Interest Payment**").  Notwithstanding the foregoing, so long as the conditions to such disbursement set forth in Section 3.1 have been satisfied and sufficient funds remain in the Interest Reserve, Lender will pay to itself from the Interest Reserve the amount of Monthly Interest Payment for the applicable month.

    (2)    **Maturity**.  On the Maturity Date, Borrower shall pay to Lender all outstanding principal, accrued and unpaid interest, and any other amounts due under the Loan Documents.

    (3)    **Prepayments; Minimum Interest**.  Borrower may prepay the Loan, in whole but not in part, upon not less than thirty (30) days' prior written notice to Lender and upon payment of the Minimum Interest, plus any and all accrued and unpaid interest and any other amounts due and owing under the Loan Documents.  If the Loan is prepaid, in whole (or in whole or in part pursuant to a casualty or condemnation, or pursuant to Section 6.5), each such prepayment shall be made to Lender on the prepayment date specified in the applicable notice to Lender pursuant hereto, and (in every case) together with the accrued and unpaid interest on the principal amount prepaid.  If the Loan is accelerated for any reason other than casualty or condemnation or pursuant to Section 6.5, Borrower shall pay to Lender, in addition to all other amounts outstanding under the Loan Documents, the Minimum Interest.  For the avoidance of doubt, Borrower shall not be required to pay a prepayment premium in connection with any full or partial prepayment of the Loan pursuant to a casualty or condemnation, or pursuant to Section 6.5. Borrower may revoke a prepayment notice or extend the date of prepayment at any time prior to the date of prepayment without prejudice to Borrower's right to deliver a prepayment notice at some later date; provided, that (i) Borrower shall keep Lender reasonably apprised of the status of any refinancing during the period between the delivery of the prepayment notice and the delivery of the revocation notice, and (ii) Borrower shall reimburse Lender, promptly on demand, for any reasonable out-of-pocket costs and expenses incurred by Lender in reliance on the revoked or extended notice, or in connection with the anticipated prepayment of the Loan.  Borrower acknowledges that the Minimum Interest required by this Section constitutes partial compensation to Lender for the cost of reinvesting the Loan proceeds and for the loss of the contracted rate of return on the Loan.  Furthermore, Borrower acknowledges that the loss that may be sustained by Lender as a result of such a prepayment by Borrower is not susceptible of precise calculation and the Minimum Interest represents the good faith effort of Borrower and Lender to compensate Lender for such loss.  Borrower confirms that Lender's agreement to make the Loan at the interest rate and on the other terms set forth herein constitutes adequate and valuable consideration, given individual weight by Borrower, for the prepayment provisions set forth in this Section 2.3(3).  By initialing this provision where indicated below, Borrower waives any rights it may have under California Civil Code Section 2954.10, or any successor statute, and Borrower confirms that Lender's agreement to make the Loan at the interest rate(s) and on the other terms set forth herein constitutes adequate and valuable consideration, given individual weight by Borrower, for the prepayment provisions set forth in this Section 2.3(3).

_____
Borrower's Initials

(4)     **Origination Points**.  As partial consideration for Lender's agreement to make the Loan, Borrower shall pay to Lender loan origination points in the amount of Two Hundred Forty-Five Thousand and No/100 Dollars ($245,000.00) which shall be fully earned and non-refundable as of the Closing Date (the "**Origination Points**").  The Origination Points shall be payable in full on or before the Closing Date.

(5)     **Exit Points**.  Upon the sooner to occur of (i) the Maturity Date, (ii) the date when full prepayment of the Loan occurs (whether in one or a related series of transactions), or (iii) the date on which the Loan has been accelerated by Lender following an Event of Default, Borrower shall pay to Lender, as additional compensation for the costs and risks borne by Lender in making funds available hereunder, an amount equal to One Hundred Twenty-Two Thousand Five Hundred and No/100 Dollars ($122,500.00) (the "**Exit Points**"), which Exit Points shall be fully earned as of the Closing Date.  All parties to this Agreement acknowledge the costs and risks being borne by Lender in making funds available hereunder, acknowledge the difficulty and impracticality of quantifying such costs and risks and agree that the Exit Points, together with the other fees, interest and costs under the Loan Documents, represents a reasonable calculation of such costs and risks. The parties further acknowledge and agree that the Exit Points does not constitute a penalty, but additional compensation for such costs and risks, and has been specifically contemplated and negotiated by the parties.

(6)     **Application of Payments**.  So long as no Event of Default exists, all payments received by Lender under the Loan Documents shall be applied in the following order: (a) to any points, costs and expenses due to Lender under the Loan Documents; (b) to any Default Rate interest or late charges; (c) to accrued and unpaid interest; and (d) to the principal sum and other amounts due under the Loan Documents.  Prepayments of principal, if permitted or accepted, shall be applied against amounts owing in inverse order of maturity.  While any Event of Default exists, Lender may apply all payments to amounts then owing in any manner and in any order as determined by Lender.

(7)     **No Offset, Deductions**.  All payments made by Borrower under the Loan Documents shall be made irrespective of, and without any deduction for, any offsets, counterclaims or defenses, including without limitation in respect of any undertakings or obligations in connection with the making of disbursements from the Interest Reserve.  Borrower waives the right to assert a counterclaim, other than a mandatory or compulsory counterclaim, in any action or proceeding brought against it by Lender arising out of or in any way connected with the Loan Documents or the Loan.  Any assignee of Lender's interest in the Loan, or any portion thereof, shall take the same free and clear of all offsets, counterclaims or defenses against the assigning Lender.

(8)     **Disbursements**.  Funds representing the proceeds of the Loan which are disbursed by Lender by wire transfer to or for the benefit of Borrower, or funded toward the payment of points, costs or expenses due in connection with the Loan, or to fund the Interest Reserve, in each case and for all purposes, shall be deemed outstanding and to have been received by Borrower as of the date of such disbursement notwithstanding the fact that such funds may not at any time have been remitted from escrow or otherwise to Borrower or for its benefit.  Lender may submit monthly billings reflecting the amount of the monthly payments due.  Neither the failure of Lender to submit a billing nor any error in any such billing shall excuse Borrower from the obligation to make full payment of all Borrower's payment obligations when due.  Lender may record the date and amount of all disbursements and all payments of principal, interest and other amounts hereunder in the records Lender maintains with respect thereto.  Lender's books and records showing the account between Lender and Borrower shall be admissible in evidence in any action or proceeding and shall constitute prima facie proof of the items therein set forth, absent manifest error.

2.4    **Security**.  The Loan shall be secured by, among other things, the Security Instrument creating a first Lien on the Project, the Additional Security Instrument creating a first Lien on the Additional Property, and the other Collateral.  Notwithstanding anything to the contrary contained in any of the Loan Documents the Guaranty and the obligations of Guarantor thereunder are not secured by the Security Instrument, the Additional Security Instrument or any of the other Loan Documents.

2.5    **Extension of Maturity Date**.  Borrower shall have the option (the "**Extension Option**") to extend the Initial Stated Maturity Date of the Loan for a period of six (6) months (the "**Extension Period**") to and including _____ 1, 2023 (the "**Extended Stated Maturity Date**"), provided that all of the following conditions precedent have been satisfied, as determined by Lender, in its sole and absolute discretion:

(1)    Borrower shall deliver to Lender a written request to exercise the Extension Option (the "**Extension Request**") at least thirty (30) days, but not more than ninety (90) days, before the Initial Stated Maturity Date.

(2)    No Event of Default or Potential Default has occurred and is continuing on the date on which Borrower delivers the Extension Request to Lender, or on the Initial Stated Maturity Date.

(3)    Concurrently with Borrower's delivery of the Extension Request, Borrower shall have paid to Lender, in immediately available funds, an amount equal to One Hundred Twenty-Two Thousand Five Hundred and No/100 Dollars ($122,500.00) (the "**Extension Points**"), which Extension Points shall be fully earned by Lender upon payment and not refundable to Borrower for any reason.

(4)    Not less than 15 days and not more than 45 days prior to the Initial Stated Maturity Date, Borrower shall have paid to Lender in immediately available funds for deposit into the Interest Reserve an amount estimated by Lender, in its sole discretion, to pay the Monthly Interest Payments due during the Extension Period as reasonably determined by Lender (the "**Extension Interest Reserve Deposit**"), employing the same formula as was employed to determine the Interest Reserve required for the initial Loan term and based on the outstanding principal balance of the Loan, the Interest Rate in effect thirty (30) days prior to the Initial Stated Maturity Date and the estimated funds remaining in the Interest Reserve on the Initial Stated Maturity Date.

(5)    In the event Borrower has not paid Property Taxes through the Extended Stated Maturity Date and delivered evidence thereof reasonably acceptable to Lender prior to the Initial Stated Maturity Date, Borrower shall have paid to Lender (from Borrower's funds other than Loan proceeds) the Extension Tax Reserve Deposit for deposit into the Tax Reserve in an amount to be determined by Lender pursuant to Section 3.1(2).

(6)    The ratio of the existing commitment amount of the Loan (whether disbursed or undisbursed) to the "as-is" appraised value set forth in an appraisal or reappraisal of the Property (complying with Lender's appraisal policy) performed no more than thirty (30) days prior to the Extension Request at Borrower's sole cost and expense, shall not exceed forty-five percent (45%);

(7)    Lender shall have received and approved certificates of insurance evidencing that the insurance coverage required in Article 4.1 hereof has been obtained in compliance with the requirements of Article 4 hereof and that the premiums therefor have been paid in full through the Extended Stated Maturity Date.

(8)    Lender shall have received the most recent financial statements of Guarantor required under the Guaranty and if requested by Lender copies of Guarantor's most recent bank statements

and a Compliance Certificate executed by Guarantor, certifying that Guarantor's Tangible Net Worth and Guarantor's Cash Liquidity Balances equal or exceed the amounts required by this Agreement.

(9)    Borrower shall have provided Lender with such information as Lender may reasonably request to enable Lender to confirm Borrower's continued compliance with Article 9.

(10)    Borrower shall execute and deliver such other instruments, certificates, opinions of counsel and documentation as Lender shall reasonably request in order to preserve, confirm or secure the Liens and security granted to Lender by the Loan Documents, including any amendments, modifications or supplements to any of the Loan Documents, endorsements to Lender's title insurance policy and, if required by Lender, estoppels and other certificates.

(11)    Borrower shall pay all costs and expenses incurred by Lender in connection with such extension of the Loan, including Lender's reasonable attorneys' fees and disbursements.

## ARTICLE 3
## RESERVES

3.1    **Interest Reserve**.  On the Closing Date, Lender shall withhold from the Loan proceeds proceeds the amount of One Million Three Hundred Eighty Thousand and No/100 Dollars ($1,380,000.00) to be used as an interest reserve (the "**Interest Reserve**") subject to the terms and conditions of Section 2.3(1) above and this Section 3.1.  So long as no Event of Default is continuing and there are sufficient funds in the Interest Reserve, on each Payment Due Date, Lender shall withdraw amounts from the Interest Reserve sufficient to make the Monthly Interest Payment then due and shall so apply such sums.  Depletion of the Interest Reserve shall not release Borrower from any of Borrower's obligations under this Agreement, the Note or any of the other Loan Documents, including without limitation, the obligation to make each Monthly Interest Payment.  Lender shall have the option, in its sole discretion, to re-balance the Interest Reserve to ensure there are sufficient funds to make the Monthly Interest Reserve Payments required hereunder during the remaining Loan term.  In the event Lender determines the funds in the Interest Reserve are insufficient for such purpose, then within ten (10) days of Lender's written demand Borrower shall deposit with Lender the amount necessary (as determined by Lender in its sole discretion) to assure sufficient funds are on deposit in the Interest Reserve to pay the Monthly Interest Reserve Payments required hereunder during the remaining Loan term (the "**Deficiency Deposit**").  Borrower further agrees to pay (from Borrower's funds other than Loan proceeds) the Extension Interest Reserve Deposit to Lender for deposit into the Interest Reserve required to as a condition to extending the Initial Stated Maturity Date pursuant to Section 2.5(4).

3.2    **Tax Reserve**.  On the Closing Date, Lender shall withhold from the Loan proceeds the amount of [_____ and No/100 Dollars ($_____.00)] to be used as a reserve for the payment of Property Taxes (the "**Tax Reserve**").  So long as no Event of Default is continuing and there are sufficient funds in the Tax Reserve, Lender shall disburse funds from the Tax Reserve to or the benefit or account of Borrower for payment of future installments of Property Taxes subject to the terms and conditions of this Section 3.2.  Borrower further agrees that, in the event Borrower has not paid Property Taxes through the Extended Stated Maturity Date and delivered evidence thereof reasonably acceptable to Lender prior to the Initial Stated Maturity Date, Borrower shall pay (from Borrower's funds other than Loan proceeds) to Lender for deposit into a reserve (the "**Extension Tax Reserve**" and collectively with the Interest Reserve and the Tax Reserve, the "**Reserves**") established by Lender for the payment of Property Taxes at least ten (10) days prior to their respective due dates, an amount sufficient to pay the Property Taxes estimated by Lender becoming due during the six (6) months ending on the Extended Stated Maturity Date as a condition to extending the Initial Stated Maturity Date pursuant to Section 2.5(5) (the "**Extension Tax Reserve Deposit**").  Borrower shall furnish Lender with bills for the Property Taxes for which the Tax Reserve or Extension Tax Reserve funds are required at least thirty (30) days prior to the

date on which such Property Taxes first become delinquent.  If at any time the amount on deposit in the Tax Reserve or Extension Tax Reserve is insufficient to pay such Property Taxes, Borrower shall pay any deficiency to Lender immediately upon demand, for deposit in the Tax Reserve or Extension Tax Reserve. Lender shall pay such Property Taxes when the amount on deposit in the Tax Reserve or Extension Tax Reserve is sufficient to pay such Property Taxes and Lender has received a bill for such Property Taxes.

       3.3    **General Provisions Regarding the Reserves**.

       (1)    As additional security for the Loan, Borrower hereby grants to Lender a first-priority security interest in all funds deposited in the Reserves, and any interest earned thereon.  In addition to the rights and remedies herein set forth, Lender shall have all of the rights and remedies with respect to the funds in the Reserves available to a secured party at law or in equity, including, without limitation, the rights of a secured party under the Uniform Commercial Code, as if such rights and remedies were fully set forth herein.

       (2)    This Agreement shall constitute a security agreement for purposes of the Uniform Commercial Code and other applicable law.  Borrower acknowledges and agrees that the funds in the Reserves are subject to the sole dominion, control and discretion of Lender, its authorized agents or designees, subject to the terms hereof, and neither Borrower nor any other Borrower Party shall have any right of withdrawal with respect to any funds held in the Reserves except with the prior written consent of Lender or as otherwise provided herein.  The funds held in the Reserves shall not constitute trust funds and may be commingled with other monies held by Lender.

       (3)    While an Event of Default or a Potential Default exists, Lender shall have no obligation to disburse any funds from the Reserves, and while an Event of Default exists, Lender shall be entitled, without notice to Borrower or any other Borrower Party, to apply any funds in the Reserves to satisfy Borrower's obligations under the Loan Documents in such order and manner as Lender shall determine, but no such application shall be deemed to have been made by operation of law or otherwise until actually made by Lender.

       (4)    The insufficiency of funds held in the Reserves on deposit with Lender shall not absolve Borrower of the obligation to make any payments, as and when due pursuant to this Agreement and the other Loan Documents, and such obligations shall be separate and independent, and not conditioned on any event or circumstance whatsoever.

**ARTICLE 4**
**INSURANCE AND CONDEMNATION**

       4.1    **Insurance**.  Borrower shall maintain insurance as follows:

       (1)    **Types and Amounts of Insurance**.  Borrower shall maintain the insurance listed on Schedule 4.1.  Lender will require Borrower to obtain and maintain flood insurance if it is determined at any time that the Project is in a flood zone, and such additional insurance that Lender, in its discretion, may reasonably require from time to time.

       (2)    **No Separate Insurance**.  Borrower shall not maintain any separate or additional insurance which is contributing in the event of loss unless it is properly endorsed and otherwise satisfactory to Lender in all respects.

       (3)    **Form and Quality**.  All insurance policies shall be endorsed in form and substance acceptable to Lender to name Lender as an additional insured thereunder (on all liability policies) and loss payee and mortgagee thereunder (on all property policies), as its interest may appear, with loss payable to

Lender, without contribution, under a standard New York (or local equivalent) mortgagee clause.  All such insurance policies and endorsements shall be fully paid for, shall be issued by appropriately licensed insurance companies acceptable to Lender with a rating of "A-:IX" or better as established by A.M. Best's Rating Guide, shall not be subject to reduction for depreciation or co-insurance, and shall otherwise be in such form, and shall contain such provisions and expiration dates, as are acceptable to Lender.  Each policy shall provide that no act of or omission by Borrower shall invalidate such policy as against Lender, and shall provide that such policy may not be canceled or materially changed except upon thirty (30) days' prior written notice of intention of non-renewal, cancellation or material change to Lender, or upon ten (10) days' prior written notice if such non-renewal or cancellation arises from a failure to pay the insurance premium.  Any flood insurance policy shall be issued in accordance with the requirements and then current guidelines of the Federal Insurance and Mitigation Administration.  Blanket policies shall not be permitted unless the terms and conditions of the coverage afforded thereunder are acceptable to Lender.  Lender shall have the right to periodically evaluate the continuing acceptability of any previously approved blanket policies and to require replacement insurance if any blanket policies are no longer acceptable as determined by Lender in its sole discretion.  If Borrower fails to maintain insurance in compliance with this Section 4.1, Lender may obtain such insurance and pay the premium therefor and Borrower shall, on demand, reimburse Lender for all expenses incurred in connection therewith.

(4)    **Assignment**.  Borrower shall assign the policies or proofs of insurance to Lender, in such manner and form that Lender and its successors and assigns shall at all times have and hold the same as security for the payment of the Loan.  Borrower shall deliver to Lender electronic copies of all required policies and all renewals thereof (which renewals shall be delivered at least ten (10) Business Days prior to the expiration of the existing policies), in each case certified to Lender by Borrower as being true copies, together with the endorsements required hereunder.  If Borrower elects to obtain any insurance which covers any risk covered by the insurance required under this Article 4 but which is not required under this Agreement, all related insurance policies shall be endorsed in compliance with Section 4.1(3), and such additional insurance shall be renewed during the term of the Loan unless Lender provides its prior written authorization.  From time to time upon Lender's request, Borrower shall identify to Lender all insurance maintained by Borrower with respect to the Project.  All Loss Proceeds shall be delivered directly to Lender, and shall be applied in accordance with Section 4.2.  The Loss Proceeds coming into the possession of Lender shall not be deemed trust funds, and Lender shall be entitled to apply such proceeds as herein provided.

(5)    **Adjustments**.  Borrower shall give immediate written notice of any loss to the insurance carrier and to Lender.  Borrower hereby irrevocably authorizes and empowers Lender, as attorney-in-fact for Borrower coupled with an interest, to notify any of Borrower's insurance carriers to add Lender as a loss payee, mortgagee insured or additional insured, as the case may be, to any policy maintained by Borrower (regardless of whether such policy is required under this Agreement), to make proof of loss, to adjust and compromise any claim under insurance policies, to appear in and prosecute any action arising from such insurance policies, to collect and receive Loss Proceeds (and endorse, on Borrower's behalf, all checks, drafts and other negotiable demand instruments payable to Borrower, or to Borrower and Lender jointly), and to deduct therefrom Lender's expenses incurred in the collection of such Loss Proceeds.  Nothing contained in this Section 4.1(5), however, shall require Lender to incur any expense or take any action hereunder.

4.2    **Application of Loss Proceeds**.

(1)    Lender shall make Loss Proceeds available for restoration of the Project in the following circumstances:

(a)     if the loss is less than or equal to the Restoration Threshold (in which event Borrower shall have the right to retain such Loss Proceeds up to the amount of the Restoration Threshold, subject to Borrower's compliance with Section 4.2(5) below); or

(b)     if the loss exceeds the Restoration Threshold, but is not more than twenty-five percent (25%) of the replacement value of the improvements (if the Project contains multiple phases or stand-alone structures, such calculation to be based on the damaged phase or structure, not the Project as a whole), provided Lender determines that (i) the amounts remaining in the Interest Reserve during restoration will be sufficient to pay Debt Service during restoration; and (ii) restoration and repair of the Project to a condition approved by Lender will be completed ninety (90) days prior to the Maturity Date.

(2)     If Lender determines that the projected costs to complete the restoration and repair of the Project exceed the Loss Proceeds available to pay such costs (a "**Shortfall**"), then prior to any disbursement of Loss Proceeds to pay such costs, Borrower shall have provided Lender with satisfactory evidence that Borrower has sufficient sources of funds from which to pay the Shortfall.  If required by Lender, Borrower shall first pay restoration and repair costs in an amount equal to the Shortfall prior to receiving any Loss Proceeds.

(3)     If Borrower does not qualify for Loss Proceeds under either Sections 4.2(1)(a) or 4.2(1)(b), Lender in its sole discretion may either apply Loss Proceeds to the payment of amounts owing under the Loan Documents or allow all or a portion of such Loss Proceeds to be used for the restoration of the Project.

(4)     Loss Proceeds applied to restoration will be disbursed pursuant to Lender's reasonable requirements therefor.  Any Loss Proceeds remaining after payment of all restoration costs shall be applied by Lender to the payment of amounts owing under the Loan Documents.

(5)     If Lender makes the Loss Proceeds from a casualty available to Borrower, Borrower shall promptly commence and diligently pursue to completion restoration of the Project such that, after restoration, the Project will be in compliance with and permitted under all applicable zoning, building and land use laws, rules, regulations and ordinances.

4.3     **Condemnation Awards**.  Borrower shall immediately notify Lender of the institution of any proceeding for the condemnation or other taking of the Project or any portion thereof.  Lender may participate in any such proceeding and Borrower will deliver to Lender all instruments necessary or required by Lender to permit such participation.  Without Lender's prior consent, Borrower (1) shall not agree to any compensation or award, and (2) shall not take any action or fail to take any action which would cause the compensation to be determined.  All awards and compensation for the taking or purchase in lieu of condemnation of the Project or any part thereof are hereby assigned to and shall be paid to Lender.  Borrower authorizes Lender to collect and receive such awards and compensation (and, if any such award or compensation is paid by check, draft or other negotiable demand instrument made payable to Borrower or to Borrower and Lender jointly, to endorse the same on Borrower's behalf), to give proper receipts and acquittances therefor, and in Lender's sole discretion to apply the same toward the payment of the outstanding principal balance of the Loan, notwithstanding that the Loan may not then be due and payable, or to the restoration of the Project; however, if the award is less than or equal to $50,000 and Borrower requests that such proceeds be used for non-structural site improvements (such as landscape, driveway, walkway and parking area repairs) required to be made as a result of such condemnation, Lender will apply the award to such restoration in accordance with disbursement procedures applicable to insurance proceeds provided there exists no Potential Default or Event of Default.  Borrower, upon request by Lender, shall execute all instruments requested to confirm the assignment of the awards and compensation to Lender, free and clear of all liens, charges or encumbrances.

4.4    **WARNING.**

**IF BORROWER FAILS TO PROVIDE LENDER WITH EVIDENCE OF THE INSURANCE COVERAGE REQUIRED BY THIS LOAN AGREEMENT, INCLUDING, WITHOUT LIMITATION, FLOOD INSURANCE TO THE EXTENT EXPRESSLY REQUIRED HEREUNDER, LENDER MAY, IN ITS SOLE DISCRETION (AND WITHOUT PRIOR NOTICE TO BORROWER IF THERE IS A LAPSE IN COVERAGE), PURCHASE INSURANCE AT BORROWER'S EXPENSE TO PROTECT THE PROJECT; SUCH INSURANCE MAY BE PLACED BY LENDER DURING ANY STATUTORY OR OTHER REQUIRED NOTICE PERIOD.    BORROWER MAY LATER CANCEL THIS COVERAGE BY PROVIDING EVIDENCE TO LENDER THAT BORROWER HAS OBTAINED THE APPLICABLE INSURANCE COVERAGE ELSEWHERE.    LENDER SHALL HAVE NO DUTY TO PLACE SUCH INSURANCE, LENDER SHALL HAVE NO LIABILITY WITH RESPECT TO THE TERMS OF SUCH INSURANCE OR THE CREDIT OF THE INSURER IF LENDER ELECTS TO PLACE SUCH INSURANCE, AND BORROWER IS NOT ENTITLED TO RELY ON THE EXISTENCE OF ANY LENDER PLACED COVERAGE EVEN IF BORROWER HAS BEEN NOTIFIED THAT LENDER HAS ELECTED TO PLACE SUCH COVERAGE.**

**BORROWER IS RESPONSIBLE FOR THE COST OF ANY INSURANCE PURCHASED BY LENDER, INCLUDING INSURANCE PURCHASED DURING ANY NOTICE PERIOD.    ALL ACTUAL AND REASONABLE EXPENSES INCURRED BY LENDER IN OBTAINING SUCH INSURANCE AND KEEPING IT IN EFFECT SHALL BE PAID BY BORROWER TO LENDER UPON DEMAND AND UNTIL PAID SHALL BE SECURED BY THE SECURITY INSTRUMENT AND SHALL BEAR INTEREST AT THE DEFAULT RATE.    AT LENDER'S OPTION, THE COST OF THIS INSURANCE MAY BE ADDED TO THE LOAN BALANCE.  IF THE COST IS ADDED TO THE LOAN BALANCE, THE INTEREST RATE ON THE UNDERLYING LOAN WILL APPLY TO THIS ADDED AMOUNT.    THE EFFECTIVE DATE OF THE LENDER PURCHASED COVERAGE MAY BE THE DATE THE PRIOR COVERAGE LAPSED OR THE DATE BORROWER FAILED TO PROVIDE PROOF OF COVERAGE TO LENDER.**

**THE COVERAGE PURCHASED BY LENDER MAY BE CONSIDERABLY MORE EXPENSIVE THAN INSURANCE BORROWER CAN OTHERWISE OBTAIN ON ITS OWN AND MAY NOT SATISFY ANY NEED FOR PROPERTY DAMAGE COVERAGE OR ANY MANDATORY LIABILITY INSURANCE REQUIREMENTS IMPOSED BY APPLICABLE LAW.**

4.5    **Lender's Rights Upon Foreclosure**.    In the event of a foreclosure of the Security Instrument or other transfer of title to the Project in extinguishment in whole or in part of the Debt, all right, title and interest of Borrower in and to the insurance policies then in force concerning the Project and all proceeds payable thereunder shall thereupon vest exclusively in Lender or the purchaser at such foreclosure or other transferee in the event of such other transfer of title.

**ARTICLE 5**
**GENERAL REPRESENTATIONS AND WARRANTIES**

Borrower represents and warrants to Lender that:

5.1    **Organization and Power**.    Borrower and each Borrower Party that is an entity is duly organized, validly existing and in good standing under the laws of the state of its formation or existence, and is in compliance with all legal requirements applicable to doing business in the state in which the Project is located.    Neither Borrower nor any Borrower Party is a "foreign person" within the meaning of Section 1445(f)(3) of the Internal Revenue Code.    Borrower and each Borrower Party that is an entity has only one state of incorporation or organization, which is set forth in Schedule 5.1.    All other information

regarding Borrower and each Borrower Party contained in <u>Schedule 5.1</u>, including the ownership structure of Borrower and its constituent entities, is true and correct as of the Closing Date.

5.2      **Validity of Loan Documents**.  The execution, delivery and performance by Borrower and Guarantor of the Loan Documents to which such party is a party: (1) are duly authorized and do not require the consent or approval of any other party or Governmental Authority which has not been obtained; and (2) will not violate any law or result in the imposition of any lien, charge or encumbrance upon the assets of any such party, except as contemplated by the Loan Documents.  The Loan Documents constitute the legal, valid and binding obligations of Borrower and Guarantor (to the extent executed by such parties), enforceable in accordance with their respective terms, subject to applicable bankruptcy, insolvency, or similar laws generally affecting the enforcement of creditors' rights.

5.3      **Financial Condition; Litigation; Other Secured Transactions**.

(1)      The most recent financial statements delivered by Borrower and Guarantor (a) are true and correct in all material respects, with no significant change since the date of preparation, and (b) fairly present the financial condition of Borrower and Guarantor as of the date thereof and the results of Borrower's and Guarantor 's operations for the period covered thereby.  Except as disclosed in such financial statements, there are no liabilities (fixed or contingent) affecting the Project, Borrower or Guarantor.  Except as disclosed in <u>Schedule 5.3</u>, there is no litigation, administrative proceeding, investigation or other legal action (including any proceeding under any state or federal bankruptcy or insolvency law) pending or, to the knowledge of Borrower, threatened, against the Project, Borrower, or Guarantor.

(2)      Borrower is not, and has not been, bound (whether as a result of a merger or otherwise) as a debtor under a pledge or security agreement entered into by another Person, which has not heretofore been terminated.

5.4      **Taxes and Assessments**.  The Project is comprised of one or more parcels, each of which constitutes a separate tax lot and none of which constitutes a portion of any other tax lot.  There are no pending or, to Borrower's knowledge, proposed, special or other assessments for public improvements or otherwise affecting the Project other than the additional property tax assessment resulting from Borrower's acquisition of the Project, nor are there any contemplated improvements to the Project that may result in such special or other assessments.

5.5      **Other Agreements; Defaults**.  Neither Borrower nor Guarantor is subject to any court order, injunction, permit, or restriction which could reasonably be expected to have a Material Adverse Effect.  Neither Borrower nor Guarantor is in violation of any agreement which violation could reasonably be expected to have a Material Adverse Effect.

5.6      **Compliance with Law**.

(1)      No condemnation has been commenced or, to Borrower's knowledge, is contemplated with respect to all or any portion of the Project or for the relocation of roadways providing access to the Project.

(2)      The Project has adequate rights of access to public ways and is served by adequate water, sewer, sanitary sewer and storm drain facilities.  All public utilities necessary or convenient to the full use and enjoyment of the Project are located in the public right-of-way abutting the Project, and all such utilities are connected so as to serve the Project without passing over other property, except to the extent such other property is subject to a perpetual easement for such utility benefiting the Project.

(3)    [Borrower has obtained all approvals, governmental and otherwise (including, without limitation, zoning, building code, land use, environmental, and licenses, but expressly excluding the final approval of the California Coastal Commission) necessary for the development of the Project as a hotel containing not less than 426 hotel rooms and 432 parking spaces, all of which are in full force and effect.  To Borrower's best knowledge after diligent inquiry and investigation, no event or condition currently exists which could result in the revocation, suspension, or forfeiture thereof.]  **[NOTE: SUBJECT TO REVIEW OF ENTITLEMENT DOCUMENTATION AND APPROVAL OF THE SAME BY LENDER'S ENTITLEMENT CONSULTANT]**

5.7    **Location of Borrower**.  Borrower's principal place of business and chief executive offices are located at the address stated in Section 14.1 and Borrower maintains its books and records at such location.  Borrower at all times has maintained its principal place of business and chief executive office at such location or at other locations within the same state.

5.8    **ERISA**.

(1)    Borrower is not an "employee benefit plan" as defined in Section 3(3) of ERISA, which is subject to Title I of ERISA, and the assets of Borrower do not constitute "plan assets" of one or more such plans for purposes of Title I of ERISA.

(2)    Borrower is not and will not be a "governmental plan" within the meaning of Section 3(32) of ERISA, and transactions by or with Borrower are not and will not be subject to state statutes applicable to Borrower regulating investments of, and fiduciary obligations with respect to, governmental plans.

(3)    Borrower has no employees.

5.9    **Margin Stock**.  No part of proceeds of the Loan will be used for purchasing or acquiring any "margin stock" within the meaning of Regulations T, U or X of the Board of Governors of the Federal Reserve System.

5.10    **Tax Filings**.  Borrower and Guarantor have filed (or have obtained effective extensions for filing) all federal, state and local tax returns required to be filed and have paid or made adequate provision for the payment of all federal, state and local taxes, charges and assessments payable by Borrower and Guarantor, respectively.

5.11    **Solvency**.  Except as disclosed in Schedule 5.3, no petition in bankruptcy has been filed by or against Borrower, or Guarantor in the last seven (7) years, and neither Borrower nor Guarantor in the last seven (7) years has ever made an assignment for the benefit of creditors or taken advantage of any insolvency act for the benefit of debtors.  Except as disclosed in Schedule 5.3, neither Borrower nor Guarantor is contemplating either the filing of a petition by it under state or federal bankruptcy or insolvency laws or the liquidation of all or a major portion of its assets or property, and neither Borrower nor Guarantor has knowledge of any Person contemplating the filing of any such petition against it.

5.12    **Full and Accurate Disclosure**.  No statement of fact made by or on behalf of Borrower or any Borrower Party in this Agreement or in any of the other Loan Documents contains any untrue statement of a material fact.  All evidence of Borrower's and each Borrower Party's identity provided to Lender is genuine, and all related information is accurate.

5.13    **Single Purpose Entity**.  Borrower is and has at all times since its formation been a Single Purpose Entity.

5.14 **Environmental Matters**.  Other than exceptions to any of the following that could not, individually or in the aggregate, reasonably be expected to result in the Borrower incurring Environmental Liability, and except as otherwise disclosed in the Existing Site Assessment:

(1)     Borrower: (i) is, and has been, in compliance with all applicable Environmental Laws; and (ii) reasonably believes that compliance with any Environmental Law that is or is expected to become applicable to it will be timely attained and maintained, without material expense;

(2)     No Hazardous Materials have been released or are present at, on, under, in, or about any real property now or formerly owned, leased or operated by Borrower (including, without limitation, any location to which Hazardous Materials have been sent for re-use, recycling, treatment, storage, or disposal) in a quantity, manner or condition which could reasonably be expected to (i) require investigation, removal, or remediation under Environmental Law or otherwise give rise to Environmental Liability of Borrower, (ii) interfere with Borrower's continued operations, or (iii) impair the fair saleable value of any real property owned or leased by Borrower;

(3)     there are no pending or, to the knowledge of the Borrower, threatened actions, suits, claims, disputes or proceedings at law or in equity, administrative or judicial, by or before any Governmental Authority (including any notice of violation or alleged violation or seeking to revoke, cancel, or amend any Environmental Permit) under or relating to any Environmental Law to which Borrower will be named as a party or affecting Borrower or any business, property or rights of Borrower;

(4)     Borrower has not received any written request for information, or been otherwise notified that it is a potentially responsible party under or relating to the federal Comprehensive Environmental Response, Compensation, and Liability Act or any similar Environmental Law, or with respect to any release of Hazardous Materials;

(5)     No real property currently owned or leased by Borrower is subject to any Lien imposed pursuant to Environmental Law and, to the knowledge of Borrower, there are no existing facts, circumstances or conditions that would reasonably be expected to result in any such Lien attaching to any such property;

(6)     Borrower has not entered into or agreed to any consent decree, order, or settlement or other agreement, or is subject to any judgment, decree, or order or other agreement, in any judicial, administrative, arbitral, or other forum for dispute resolution, relating to compliance with Environmental Law or any Environmental Liability; and

(7)     Borrower has not assumed or retained, by contract or operation of law, any Environmental Liabilities of any kind, whether fixed or contingent, known or unknown.

5.15 **No Conflicts**.  The execution, delivery and performance of this Agreement and the other Loan Documents by Borrower and Guarantor will not conflict with or result in a breach of any of the terms or provisions of, or constitute a default under, or result in the creation or imposition of any Lien (other than pursuant to the Loan Documents) upon any of the property or assets of Borrower or Guarantor pursuant to the terms of any indenture, mortgage, deed of trust, loan agreement, operating agreement or other agreement or instrument to which Borrower or Guarantor is a party or by which any of Borrower's or Guarantor's property or assets is subject, nor will such action result in any violation of the provisions of any statute or any order, rule or regulation of any court or governmental agency or body having jurisdiction over Borrower or Guarantor or any of Borrower's or Guarantor's properties or assets, and any consent, approval, authorization, order, registration or qualification of or with any court or any such regulatory authority or other governmental agency or body required for the execution, delivery and performance by Borrower of this Agreement or any other Loan Documents has been obtained and is in full force and effect.

5.16    **Title**.  Borrower has good, marketable and insurable title to the Project, free and clear of all Liens whatsoever, except for the Permitted Encumbrances and such other Liens as are permitted pursuant to the Loan Documents and has rights and the power to transfer each item of Collateral upon which it purports to grant a Lien under the Security Instrument or any of the other Loan Documents.  Upon recordation of the Security Instrument and any related financing statements, the Security Instrument creates (1) a valid, perfected first-priority Lien on the Project, subject only to Permitted Encumbrances, and (2) perfected first-priority security interests in and to, and collateral assignments of, all personalty (including the leases), all in accordance with the terms thereof, in each case subject only to any applicable Permitted Encumbrances and such other Liens as are permitted pursuant to the Loan Documents.  There are no claims for payment for work, labor or materials affecting the Project which are or may become a Lien prior to, or of equal priority with, the Liens created by the Loan Documents.  None of the Permitted Encumbrances, individually or in the aggregate, have a Material Adverse Effect.

5.17    **Use of Project**.  The Project is and shall at all times be used exclusively for uses permitted under Legal Requirements.

5.18    **Flood Zone**.  No portion of the improvements comprising the Project is located in an area identified by the Federal Emergency Management Agency or any successor thereto as an area having special flood hazards pursuant to the National Flood Insurance Act of 1968, the Flood Disaster Protection Act of 1973 or the National Flood Insurance Act of 1994, as amended, or any successor law.

5.19    **Insurance**.  Borrower has obtained and has delivered to Lender certificates of all of the insurance policies for the Project reflecting the insurance coverages, amounts and other insurance requirements set forth in this Agreement.  No claims have been made under any such policy, and no Person, including Borrower, has done, by act or omission, anything which would impair the coverage of any such policy.

5.20    **Filing and Recording Taxes**.  All transfer taxes, deed stamps, intangible taxes or other amounts in the nature of transfer taxes required to be paid by any Person under applicable legal requirements currently in effect in connection with the transfer of the Project to Borrower or any transfer of a controlling interest in Borrower will have been paid on or before the Closing Date.  All mortgage, mortgage recording, stamp, intangible or other similar tax required to be paid by any Person under applicable legal requirements currently in effect in connection with the execution, delivery, recordation, filing, registration, perfection or enforcement of any of the Loan Documents, including the Security Instrument and the Additional Security Instrument, have or will have been paid as of the Closing Date and, under current legal requirements, the Security Instrument and the Additional Security Instrument are enforceable in accordance with its terms by Lender or any subsequent holder thereof, subject to applicable bankruptcy, insolvency, or similar laws generally affecting the enforcement of creditors' rights.

5.21    **Restricted Company**.  Borrower is not a Restricted Company.

5.22    **Franchise Agreement**.  The Franchise Agreement is in full force and effect and there is no default existing thereunder by any party thereto and no event (other than payments due but not yet delinquent) which, with the passage of time or with notice and the expiration of any grace or cure period, would constitute a default by any party thereunder.

### ARTICLE 6
### GENERAL COVENANTS

Borrower covenants and agrees with Lender as follows:

6.1    **No Sale or Encumbrance; No Transfers of Equity Interests**.

(1)    Borrower acknowledges that Lender, in agreeing to make the Loan, has examined and relied on the experience of the Borrower Parties in owning and operating properties such as the Project, and that Lender will continue to rely on Borrower's ownership and operation of the Project as a means of maintaining the value of the Project as security for repayment of the Debt.  Borrower acknowledges that Lender has a valid interest in maintaining the value of the Project so as to ensure that, should Borrower default in the repayment of the Debt, Lender can recover all or a portion of the Debt by a sale of the Project. Accordingly, subject to the terms of this Section 6.1 and except for the liens in favor of Lender, Borrower shall not, without the prior written consent of Lender, directly or indirectly, sell, convey, alienate, mortgage, encumber, pledge or otherwise Transfer the Project, or any part thereof or any interest therein, or permit the Transfer of the Project, or any part thereof or any legal or beneficial interest therein.

(2)    A Transfer of the Project within the meaning of this Section 6.1 shall be deemed to include:  (A) an installment sales agreement wherein Borrower agrees to sell the Project or any part thereof or any interest therein for a price to be paid in installments; (B) an agreement by Borrower leasing any part of the Project, or a sale, assignment or other transfer of, or the grant of a security interest in, Borrower's right, title and interest in and to any Leases or any Rents or Operating Revenues; (C) if Borrower or other Borrower Party (each a "**Restricted Party**"), or any partner or member or non-member manager of a Restricted Party (or any indirect owner of an interest in a Restricted Party or any constituent partner or member of a Restricted Party no matter how remote) is a corporation, the Transfer of such corporation's stock or any portion thereof (or the stock of any corporation directly or indirectly controlling such corporation by operation of law or otherwise) or the creation or issuance of new stock in one or a series of transactions by which any of such corporation's stock or any portion thereof shall be vested in a party or parties who are not now existing stockholders as of the Closing Date or results in any change in the ultimate ownership or control of such corporation (no matter how remote); (D) if a Restricted Party or any partner or member of a Restricted Party (or other indirect owner of an interest in a Restricted Party or any constituent partner or member of a Restricted Party no matter how remote) is a limited or general partnership, joint venture or limited liability company, the change, removal, resignation or addition of a partner, joint venturer or member or the Transfer of the partnership or membership interest of any partner or any member or the Transfer of the interest of any joint venturer, partner or member; (E) if a Restricted Party is a limited or general partnership, joint venture, limited liability company, trust, nominee trust, tenancy in common or other unincorporated form of business association or form of ownership interest, the Transfer of any interest (including any economic or profits interest) of any Person having a direct or indirect legal or beneficial ownership interest in a Restricted Party, including any legal or beneficial interest in any constituent partner or member of a Restricted Party; (F) any instrument subjecting the Project to a condominium regime or transferring ownership to a cooperative corporation; and (G) the dissolution or termination of a Restricted Party or any partner or member of a Restricted Party or any constituent member or partner of a Restricted Party or the merger or consolidation of a Restricted Party or any partner or member of a Restricted Party with any other Person; (H) any transfer of a direct or indirect ownership interest in a Restricted Party; (I) any other transaction pursuant to which any Person not holding a direct or indirect ownership interest in a Restricted Party on the Closing Date acquires a direct or indirect (and no matter how remote) ownership interest in a Restricted Party; (J) any swap, derivative or other transaction shifting the risks and rewards of ownership of the Project, unless otherwise expressly required by the Loan Documents; (K) any transaction pursuant to which any Person is granted an option to purchase all or any portion of the Project or any direct, indirect or beneficial interest in a Restricted Party; and (L) any transaction, agreement or arrangement pursuant to which any Person is given any right to control, direct or veto any material actions or decisions by a Restricted Party, directly or indirectly, whether through an ownership interest, contract right or otherwise.

(3)      Lender shall not be required to demonstrate any actual impairment or prejudice of its security or any increased risk of default hereunder in order to declare the Debt immediately due and payable upon any Transfer without Lender's prior written consent.  This provision shall apply to every Transfer regardless of whether voluntary or not, or whether or not Lender has consented to any previous Transfer.

(4)      Lender's consent to one Transfer of the Project, including an interest in a Restricted Party, shall not be deemed to be a waiver of Lender's right to require such consent to any future Transfer.  Any Transfer made in contravention of this <u>Section 6.1</u> shall be null and void and of no force and effect.

(5)      Borrower agrees to bear and shall pay or reimburse Lender on demand for all reasonable costs and expenses (including title search costs, title insurance endorsement premiums and reasonable attorneys' fees and expenses at standard firm rates and disbursements) actually incurred by Lender in connection with the review, approval and documentation of any proposed Transfer, whether or not such consent is granted, withheld, conditioned or denied.

6.2      **Taxes; Charges**.  Borrower shall pay before any fine, penalty, interest or cost may be added thereto, and shall not enter into any agreement to defer, any Property Taxes, franchise taxes and charges, and other governmental charges that may become a Lien upon the Project or become payable during the term of the Loan, and will promptly furnish Lender with evidence of such payment.  Borrower shall not suffer or permit the joint assessment of the Project with any other real property constituting a separate tax lot or with any other real or personal property.  Borrower may in good faith contest, by proper legal actions or proceedings, the validity or amount of any Property Tax assessed upon the Project provided that at the time of commencement of any such action or proceeding, and during the pendency thereof, (1) no Event of Default shall be continuing; (2) Borrower provides Lender with a release bond in such form and amount as are satisfactory to Lender, including Lender's estimate of interest, penalties and attorneys' fees; (3) such contest operates to suspend collection of the contested Property Tax; (4) Borrower maintains and prosecutes such contest continuously with diligence, and concludes such contest prior to the thirtieth (30th) day preceding the earlier to occur of the Maturity Date or the date on which the Project is scheduled to be sold for non-payment; (5) the Project shall not be subject to forfeiture or loss or any Lien by reason of the institution or prosecution of such contest; and (6) Borrower shall promptly pay or discharge such contested Property Tax and all additional charges, interest, penalties and expenses, if any, and shall deliver to Lender evidence acceptable to Lender of such compliance, payment or discharge, if such contest is terminated or discontinued adversely to Borrower.

6.3      **Control**.  Without the prior written consent of Lender in Lender's sole discretion, there shall be no change in Control or change in the day-to-day Control and management of Borrower, Borrower's Manager, or any other member or non-member manager of Borrower or Borrower's Manager, and no change in their respective organizational documents relating to control over Borrower and/or the Project.  Any replacement of Borrower's Manager pursuant to  the terms of Borrower's Operating Agreement shall require the prior written approval of Lender.

6.4      **Use; Maintenance; Inspection**.  The Project shall be used exclusively for the purpose described in <u>Section 5.17</u>, and other appurtenant and related uses.  Borrower shall maintain the Project in good condition and promptly repair any damage or casualty, subject to receipt of Loss Proceeds in accordance with <u>Section 4.2</u>.  At all times during the term of the Loan, Borrower shall cause (1) the Project to have adequate rights of access to public ways and to be served by adequate water, sewer, sanitary sewer and storm drain facilities and (2) all public utilities necessary or convenient to the full use and enjoyment of the Project to be located in the public right of way abutting the Project, and to be connected so as to serve the Project without passing over other property, except to the extent such other property is subject to a perpetual easement for such utility benefiting the Project.  Borrower shall maintain all rights of way,

easements, grants, privileges, licenses, certificates, permits, entitlements and franchises necessary for the use of the Project. Borrower shall not, without the prior written consent of Lender, undertake any alteration of the Project (other than restoration work following casualty or condemnation as permitted under this Agreement) or permit any of the fixtures or personalty owned by Borrower to be removed at any time from the Project, unless the removed item is removed temporarily for maintenance and repair or, if removed permanently, is obsolete and is replaced by an article of equal or better suitability and value, owned by Borrower and free and clear of any Liens except those in favor of Lender. Borrower shall not commence any grading or construction or renovation activities on the Project, without the prior written of Lender which may be withheld in Lender's sole and absolute discretion. Borrower shall permit Lender and its agents, representatives and employees, upon reasonable prior notice to Borrower, to inspect the Project and conduct such environmental and engineering studies as Lender may require, provided such inspections and studies do not materially interfere with the use and operation of the Project.

6.5    **Taxes on Security**. Borrower shall pay all taxes, charges, filing, registration and recording fees, excises and levies payable with respect to the Note or the Liens created or secured by the Loan Documents, other than income, franchise and doing business taxes imposed on Lender. If there shall be enacted any law (1) deducting the Loan from the value of the Project for the purpose of taxation, (2) affecting any Lien on the Project, or (3) changing existing laws of taxation of mortgages, deeds of trust, security deeds, or debts secured by real property, or changing the manner of collecting any such taxes, Borrower shall promptly pay to Lender, on demand, all taxes, costs and charges for which Lender is or may be liable as a result thereof; however, if such payment would be prohibited by law or would render the Loan usurious, then instead of collecting such payment, Lender may declare all amounts owing under the Loan Documents to be due and payable within ninety (90) days following notice thereof.

6.6    **Compliance with Law and Other Restrictions**. Borrower shall observe and comply with all legal requirements applicable to its existence and to the ownership, use and operation of the Project. Borrower shall comply with all restrictive covenants affecting the Project, and all zoning ordinances and other public or private restrictions as to the use of the Project.

6.7    **Legal Existence; Name, Status, Etc.** Borrower shall preserve and keep in full force and effect its existence as, and at all times operate as, a Single Purpose Entity, and Borrower and each Borrower Party that is an entity shall preserve and keep in full force and effect its entity status, franchises, rights and privileges under the laws of the state of its formation, and all qualifications, licenses and permits applicable to the ownership, use and operation of the Project. Borrower shall not become a Restricted Company. Neither Borrower nor any other Borrower Party shall wind up, liquidate, dissolve, reorganize, merge, or consolidate with or into any Person. Without limiting the foregoing, neither Borrower nor any other Borrower Party shall reincorporate or reorganize itself under the laws of any jurisdiction other than the jurisdiction in which it is incorporated or organized as of the Closing Date. Borrower shall conduct business only in its own name and shall not change its name, identity, organizational structure, state of formation or the location of its chief executive office or principal place of business unless Borrower (1) shall have obtained the prior written consent of Lender to such change, and (2) shall have taken all actions necessary or requested by Lender to file or amend any financing statement or continuation statement to assure perfection and continuation of perfection of security interests under the Loan Documents. If Borrower does not have an organizational identification number and later obtains one, Borrower shall promptly notify Lender of its organizational identification number.

6.8    **Affiliate Transactions**. Without the prior written consent of Lender, Borrower shall not engage in any transaction affecting the Project with an Affiliate of Borrower or of any Borrower Party, and no Operating Revenues shall be used to make payments with respect to any such transaction, unless (1) the terms are commercially reasonable and the payment terms thereunder are competitive with amounts that would be paid to or received from third parties on an "arm's-length" basis, (2) the terms are reduced to a written agreement covering all aspects of such arrangement, and Borrower has delivered to Lender a copy

of such agreement, (3) the agreement with the Affiliate is terminable without cause by Borrower or Lender, without penalty or fee, upon not more than thirty (30) days' prior written notice, and (4) the agreement and all payments to be made by Borrower thereunder are subject and subordinate to the Loan Documents and Borrower's payment obligations thereunder.

6.9    **Limitation on Other Debt**.  Borrower shall not, without the prior written consent of Lender, incur any Debt (including Debt to any Affiliate) other than Permitted Debt.  Borrower has no outstanding indebtedness, secured or unsecured, direct or contingent (including any guaranties), other than the Permitted Debt. Without limiting the foregoing, no Debt other than the Loan may be secured (subordinate or pari passu) by the Property.

6.10    **Mechanic's Liens and Stop Payment Notices**.  Borrower shall pay when due all claims and demands of mechanics, materialmen, laborers and others which, if unpaid, might result in a mechanics or materialmans or similar Lien and/or notice of pendency of action (each, a "**Mechanic's Lien**") being filed or recorded against the Project or the assertion of a stop payment notice or similar claim ("**Stop Payment Notice**") against Loan proceeds, and shall defend, indemnify and hold Lender harmless from all Mechanic's Liens and Stop Payment Notices, including all proceedings to foreclose on Mechanic's Liens or to enforce Stop Payment Notices.  If any Mechanic's Liens are served, filed, recorded or otherwise asserted against any portion of the Project, or if any such Stop Payment Notices are asserted against Loan proceeds, Borrower shall, within ten (10) Business Days of written demand, discharge or cause to be discharged such Mechanic's Lien and/or Stop Payment Notice, and shall promptly obtain the dismissal of any proceedings for the foreclosure or the enforcement thereof.  However, Borrower may contest in good faith the validity of any Mechanic's Lien or Stop Payment Notice so long as (1) Borrower notifies Lender that it intends to contest such Mechanic's Lien or Stop Payment Notice, (2) Borrower provides Lender with (a) an endorsement to Lender's title insurance policy (insuring against such Mechanic's Lien) in form and substance satisfactory to Lender, and (b) either a release bond or other security, in either case in such form and amount as may be satisfactory to Lender, including Lender's estimate of interest, penalties and attorneys' fees, and (3) Borrower is diligently contesting the same by appropriate legal proceedings in good faith, at its own expense, and on its own behalf and on behalf of Lender, and concludes such contest prior to the tenth (10th) day preceding the earlier to occur of the Maturity Date or the date on which the Project is scheduled to be sold for non-payment, and timely pays any award, judgment or settlement in favor of such Mechanic's Lien or Stop Payment Notice claimant.  Lender shall have no obligation to make any Loan advances until all Mechanic's Liens and Stop Payment Notices have been fully released or discharged or are being contested in accordance with this Section.

6.11    **ERISA**.  Throughout the term of the Loan:

(1)    Borrower will not be an "employee benefit plan" as defined in Section 3(3) of ERISA, which is subject to Title I of ERISA, and the assets of Borrower will not constitute "plan assets" of one or more such employee benefit plans for purposes of Title I of ERISA.

(2)    Borrower will not be a "governmental plan" within the meaning of Section 3(32) of ERISA, and transactions by or with Borrower will not be subject to state statutes applicable to Borrower regulating investments of, and fiduciary obligations with respect to, such governmental plans.

(3)    Borrower shall have no employees.

6.12    **No Liens**.  Borrower shall not create, incur, assume or suffer to exist any Lien upon or with respect to the Project, any Lease or any of Borrower's rights, income or other assets relating thereto, including, without limitation, the Collateral, whether now owned or hereafter acquired, other than (i) Liens in favor of Lender, and (ii) Liens for current year's taxes, assessments or governmental charges or levies provided payment thereof shall not be delinquent and (iii) other Permitted Encumbrances.

6.13    **Further Assurances**.  Borrower shall promptly (1) cure any defects in the execution and delivery of the Loan Documents, (2) provide, and cause each Borrower Party to provide, Lender such additional information and documentation on Borrower's and each Borrower Party's legal or beneficial ownership, policies, procedures and sources of funds as Lender deems necessary or prudent to enable Lender to comply with Anti-Money Laundering Laws as now in existence or hereafter amended, and (3) execute and deliver, or cause to be executed and delivered, all such other documents, agreements and instruments as Lender may reasonably request to further evidence and more fully describe the collateral for the Loan, to correct any omissions in the Loan Documents, to perfect, protect or preserve any Liens created under any of the Loan Documents, or to make any recordings, file any notices, or obtain any consents, as may be necessary or appropriate in connection therewith.  Borrower shall preserve and protect the first lien and security interest status of the Security Instrument, the Additional Security Instrument and the other Loan Documents.  If any Lien other than the Permitted Encumbrances is asserted against the Project, Borrower shall promptly, and at its expense, (a) give Lender a detailed written notice of such lien or security interest (including origin, amount and other terms), and (b) pay the underlying claim in full or take such other action so as to cause it to be released or contest the same in the same manner that Mechanic's Liens may be contested under Section 6.10.  From time to time, but not more often than annually or at any time while an Event of Default exists, upon the written request of Lender, Borrower shall deliver to Lender a schedule of the name, legal domicile address and jurisdiction of organization, if applicable, for each Borrower Party.

6.14    **Estoppel Certificates**.  Borrower, within ten (10) days after request, shall furnish to Lender a written statement, duly acknowledged, and made based on its knowledge, setting forth the amount due on the Loan, the terms of payment of the Loan, the date to which interest has been paid, whether any offsets or defenses exist against the Loan and, if any are alleged to exist, the nature thereof in detail, and such other matters as Lender may request.

6.15    **Notice of Certain Events**.  Borrower shall promptly notify Lender of (1) any Event of Default, together with a detailed statement of the steps being taken to cure such Event of Default; (2) any notice of default received by Borrower or Guarantor under any of the Leases or Material Agreements; and (3) any threatened or pending legal, judicial or regulatory proceedings, including any dispute between Borrower and any Governmental Authority, affecting Borrower or the Project and of which Borrower has received written notice.

6.16    **Indemnification**.  Borrower shall indemnify, defend and hold Lender harmless from and against any and all out-of-pocket losses, liabilities, claims, damages, expenses, obligations, penalties, actions, judgments, suits, costs and disbursements (including the reasonable fees and actual expenses of Lender's counsel) of any kind or nature whatsoever, in connection with (1) Lender's exercise of its rights and remedies under the Security Instrument, the Additional Security Instrument and other Loan Documents, (2) any lessor obligations or liabilities under any of the Leases at the Project arising prior to Lender taking title to the Project, including any claim against Lender by reason of any alleged obligation, undertaking, action or inaction on its part to perform or discharge any terms, covenants or conditions of such Leases or with respect to the rents and other sums payable thereunder, (3) any inspection, review or testing of or with respect to the Project, (4) any investigative, administrative, mediation, arbitration, or judicial proceeding, whether or not Lender is designated a party thereto, commenced or threatened at any time (including after the repayment of the Loan) in any way related to (a) the Project, (b) Borrower or its owners, or (c) any dealings between Borrower or its owners and any third parties (including any and all costs and expenses incurred by Lender in responding to any third-party subpoenas or other third-party discovery requests and defending any depositions of their respective directors, officers, employees, agents or attorneys), (5) any proceeding instituted by any Person claiming a Lien, and (6) any brokerage commissions or finder's fees claimed by any broker or other party in connection with the Loan, the Project, or any of the transactions contemplated in the Loan Documents, except to the extent any of the foregoing is caused by Lender's gross

negligence or willful misconduct.  Any amount covered by this indemnity shall be payable on demand, and shall bear interest from the date of demand until the same is paid by Borrower to Lender at the Default Rate.

6.17    **Restriction of Distributions**.  During the term of the Loan, Borrower shall not (1) declare or pay any dividend, distribution or other advance of any type on or in respect of any direct or indirect ownership interest or other beneficial in Borrower, or (2) purchase, redeem, exchange or otherwise retire any ownership interest or other beneficial interest in Borrower.

6.18    **Material Agreements**.

(1)    Borrower shall not enter into any agreement or instrument or become subject to any restriction which would reasonably be expected to have a Material Adverse Effect.  Borrower shall (a) comply with all material terms, conditions and covenants of each Material Agreement and each material Permitted Encumbrance, including any reciprocal easement agreement, ground lease, declaration of covenants, conditions and restrictions, and any condominium arrangements, (b) promptly deliver to Lender a true and complete copy of each and every notice of default received or served by Borrower with respect to any obligations under the provisions of any Material Agreement and/or Permitted Encumbrance, (c) deliver to each other party to any Permitted Encumbrance and any Material Agreement notice of the identity of Lender and each assignee of Lender of which Borrower is aware if such notice is required in order to protect Lender's interest thereunder, and (d) enforce, short of termination thereof, the performance and observance of each and every material term, covenant and provision of each Material Agreement and Permitted Encumbrance to be performed or observed, if any.

(2)    Borrower shall not (x) enter into any Material Agreement, or amend, modify, surrender, grant or withhold any material consent, approval or waiver under any Material Agreement or waive any material rights or remedies under any Material Agreement, except, in each case, on arms-length commercially reasonable terms, (y) terminate any Material Agreement, except for terminations in connection with a material default thereunder, or (y) default in its obligations under any Material Agreement.

6.19    **Other Agreements; Defaults**.  Borrower shall not become party to any agreement or instrument, or subject to any court order, injunction, permit or restriction, which could reasonably be expected to have a Material Adverse Effect.  Borrower shall not violate any agreement in a manner which would have a Material Adverse Effect.

6.20    **Financial Covenants**.  Until all of the Borrower's obligations under the Loan Documents have been indefeasibly paid and performed in full, the Guarantor shall at all times maintain (a) a minimum Tangible Net Worth of not less than Twenty Million and No/100 Dollars ($20,000,000), and (b) minimum Cash Liquidity Balances of not less than One Million Two Hundred Thousand and No/100 Dollars ($1,200,000.00).

6.21    **Zoning and Use**.  Borrower shall not do any of the following without the prior written consent of Lender:

(1)    (a) initiate or support any limiting change in the permitted uses of the Property (or to the extent applicable, zoning reclassification of the Property, or any portion thereof), (b) seek any variance under existing land use restrictions, laws, rules or regulations (or, to the extent applicable, zoning ordinances) applicable to the Property, (c) use or permit the use of the Property in a manner that would result in the use of the Property becoming a nonconforming use under applicable land-use restrictions or zoning ordinances or that would violate the terms of any Lease, Material Agreement or Legal Requirement (and if under applicable zoning ordinances the use of all or any portion of the Property is a nonconforming use, Borrower shall not cause or permit such nonconforming use to be discontinued or abandoned) or

(d) use or permit the use of the Property for any purpose other than for the current uses as of the date of this Agreement; or

(2)     execute or file any subdivision plat affecting any portion of the Property, or institute, or permit the institution of, proceedings to alter any tax lot comprising any portion of the Property.

6.22    **Single Purpose Entity**.  Borrower shall at all times be and remain a Single Purpose Entity.

6.23    **Compliance with Environmental Laws; Notice; Preparation of Environmental Reports**.  Borrower shall, at all times:

(1)     (i) comply, and use commercially reasonable efforts to cause all lessees and other Persons operating or occupying its properties to comply, with all applicable Environmental Laws and Environmental Permits; (ii) obtain and renew all Environmental Permits necessary for its operations and properties; (iii) conduct any investigation, study, sampling and testing, and undertake any cleanup, response or other corrective action necessary to address any releases of Hazardous Materials at, on, under or emanating from any property owned, leased or operated by it in accordance with the requirements of all Environmental Laws, and (iv) make an appropriate response to any investigation, notice, demand, claim, suit or other proceeding asserting Environmental Liability against the Borrower and discharge any obligations it may have to any Person thereunder, except in the case of each of clauses (i) through (iv), where the failure to do so could not reasonably be expected to have a Material Adverse Effect or otherwise result in Environmental Liability.

(2)     At the request of the Lender at any time and from time to time pursuant to the terms of the Hazardous Materials Indemnity Agreement, provide to the Lender within 60 days after such request, at the expense of the Borrower, an environmental assessment report for any properties owned, leased or operated by it described in such request, prepared by an environmental consulting firm acceptable to the Lender, indicating the presence or absence of Hazardous Materials or noncompliance with Environmental Law and the estimated cost of any compliance, response or other corrective action to address any Hazardous Materials on such properties; without limiting the generality of the foregoing, if the Lender determines at any time that a material risk exists that any such report will not be provided within the time referred to above, the Lender may retain an environmental consulting firm to prepare such report at the expense of the Borrower, and the Borrower hereby grants the Lender, such firm and any agents or representatives thereof an irrevocable non-exclusive license, subject to the rights of tenants or necessary consent of landlords, to enter onto their respective properties to undertake such an assessment.

6.24    **Franchise Agreement**.  Borrower shall:

(1)     pay all sums required to be paid by Borrower under the Franchise Agreement and promptly perform and/or observe all of the covenants and agreements required to be performed and observed by it under the Franchise Agreement and do all things reasonably necessary to preserve and to keep unimpaired its material rights thereunder, unless and until the Franchise Agreement is terminated in accordance with Section 6.24(3) below;

(2)     promptly notify Lender in writing of any default under the Franchise Agreement of which it is aware and provide Lender with copies of any notices delivered in connection therewith; and

(3)     not amend, modify or terminate the Franchise Agreement without the prior written consent of Lender; provided, however, that in the event Borrower enters into an Approved Purchase Agreement which contemplates the development of the Property for multifamily use, Lender's consent to the termination of the Franchise Agreement shall not be unreasonably withheld.

6.25    **Cash Collateral Account Deposits**.  On or prior to the date six (6) months following the Closing Date (the "**Cash Collateral Date**"), Borrower shall cause Guarantor to (i) establish a deposit account ("**Cash Collateral Account**") with a banking institution reasonably acceptable to Lender, (ii) execute and deliver to Lender a deposit account control agreement with respect to such Cash Collateral Account in form and substance reasonably acceptable to Lender, and (iii) deposit Guarantor's funds in an amount equal to One Million and No/100 Dollars ($1,000,000.00) into the Cash Collateral Account as additional collateral for the Loan unless a Cash Collateral Reduction Event (as defined below) has occurred on or prior to the Cash Collateral Date, in which event Borrower shall cause Guarantor to deposit Guarantor's funds in an amount equal to Five Hundred Thousand and No/100 Dollars ($500,000.00) (the "**Reduced Cash Collateral Amount**") into the Cash Collateral Account as additional collateral for the Loan.  For the purposes hereof, a "Cash Collateral Reduction Event" shall refer to the occurrence of either of the following:  (a) Borrower delivers to Lender an executed Approved Purchase Agreement with respect to the Property (the "**Purchase Agreement Reduction Event**"); or (b) Borrower delivers documentation acceptable to Lender evidencing (i) investments made with respect to the Project pursuant to the EB-5 Program and in accordance with all applicable Legal Requirements of not less than Fifteen Million and No/100 Dollars ($15,000,000) in the aggregate (collectively the "**EB-5 Proceeds**"), and (ii) the deposit of all such EB-5 Proceeds into a special purpose entity Controlled by Guarantor.  Notwithstanding the foregoing, in the event Borrower causes Guarantor to deposit the Reduced Cash Collateral Amount on or prior to the Cash Collateral Date as a result of the occurrence of the Purchase Agreement Reduction Event and such Approved Purchase Agreement is terminated for any reason prior to the earlier of the close of escrow thereunder or the Stated Maturity Date, then within ten (10) days thereafter Borrower shall cause Guarantor to deposit an additional Five Hundred Thousand and No/100 Dollars ($500,000.00) into the Cash Collateral Account as additional collateral for the Loan.

### ARTICLE 7
### LEASING MATTERS

7.1    **Leasing Representations and Warranties**.  Borrower represents and warrants to Lender that no Leases are in effect with respect to the Property and there are no oral agreements to lease.

7.2    **Leasing Covenants**.  Borrower shall not enter into any Lease with respect to the Property during the term of the Loan.

### ARTICLE 8
### FINANCIAL REPORTING

8.1    **Financial Statements**.

(1)    **Annual Financial Statements**.  Within ninety (90) days following the end of each calendar year during the term of the Loan, commencing on December 31, 2022, Borrower shall furnish to Lender unaudited annual financial statements of Borrower, which shall include an income statement and balance sheet, together with a schedule of contingent liabilities for each such calendar year.  Such financial statements shall be in scope and detail satisfactory to Lender and certified as true and correct in all material respects on behalf of Borrower by the chief financial representative of Borrower.

(2)    **Certification; Supporting Documentation**.  Each such financial statement shall be in scope and detail satisfactory to Lender and certified as true and correct in all material respects on behalf of Borrower by the chief financial representative of Borrower.

(3)    **Tax Returns.**  Borrower shall furnish or cause to be furnished to Lender copies of Borrower's filed federal, state and (if applicable) local income tax returns for each taxable year (with all

forms and supporting schedules attached) within thirty (30) days after the earlier of the date of filing and the date by which filing is required.

(4)    **Guarantor Financial Statements and Compliance Certificates**.  (i) On a quarterly basis commencing on September 30, 2022, and on each December 31, March 31, June 30 and September 30 thereafter through the Maturity Date, (ii) within ten (10) Business Days following Lender's written request at any time following the occurrence of an Event of Default, and/or (iii) in connection with and as a condition to an extension of the Stated Maturity Date, Borrower shall cause Guarantor to execute and deliver to Lender a Compliance Certificate certifying Guarantor's Tangible Net Worth and Guarantor's Cash Liquidity Balances equal or exceed the amounts required by this Agreement as of the date thereof, and in the case of a Compliance Certificate delivered pursuant to clauses (i), (ii) or (iii) above, the Compliance Certificate shall be accompanied by (a) Guarantor's most recent bank and/or brokerage statements, and (b) Guarantor's unaudited quarterly financial statements, which shall include an income statement and balance sheet and statement of real estate owned, together with a schedule of contingent liabilities for each such calendar quarter.

8.2    **Accounting Principles**.  All financial statements of Borrower and Guarantor shall be prepared in accordance with generally accepted accounting principles (or other method of accounting approved by Lender), consistently applied from year to year.  If the financial statements of Borrower or Guarantor are prepared on an accrual basis, such statements shall be accompanied by a reconciliation to cash basis accounting principles.

8.3    **Other Information**.  Borrower shall deliver to Lender such additional information regarding Borrower, its subsidiaries, its business, and the Project as may be reasonably requested by Lender, within thirty (30) days after Lender's request therefor.

8.4    **Audits**.  Lender's employees and third-party consultants shall be entitled to perform such financial investigations and audits of Borrower's books and records as Lender shall deem necessary. Borrower shall permit Lender and Lender's agents and consultants to examine, upon reasonable advance written notice, such records, books and papers of Borrower which reflect upon its financial condition, the income and expenses relative to the Project and the representations set forth in Article 9 at Borrower's office or such other location where such books, records and other information are maintained.  If Borrower engages an independent certified public accountant, Borrower authorizes Lender to communicate directly with Borrower's independent certified public accountants, and authorizes such accountants to disclose to Lender any and all financial statements and other supporting financial documents and schedules, including copies of any management letter, with respect to the business, financial condition and other affairs of Borrower.

**ARTICLE 9**
**ANTI-MONEY LAUNDERING AND**
**INTERNATIONAL TRADE CONTROLS**

9.1    **Compliance with International Trade Control Laws and OFAC Regulations; Borrower's Funds**.  Borrower represents, warrants and covenants to Lender that:

(1)    Neither Borrower, nor any Borrower Party, nor any Person who owns a 20% or more direct or indirect interest in Borrower, is now nor shall be at any time until after the Loan is fully repaid a Person with whom a U.S. Person, including a Financial Institution, is prohibited from transacting business of the type contemplated by this Agreement, whether such prohibition arises under U.S. law, regulation, executive orders and lists published by the OFAC (including those executive orders and lists published by OFAC with respect to Specially Designated Nationals and Blocked Persons) or otherwise.

(2)    It has taken, and shall continue to take until after the Loan is fully repaid, such measures as are required by law to verify that the funds invested in Borrower and funds used to make payments on the Loan (including Operating Revenues and funds used to repay the Loan, whether from a refinancing, asset sale or otherwise) are derived (a) from transactions that do not violate U.S. law nor, to the extent such funds originate outside the United States, do not violate the laws of the jurisdiction in which they originated; and (b) from permissible sources under U.S. law and to the extent such funds originate outside the United States, under the laws of the jurisdiction in which they originated.

(3)    To the best of its knowledge, neither Borrower, nor any Borrower Party, nor any holder of a 20% or greater direct or indirect interest in Borrower, nor any Person providing funds to Borrower (a) is under investigation by any Governmental Authority for, or has been charged with, or convicted of, money laundering, drug trafficking, terrorist-related activities, any crimes which in the United States would be predicate crimes to money laundering, or any violation of any Anti-Money Laundering Laws; (b) has been assessed civil or criminal penalties under any Anti-Money Laundering Laws; and (c) has had any of its/his/her funds seized or forfeited in any action under any Anti-Money Laundering Laws.

(4)    Borrower shall make payments on the Loan solely from the Interest Reserve (if permitted hereby), funds invested in Borrower, Operating Revenues or insurance proceeds unless otherwise agreed to by Lender.

(5)    No portion of any of the Project has been or will be purchased, improved, equipped or furnished with proceeds of any illegal activity.

## ARTICLE 10
## EVENTS OF DEFAULT AND CURE PERIODS

Each of the following shall constitute an "**Event of Default**":

10.1    **Events of Default Not Subject to Cure Periods**.

(1)    **Payment at Maturity**.  Borrower's failure to pay the Loan by the Maturity Date.

(2)    **Insurance**.  Borrower's failure to maintain insurance as required under Section 4.1 of this Agreement.

(3)    **Transfer**.  Any Transfer occurs in violation of Section 6.1 of this Agreement.

(4)    **Representations and Warranties**.  Any representation or warranty made in any Loan Document proves to be false or misleading in any material respect when made or deemed made; provided, however, as to any such false or misleading representation or warranty which was unintentionally made or submitted to Lender and which can be made true and correct by action of Borrower, Borrower shall have a period of ten (10) Business Days following written notice thereof to Borrower to make such representation or warranty true and correct in all material respects.

(5)    **Single Purpose Entity**.  Borrower's failure to perform, observe or comply with any of the agreements, covenants or provisions contained in Section 6.22.

(6)    **Article 9 Compliance**.  Borrower's failure to perform, observe or comply with any of the agreements, covenants or provisions contained in Article 9.

(7)    **Voluntary Petitions, Etc.**  Commencement by Borrower or Guarantor (each, a "**Bankruptcy Party**") of a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to itself or its Debts or other liabilities, or seeking to consolidate its assets with the assets of any other Person, under any bankruptcy, insolvency or other similar law or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official for it or any of its property, or consent by a Bankruptcy Party to any such relief or to the appointment of or taking possession by any such official in an involuntary case or other proceeding commenced against it or its assets, or the making by a Bankruptcy Party of a general assignment for the benefit of creditors, or the failure by a Bankruptcy Party, or the admission by a Bankruptcy Party in writing of its inability, to pay its debts generally as they become due, or any action by a Bankruptcy Party to authorize or effect any of the foregoing.

(8)    **Franchise Agreement**.  Borrower's failure to perform, observe or comply with any of the agreements, covenants or provisions contained in Section 6.24.

(9)    **Cash Collateral Account**.  Borrower's failure to perform, observe or comply with any of the agreements, covenants or provisions contained in Section 6.25.

10.2    **Events of Default Subject to Specific Cure Periods**.

(1)    **Payments Prior to Maturity**.  Borrower's failure to pay any regularly scheduled installment of principal or interest on the Loan, or any other amount owing under the Loan Documents (other than payment of the Loan on the Maturity Date covered under Section 10.1(1)), within five (5) days of (and including) the date when due.

(2)    **Involuntary Bankruptcy or Other Proceeding**.  Commencement of an involuntary case or other proceeding against any Bankruptcy Party, or against the assets of any Bankruptcy Party, which seeks liquidation, reorganization or other relief with respect to such Bankruptcy Party or its Debts or other liabilities, or seeks to consolidate the assets of such Bankruptcy Party with the assets of any other Person, under any bankruptcy, insolvency or other similar law now or hereafter in effect, or seeks the appointment of a trustee, receiver, liquidator, custodian or other similar official of it or any of its property; and such involuntary case or other proceeding shall remain undismissed or unstayed for a period of ninety (90) days; or an order for relief against a Bankruptcy Party or its assets shall be entered in any such case under the Federal Bankruptcy Code.

(3)    **Guarantor's Financial Covenants**.  The failure of Guarantor to at all times maintain a Tangible Net Worth and Cash Liquidity Balances in the amounts required by this Agreement, and the continuation of such failure for ten (10) Business Days after receipt of notice thereof from Lender.

(4)    **Compliance Certificates**.  The failure to deliver a Compliance Certificate in the time and manner set forth in Section 8.1(4) and the continuance of such failure for ten (10) Business Days after receipt of written notice from Lender.

(5)    **Financial Condition**.  The occurrence of any materially adverse change in the financial condition or prospects of Borrower, or the existence of any other condition which, in Lender's reasonable determination, constitutes a material impairment of any such Person's ability to operate the Project or of such Person's ability to perform their respective obligations under the Loan Documents, which is not remedied within thirty (30) days after written notice.

(6)    **Guarantor**.  (i) The Guaranty shall for any reason cease to be a valid and binding obligation or enforceable against Guarantor; (ii) Guarantor shall repudiate, revoke or deny any liability under the Guaranty; or (iii) any Guarantor that is a natural person shall die or be declared legally incompetent; or (iv) any Guarantor that is a revocable trust shall be revoked.

10.3    **Other Events of Defaults**.

(1)    **Specified Defaults Under Other Loan Documents**.  If any term, covenant or provision set forth in the Loan Documents under which Borrower or Guarantor are obligated expressly contains a specific grace period, then Borrower's, or Guarantor's failure to perform, observe or comply with such term, covenant or condition after the expiration of such grace period.

(2)    **Covenants Without Specific Grace Periods**.  Borrower or Guarantor shall continue to be in default under any of the other terms, covenants or provisions of this Agreement not specified in Section 10.1, Section 10.2 or Section 10.3(1), or under any of the terms, covenants or provisions contained in the other Loan Documents, for ten (10) days after receipt of notice of such default from Lender, in the case of any default which can be cured by the payment of a sum of money, or for thirty (30) days after receipt of notice of such default from Lender in the case of any other default; provided, however, that if (a) such non-monetary default is susceptible of cure but cannot reasonably be cured within such 30-day period, (b) the defaulting party shall have commenced to cure such default within such 30-day period and thereafter is diligently and expeditiously proceeding to cure such default, and (c) the defaulting party has provided Lender with security satisfactory to Lender against any interruption of payment or impairment of collateral as a result of such continuing default, then such 30-day period shall be extended for such additional time as is reasonably necessary for the defaulting party, exercising due diligence, to cure such default, provided further that in no event shall such additional period exceed ninety (90) days.

# ARTICLE 11
# LENDER'S REMEDIES

11.1    **Remedies - Insolvency Events**.  Upon the occurrence of any Event of Default described in Section 10.1(7) or Section 10.2(2), the obligations of Lender to advance amounts hereunder shall immediately terminate, and all amounts due under the Loan Documents immediately shall become due and payable, all without written notice and without presentment, demand, protest, notice of protest or dishonor, notice of intent to accelerate the maturity thereof, notice of acceleration of the maturity thereof, or any other notice of default of any kind, all of which are hereby expressly waived by Borrower; however, if the Bankruptcy Party under Section 10.1(7) or Section 10.2(2) is other than Borrower, then all amounts due under the Loan Documents shall become immediately due and payable at Lender's election, in Lender's sole discretion.

11.2    **Remedies - Other Events**.  Except as set forth in Section 11.1 above, while any Event of Default exists, Lender may (1) by written notice to Borrower, declare the entire Loan to be immediately due and payable without presentment, demand, protest, notice of protest or dishonor, notice of intent to accelerate the maturity thereof, notice of acceleration of the maturity thereof, or other notice of default of any kind, all of which are hereby expressly waived by Borrower, (2) terminate the obligation, if any, of Lender to advance amounts hereunder, and (3) exercise all rights and remedies therefor under the Loan Documents and at law or in equity.

11.3    **Lender's Right to Perform the Obligations**.  If Borrower shall fail, refuse or neglect to make any payment or perform any act required by the Loan Documents, then while any Event of Default exists, and without notice to or demand upon Borrower and without waiving or releasing any other right, remedy or recourse Lender may have because of such Event of Default, Lender may (but shall not be obligated to) make such payment or perform such act for the account of and at the expense of Borrower, and shall have the right to enter upon the Project for such purpose and to take all such action thereon and with respect to the Project as it may deem necessary or appropriate.  If Lender shall elect to pay any sum due with reference to the Project, Lender may do so in reliance on any bill, statement or assessment procured from the appropriate Governmental Authority or other issuer thereof without inquiring into the accuracy or

validity thereof.  Similarly, in making any payments to protect the security intended to be created by the Loan Documents, Lender shall not be bound to inquire into the validity of any apparent or threatened adverse title, Lien, claim or charge before making an advance for the purpose of preventing or removing the same.  Borrower shall indemnify, defend and hold Lender harmless from and against any and all losses, liabilities, claims, damages, expenses, obligations, penalties, actions, judgments, suits, costs or disbursements of any kind or nature whatsoever, including reasonable attorneys' fees and disbursements, incurred or accruing by reason of any acts performed by Lender pursuant to the provisions of this Section 11.3, including those arising from the joint, concurrent, or comparative negligence of Lender, except to the extent caused by Lender's gross negligence or willful misconduct.  All sums paid by Lender pursuant to this Section 11.3 and all other sums expended by Lender to which it shall be entitled to be indemnified, together with interest thereon at the Default Rate from the date of such payment or expenditure until paid, shall constitute additions to the Loan, shall be secured by the Loan Documents and shall be paid by Borrower to Lender upon demand.

## ARTICLE 12
## CONDITIONS PRECEDENT TO EFFECTIVENESS OF AGREEMENT

12.1    **Conditions Precedent to Effectiveness of Agreement**.    The effectiveness of this Agreement is subject to the fulfillment by Borrower, or waiver by Lender, of the following conditions precedent and any other obligations of Borrower, Guarantor or Property Manager contemplated by this Agreement to occur on or before the Closing Date:

(1)    **Delivery of Loan Documents**.  Lender shall have received the following original documents, duly executed by the parties thereto, and where required, duly acknowledged and in recordable form, each of which shall be in form and substance acceptable to Lender:

(a)    This Agreement, duly executed by Borrower and Lender;

(b)    The Note, duly executed by Borrower in favor of Lender;

(c)    The Security Instrument, duly executed by Borrower and in recordable form;

(d)    The Additional Security Instrument, duly executed by Guarantor and in recordable form;

(e)    The Guaranty, duly executed by Guarantor;

(f)    The Hazardous Materials Indemnity Agreement in favor of Lender, duly executed by Borrower and Guarantor;

(g)    An Officer's Certificate for each Borrower Entity, in form and substance acceptable to Lender; and

(h)    Any other documents or agreements reasonably requested by Lender to the extent required or contemplated by this Agreement or the other Loan Documents.

(2)    **Title Insurance**.  Lender shall have received a lender's title insurance policy ("**Title Insurance Policy**") issued by [_____] ("**Title Company**"), to Lender, and its successors and assigns, dated as of the Closing Date, in form and substance acceptable to Lender, showing

fee title to the Property vested in Borrower and fee title to the Additional Property vested in Guarantor, with coverage equal to the Loan Amount, together with such endorsements thereto as Lender may require (including, without limitation, affirmative mechanic's lien coverage) and insuring that the Security Instrument creates a valid first priority lien on the Project and that the Additional Security Instrument creates a valid first priority lien on the Additional Property, free and clear of all exceptions from coverage other than those exceptions approved by Lender, in its sole and absolute discretion and standard exceptions and exclusions from coverage (as modified by the terms of any endorsements), Lender also shall have received evidence that all premiums in respect of the Title Insurance Policy, including all endorsements thereto, have been paid by Borrower.

(3)    **Related Documents**.   Each additional document not specifically referenced herein, but relating to the transactions contemplated herein, shall be in form and substance reasonably satisfactory to Lender, and shall have been duly authorized, executed and delivered by all parties thereto and Lender shall have received and approved certified copies thereof.

(4)    **Delivery of Organizational Documents; Officer's Certificates**.   Borrower, Borrower's Member and Borrower's Manager (each a "**Borrower Entity**") shall each deliver or cause to be delivered to Lender copies, certified by an authorized officer, trustee or member (as applicable) of each Borrower Entity of all organizational documentation related to such Borrower Entity and the formation, structure, existence, good standing and qualification to do business, as Lender may reasonably request, including, without limitation, copies of the articles of formation certified by the appropriate secretary of state within thirty (30) days of the Closing Date, operating agreements, bylaws, current good standing certificates, qualifications to do business in the appropriate jurisdictions, resolutions authorizing the entering into of the Loan Documents and incumbency certificates as may be requested by Lender, all of which shall be accompanied by an officer's certificate in favor of Lender duly executed by an authorized officer or member of the applicable Borrower Entity, in form and substance acceptable to Lender (each, an "**Officer's Certificate**").

(5)    **Points and Costs**.   Borrower shall have paid to Lender the following points and costs:

(a)    the Origination Points;

(b)    the Initial Servicing Costs; and

(c)    all of its other costs and expenses paid or incurred in connection with the Loan, provided that any deposits or other amounts previously provided by Borrower to Lender in connection with the Loan shall be applied toward such amounts as previously agreed in writing with respect to such amounts.

(6)    **Property Taxes**.   Lender shall have received evidence that the Property Taxes then due and payable have been paid in full (or will be paid in full on the Closing Date through the Title Company and shown as paid on the Title Insurance Policy).

(7)    **Opinions of Counsel**.   Lender shall have received opinions from Borrower's and Guarantor's counsel with respect to the due execution, authority, enforceability of this Agreement and the other Loan Documents and such other matters as Lender may reasonably require, all such opinions in form, scope and substance satisfactory to Lender and Lender's counsel.

(8)    **Certificates of Insurance**.   Lender shall have received and approved certificates of insurance evidencing that the insurance coverage required in Article 4.1 hereof has been obtained in compliance with the requirements of Article 4 hereof.

(9)      **Flood Zone**.  Lender shall have received satisfactory evidence that no portion of the Project is located in an area identified by the Federal Emergency Management Agency as an area having special flood hazards.

(10)      **Updated UCC, Lien, Bankruptcy and Searches**.  Lender shall have received and approved of the following searches each dated no earlier than thirty (30) days prior to the Closing Date: (a) Uniform Commercial Code searches, state and federal tax and judgment lien searches; federal and local litigation searches and bankruptcy searches on Borrower, Borrower Parties and Guarantor.

(11)      **Bankruptcy**.  The Bankruptcy Court shall have entered a Final Order or Final Orders, in form and substance acceptable to lender, which Final Order or Orders shall (a) (i) approve the Loan pursuant to 11 U.S.C. § 364(d), (ii) grant Lender a senior and first priority security interest in and to the Collateral, and (iii) find that Lender is making the Loan in good faith pursuant to 11 U.S.C. § 364(e), and (b) (i) dismiss the Bankruptcy Case and (ii) provide that the orders of the Bankruptcy Court entered pursuant to this Agreement are not impacted or altered by such dismissal as provided in 11 U.S.C. § 349.

(12)      **No Subordinate Liens**.  Borrower shall have caused to be repaid in full as of the Closing Date all lienholders encumbering the Project other than Lender, including, without limitation, all secured creditors identified in the Chapter 11 Plan.

(13)      **Survey**.  Borrower shall have furnished to Lender an ALTA/ACSM Land Title Survey of the Project.  Said survey shall be dated no earlier than thirty (30) days prior to the date of this Agreement and shall be made (and certified to have been made) in form reasonably satisfactory to Lender in its sole discretion.  Such survey shall be sufficient to permit issuance of the Title Insurance Policy in the form required by this Agreement.  Such survey shall include the legal description of the Land.

(14)      **Financial Statements**.  Borrower shall have furnished to Lender current annual financial statements of Borrower, Guarantor, and such other persons or entities connected with the Loan as Lender may request, each in form and substance and certified by such individual as acceptable to Lender.

(15)      **Representations and Warranties**.  All of the representations and warranties set forth in this Agreement and the other Loan Documents shall be true, correct and complete in all material respects as of the Closing Date.

(16)      **Further Documents**.  Lender or its counsel shall have received such other and further approvals, opinion, documents, estoppels certificates, consents and information as Lender or its counsel may have reasonably requested including, without limitation, the Loan Documents in form and substance satisfactory to Lender and its counsel.

## ARTICLE 13
## LIMITATION ON LIABILITY

13.1      **Limitation on Liability of Lender's Officers, Employees, Etc.**  Any obligation or liability whatsoever of Lender which may arise at any time under this Agreement or any other Loan Document shall be satisfied, if at all, out of Lender's assets only.  No such obligation or liability shall be personally binding upon, nor shall resort for the enforcement thereof be had to, the property of any of Lender's shareholders, directors, officers, employees or agents, regardless of whether such obligation or liability is in the nature of contract, tort or otherwise.

**ARTICLE 14**
**MISCELLANEOUS**

14.1     **Notices**.  All notices, consents, approvals and requests required or permitted under any Loan Document (each, a "**Notice**") shall be given in writing by expedited prepaid delivery service, either commercial or United States Postal Service, with proof of delivery or attempted delivery, addressed as set forth below (except that any party hereto may change its address and other contact information for purposes hereof at any time by sending a written notice to the other parties to this Agreement in the manner provided for in this Section). A notice shall be deemed to have been given when delivered or upon refusal to accept delivery.   Borrower shall not be permitted to designate more than one place for service of Notice concurrently.

Addresses for Notices:

If to Borrower:          Crown Jewel Properties, LLC
                         _____
                         _____
                         _____
                         _____

                         With a copy to:

                         _____
                         _____
                         _____
                         _____

If to Lender:            Buchanan Mortgage Holdings, LLC
                         3501 Jamboree Road, Suite 4200
                         Newport Beach, CA 92660
                         Attention:  Tim Ballard and Scott Magoffin

                         with a copy to:

                         Trimont Real Estate Advisors, Inc.
                         3424 Peachtree Road NE, Suite 2200
                         Atlanta, GA 30326
                         Attention:  J. Gregory Winchester
                         Attention:  Steven Lauer

                         and to:

                         Trimont Real Estate Advisors, Inc.
                         3030 Old Ranch Parkway; Suite 350
                         Seal Beach, California 90740
                         Attention:  Jeff Stargardter

                         and to:

                         Rutan & Tucker, LLP
                         18575 Jamboree Road, 9th Floor

Irvine, CA 92612
Attention:  Robert Dillaway

14.2    **Amendments, Waivers, References**.

(1)    This Agreement and any other Loan Document may be amended, modified or supplemented only by a written instrument signed by Borrower and Lender.  No waiver of any provision of the Loan Documents shall be effective unless in writing and signed by the party against whom enforcement is sought.

(2)    This Agreement and the other Loan Documents shall not be executed, entered into, altered, amended, or modified by electronic means.  Without limiting the generality of the foregoing, Borrower and Lender hereby agree that no exchange of electronic correspondence between the parties shall operate to amend, modify or waive any term or provision of any Loan Document.

(3)    Any reference to a Loan Document, whether in this Agreement or in any other Loan Document, shall be deemed to be a reference to such Loan Document as it may hereafter from time to time be amended, modified, consolidated, replaced, severed, supplemented, extended and restated.

14.3    **Limitation on Interest**.  It is the intention of the parties hereto to conform strictly to applicable usury laws.  Accordingly, all agreements between Borrower and Lender with respect to the Loan are hereby expressly limited so that in no event, whether by reason of acceleration of maturity or otherwise, shall the amount paid or agreed to be paid to Lender or charged by Lender for the use, forbearance or detention of the money to be lent hereunder or otherwise, exceed the maximum amount allowed by law.  If the Loan would be usurious under applicable law, then, notwithstanding anything to the contrary in the Loan Documents: (1) the aggregate of all consideration which constitutes interest under applicable law that is contracted for, taken, reserved, charged or received under the Loan Documents shall under no circumstances exceed the maximum amount of interest allowed by applicable law, and any excess shall be credited on the Note by the holder thereof (or, if the Note has been paid in full, refunded to Borrower); and (2) if maturity is accelerated by reason of an election by Lender, or in the event of any prepayment, then any consideration which constitutes interest may never include more than the maximum amount allowed by applicable law.  In such case, excess interest, if any, provided for in the Loan Documents or otherwise, to the extent permitted by applicable law, shall be amortized, prorated, allocated and spread from the date of advance until payment in full so that the actual rate of interest is uniform through the term hereof.  If such amortization, proration, allocation and spreading is not permitted under applicable law, then such excess interest shall be canceled automatically as of the date of such acceleration or prepayment and, if theretofore paid, shall be credited on the Note (or, if the Note has been paid in full, refunded to Borrower).  The terms and provisions of this Section 14.3 shall control and supersede every other provision of the Loan Documents.  If at any time the laws of the United States of America permit Lender to contract for, take, reserve, charge or receive a higher rate of interest than is allowed by applicable state law (whether such federal laws directly so provide or refer to the law of any state), then such federal laws shall to such extent govern as to the rate of interest which Lender may contract for, take, reserve, charge or receive under the Loan Documents.

14.4    **Invalid Provisions**.  If any provision of any Loan Document is held to be illegal, invalid or unenforceable, such provision shall be fully severable; the Loan Documents shall be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part thereof; the remaining provisions thereof shall remain in full effect and shall not be affected by the illegal, invalid, or unenforceable provision or by its severance therefrom; and in lieu of such illegal, invalid or unenforceable provision there shall be added automatically as a part of such Loan Document a provision as similar in terms to such illegal, invalid or unenforceable provision as may be possible to be legal, valid and enforceable.

14.5    **Reimbursement of Expenses**.  Borrower shall pay or reimburse Lender on written demand for (1) all reasonable costs and expenses incurred by Lender in connection with the diligence, negotiation, documentation, closing, disbursement and administration of the Loan, including fees and expenses of Lender's attorneys and Lender's environmental, engineering, accounting, entitlement and other consultants; fees, charges and taxes for the recording or filing of Loan Documents; financial investigation, audit and inspection fees and costs; settlement of condemnation and casualty awards; title search costs, premiums for title insurance and endorsements thereto; fees and costs for lien and litigation searches and background checks; and costs and expenses of responding to third-party subpoenas; and (2) all amounts expended, advanced or incurred by Lender to collect the Note, or to enforce the rights of Lender under this Agreement or any other Loan Document, to protect, defend or assert the rights, claims and actions of Lender under the Loan Documents or with respect to the Collateral (by litigation or other proceedings) or to defend any claims asserted against Lender by Borrower or any Borrower Party with respect to the Loan, the Loan Documents, the Collateral or the transactions contemplated hereby, which amounts will include all transfer taxes payable upon foreclosure of any Collateral, court costs, attorneys' fees and expenses, fees of auditors and accountants, and investigation expenses as may be incurred by Lender in connection with any such matters (whether or not litigation is instituted), together with interest at the Default Rate on each such amount from the date of written demand for payment until the date of reimbursement to Lender.  All amounts payable by Borrower to Lender under this Section shall constitute part of the Loan and shall be secured by the Loan Documents.

14.6    **Approvals; Third Parties; Conditions**.  All rights retained or exercised by Lender to review or approve leases, contracts, plans, studies and other matters, including Borrower's and any other Person's compliance with the provisions of Article 9 and compliance with laws applicable to Borrower, the Project or any other Person, are solely to facilitate Lender's credit underwriting and administration of the Loan, and shall not be deemed or construed as a determination that Lender has passed on the adequacy thereof for any other purpose and may not be relied upon by Borrower or any other Person.  This Agreement is for the sole and exclusive use of Lender and Borrower and may not be enforced, nor relied upon, by any Person other than Lender and Borrower.  All conditions of the obligations of Lender hereunder, including the obligation to make advances, are imposed solely and exclusively for the benefit of Lender, its successors and assigns, and no other Person shall have standing to require satisfaction of such conditions or be entitled to assume that Lender will refuse to make advances in the absence of strict compliance with any or all of such conditions, and no other Person shall, under any circumstances, be deemed to be a beneficiary of such conditions, any and all of which may be freely waived in whole or in part by Lender at any time in Lender's sole discretion.

14.7    **Lender Not in Control; No Partnership**.

(1)      None of the covenants or other provisions contained in this Agreement shall, or shall be deemed to, give Lender the right or power to exercise control over the affairs or management of Borrower.  The power of Lender is limited to the right to exercise the rights and remedies under the Loan Documents.

(2)      Borrower and Lender agree that the relationship between Borrower and Lender is, and at all times shall remain, solely that of debtor and creditor.  No covenant or provision of the Loan Documents is intended, nor shall be deemed or construed, to create, and Lender and Borrower disclaim any intention to create, a partnership, joint venture, agency or common interest in profits or income between Lender and Borrower, or to create an equity in the Project in Lender, or any sharing of liabilities, losses, costs or expenses.  Lender neither undertakes nor assumes any responsibility or duty to Borrower, to any direct or indirect constituent partners, members, stockholders or investors in Borrower (each, a "**Borrower Investor**") or to any other Person with respect to the Collateral or the Loan, except as expressly provided in the Loan Documents.  Notwithstanding any other provision of the Loan Documents: (a) Lender is not, nor shall be construed as, a partner, joint venturer, alter ego, manager, controlling person

or other business associate or participant of any kind in Borrower or any Borrower Investor or Borrower Party, and Lender does not intend to ever assume such status; (b) Lender shall in no event be liable for any debts, expenses or losses incurred or sustained by Borrower or any Borrower Investor or Borrower Party; and (c) Lender shall not be deemed responsible for or a participant in any acts, omissions or decisions of Borrower or any Borrower Investor or Borrower Party.

14.8    **Time of the Essence**.  Time is of the essence with respect to this Agreement and the other Loan Documents.

14.9    **Successors and Assigns**.

(1)    This Agreement shall be binding upon and inure to the benefit of Lender and Borrower and their respective successors and permitted assigns, provided that neither Borrower nor any Borrower Party shall, without the prior written consent of Lender, assign any rights, duties or obligations hereunder.

(2)    The Loan, the Note, the Loan Documents, and/or Lender's rights, title, obligations and interests therein may be sold, assigned, participated, syndicated, pledged or otherwise transferred by Lender and any of its successors and assigns to any Person at any time in its sole and absolute discretion, in whole or in part, whether by operation of law (pursuant to a merger or other successor in interest) or otherwise without notice to or consent from any Borrower Party or any other Person and without any other restriction of any kind.  Any sale, assignment, participation, pledge or other transfer of the Loan, the Note, the Loan Documents, any additional advance, if any, and/or Lender's rights, title and interests therein may be assigned separately from any covenants by Lender to consider the making of any additional advances, if any, hereunder and under the other Loan Documents.  Upon any such sale, assignment, participation, syndication, pledge or other transfer, all references to Lender in this Agreement and in any Loan Document shall be deemed to refer to such assignee or successor in interest to the extent of the interest so transferred and such assignee or successor in interest shall thereafter stand in the place of Lender in all respects.  To the extent any such assignee or transferee assumes the rights, title and interests of Lender hereunder and under the other Loan Documents, Lender shall be released from such rights, title and interests and shall have no further liability with respect thereto; underlined(provided, ) underlined(however, ) that Lender shall retain any and all covenant to consider the making of future advances unless Borrower shall have received notice from Lender and such assignee or transferee that such assignee or transferee has assumed the covenant to consider the making of additional advances.  Borrower hereby agrees to execute any amendment and/or any other document that may be reasonably necessary to effectuate the foregoing. provided that such amendment or other documents do  not change the economic terms of the Loan or otherwise increase, in any material respect, Borrower's or Guarantor's duties, responsibilities or liabilities under the Loan Documents, or decrease, limit or restrict Borrower's or Guarantor's rights under the Loan Documents. Borrower shall reasonably cooperate with Lender in effecting any such sale, assignment, participation, syndication, pledge or other transfer and shall reasonably cooperate and use all reasonable efforts to satisfy the market standards to which Lender customarily adheres or which may be reasonably required by any participant, investor, lender, or purchaser involved in any such sale, assignment, participation, syndication, pledge or other transfer(including delivery of opinions of counsel in form and substance similar to the opinions of counsel delivered to Lender on the Closing Date).  Borrower shall provide such information and documents relating to Borrower, the Guarantor and the Project as Lender may request in connection with any such sale, assignment, participation, syndication, pledge or other transfer.  In addition, Borrower shall make available to Lender all information concerning the Project, its business and operations that Lender may reasonably request.  Borrower shall not be responsible for Lender's costs and expenses incurred in connection with any of the foregoing transactions (including the costs of any third party reports required by Lender).

(3)    Borrower authorizes Lender to disclose to any participant, any assignee or any other Person acquiring an interest in the Obligations, the Loan or the Loan Documents by operation of law (each a "**Transferee**"), and to any prospective Transferee, any and all information in Lender's possession concerning the Project, the Borrower or any other Borrower Party, or any of their respective Affiliates. Notwithstanding any such provisions or agreements, Lender may also disclose any and all information in Lender's possession concerning the Project, Borrower or any other Borrower Party or any of their respective Affiliates to: (a) Lender's Affiliates; (b) the legal counsel, accountants or other professional advisors to Lender, any assignee or participant of Lender's interest in the obligations owed in connection with or under the Loan or the Loan Documents, or any portion thereof or their respective Affiliates; (c) regulatory officials; (d) any Person as requested pursuant to or as required by law, regulation, or legal process; and (e) any Person in connection with any legal proceeding to which Lender is a party.

14.10    **Renewal, Extension or Rearrangement**.  Subject to Section 14.9, all provisions of the Loan Documents shall apply with equal effect to each and all promissory notes and amendments thereof hereinafter executed which in whole or in part represent a renewal, extension, increase or rearrangement of the Loan.

14.11    **Waivers**.  No course of dealing on the part of Lender, its officers, employees, consultants or agents, nor any failure or delay by Lender with respect to exercising any right, power or privilege of Lender under any of the Loan Documents, shall operate as a waiver thereof.  Any waiver of a Potential Default or Event of Default, shall not be construed to be a waiver of any subsequent occurrence of the same or any other Potential Default or Event of Default.

14.12    **Cumulative Rights**.    The rights, powers and remedies of Lender under the Loan Documents shall be cumulative and not exclusive of any right, power or remedy available at law or in equity or otherwise.  The exercise or partial exercise of any such right, power or remedy shall not preclude the exercise of any other right, power or remedy, each of which may be pursued singly, concurrently or otherwise, at such time and in such order as Lender may determine in its sole discretion.

14.13    **Promotional Material**.    Borrower authorizes Lender to issue press releases, advertisements and other promotional materials in connection with Lender's own promotional and marketing activities, and describing the Loan, the Property or the Project in general terms or in detail and Lender's participation in the Loan, provided that all references to Borrower contained in any such press releases, advertisements or promotional materials shall be approved in writing by Borrower in advance of issuance.  All references to Lender contained in any press release, advertisement or promotional material issued by Borrower shall be approved in writing by Lender in advance of issuance.

14.14    **Survival**.  All of the representations, warranties, covenants, and indemnities of Borrower hereunder, and under the indemnification provisions of the other Loan Documents, shall survive the repayment in full of the Loan and the release of the Liens evidencing or securing the Loan, and shall survive the transfer (by sale, foreclosure, conveyance in lieu of foreclosure or otherwise) of any or all right, title and interest in and to the Project to any party, whether or not an Affiliate of Borrower.

14.15    **WAIVER OF JURY TRIAL.  TO THE MAXIMUM EXTENT PERMITTED BY LAW, BORROWER AND LENDER HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENT (WHETHER VERBAL OR WRITTEN) OR ACTION OF EITHER PARTY OR ANY EXERCISE BY ANY PARTY OF THEIR RESPECTIVE RIGHTS UNDER THE LOAN DOCUMENTS OR IN ANY WAY RELATING TO THE LOAN OR THE COLLATERAL (INCLUDING, WITHOUT LIMITATION, ANY ACTION TO RESCIND OR**

**CANCEL THIS AGREEMENT, AND ANY CLAIM OR DEFENSE ASSERTING THAT THIS AGREEMENT WAS FRAUDULENTLY INDUCED OR IS OTHERWISE VOID OR VOIDABLE). THIS WAIVER IS A MATERIAL INDUCEMENT FOR LENDER TO ENTER INTO THIS AGREEMENT.**

14.16    **Punitive or Consequential Damages; Waiver**.  Neither Lender nor Borrower shall be responsible or liable to the other party or to any of the other party's Affiliates for any punitive, exemplary or consequential damages which may be alleged by either party (or by any of their respective Affiliates) as a result of the Loan or the transactions contemplated hereby, including any breach or other default by any party hereto.  Borrower represents and warrants to Lender that as of the Closing Date neither Borrower nor any Borrower Party has any claims against Lender in connection with the Loan.

14.17    **Governing Law**.  The validity, construction, enforcement, interpretation and performance of the Loan Documents, and the obligations arising thereunder, and any claim, controversy or dispute arising under or related to any of the Loan Documents, the transactions contemplated thereby or the rights, duties and relationship of the parties thereto, shall be governed by, and construed in accordance with, the laws of the State of California applicable to contracts made and performed in such State, without regard to the principles thereof regarding conflict of laws, and any applicable laws of the United States of America; provided, however, that if any other Loan Document expressly states that it is governed in whole or in part by the laws of a different jurisdiction, then the governing law provision of that Loan Document shall control.

14.18    **Entire Agreement**.  This Agreement and the other Loan Documents embody the entire agreement and understanding between Lender and Borrower and supersede all prior agreements and understandings between such parties relating to the subject matter hereof and thereof, including any commitment letter (if any) issued by Lender with respect to the Loan and any confidentiality agreements previously executed by the parties with respect to the Loan.  Accordingly, the Loan Documents may not be contradicted by evidence of prior, contemporaneous, or subsequent oral agreements of the parties.  There are no unwritten oral agreements between the parties.  If any conflict or inconsistency exists between this Agreement and any of the other Loan Documents (other than the Hazardous Materials Indemnity Agreement), the terms of this Agreement shall control.

14.19    **Counterparts**.  This Agreement may be executed in multiple counterparts, each of which shall constitute an original, but all of which shall constitute one document.  Copies of originals, including copies delivered by facsimile, PDF or other electronic means, shall have the same import and effect as original counterparts and shall be valid, enforceable and binding for the purposes of this Agreement.

14.20    **Brokers**.  Borrower hereby represents to Lender that Borrower has not dealt with any broker, underwriters, placement agent, or finder in connection with the transactions contemplated by this Agreement and the other Loan Documents, other than Cushman & Wakefield (the "**Broker**").  Borrower hereby agrees to pay all fees and commissions due and payable to Broker and to indemnify and hold Lender harmless from and against any and all claims, liabilities, costs and expenses of any kind in any way relating to or arising from a claim by any Person (including Broker) that such Person acted on behalf of Borrower in connection with the transactions contemplated herein.

14.21    **Claims Against Lender**.  Lender shall not be in default under this Agreement, or under any other Loan Documents, unless a written notice specifically setting forth the default claimed by Borrower shall have been given to Lender within four (4) months after Borrower first had knowledge of the occurrence of the event which Borrower alleges gave rise to such claimed default and Lender does not remedy or cure the default, if any default actually exists, promptly thereafter.  Borrower waives any claim, set-off or defense against Lender arising by reason of any alleged default by Lender as to which Borrower does not give such notice timely as required by this Section 14.21 and, in any event, within six (6) months after the Maturity Date or earlier repayment of the Loan.  Borrower acknowledges that such waiver is or

may be essential to Lender's ability to enforce its remedies without delay and that such waiver therefore constitutes a substantial part of the bargain between Lender and Borrower with regard to the Loan.  No Borrower Party or tenant of the Project is intended to have any rights as a third-party beneficiary of the provisions of this Section 14.21.

14.22    **Invalidated Payments**.  If any payment received by Lender is deemed by a court of competent jurisdiction to be a voidable preference or fraudulent conveyance under any bankruptcy, insolvency or other debtor relief law, and is required to be returned by Lender, then the obligation to make such payment shall be reinstated, notwithstanding that the Note may have been marked satisfied and returned to Borrower or otherwise canceled, and such payment shall be immediately due and payable upon demand.

14.23    **Retention of Servicer**.  At the option of Lender, the Loan may be serviced by Trimont Real Estate Advisors, Inc. or such other servicer selected by Lender from time to time (the "**Servicer**") and Lender may delegate all or any portion of its responsibilities under this Agreement and the other Loan Documents to the Servicer pursuant to a servicing agreement (the "**Servicing Agreement**") between Lender and the Servicer.  Borrower shall pay all set-up costs in connection with such servicing (the "**Initial Servicing Costs**"), and Servicer's monthly servicing fees, as well as any costs and expenses in connection with the special servicing or work-out of the Loan or enforcement of the Loan Documents upon the occurrence of an Event of Default.

14.24    **Section 2822 Waiver**.  Borrower hereby irrevocably authorizes Lender to apply any and all amounts received by Lender in repayment of the Indebtedness first to amounts which are not guaranteed pursuant to the terms of any guaranty of the Loan and then to amounts which are guaranteed pursuant to the terms of any guaranty of the Loan.  Borrower hereby waives any and all rights it has or may have under Section 2822 of the California Civil Code which provides that if a guarantor is "liable upon only a portion of an obligation and the principal provides partial satisfaction of the obligation, the principal may designate the portion of the obligation that is to be satisfied."

**[SIGNATURE PAGE FOLLOWS]**

EXECUTED as of the date first written above.

**LENDER**:

**BUCHANAN MORTGAGE HOLDINGS, LLC**,
a Delaware limited liability company

By:_____
Name:  Timothy J. Ballard
Title:  President

(SIGNATURES CONTINUE ON NEXT PAGE)

[SIGNATURE PAGE TO
LOAN AGREEMENT]
S-1

**BORROWER**:

**CROWN JEWEL PROPERTIES, LLC**,
a California limited liability company


By:_____
Name:_____
Title:_____

2459/033378-0032
17537760

**SCHEDULE 1.1**

**DEFINITIONS**

As used in this Agreement, the following terms have the meanings indicated:

"**Additional Security Instrument**" means the Deed of Trust, Assignment of Rents and Leases, Security Agreement and Fixture Filing, of even date herewith executed by Guarantor, as trustor, in favor of Lender, covering the Additional Collateral, as the same may be amended, supplemented or restated from time to time.

"**Additional Property**" means that certain real property owned by Guarantor located at 3317-3319 Cerritos Avenue, Signal Hill, California 90755.

"**Affiliate**" means, as to any Person, any other Person which, directly or indirectly, is in control of, is controlled by, or is under common control with, such Person. A Person shall be deemed to control another Person if the controlling Person possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of the other Person, whether through the ownership of voting securities, membership interests, by contract, or otherwise. Each Borrower Party shall be deemed to be an Affiliate of Borrower.

"**Agreement**" means this Loan Agreement.

"**Anti-Money Laundering Laws**" means those laws, regulations and sanctions, state and federal, criminal and civil, that (a) limit the use of and/or seek the forfeiture of proceeds from illegal transactions; (b) limit commercial transactions with designated countries or individuals believed to be terrorists, narcotics dealers or otherwise engaged in activities contrary to the interests of the United States; (c) require identification and documentation of the parties with whom a Financial Institution conducts business; or (d) are designed to disrupt the flow of funds to terrorist organizations. Such laws, regulations and sanctions shall be deemed to include the Patriot Act, the Bank Secrecy Act, the Trading with the Enemy Act, 50 U.S.C. App. Section 1 et seq., the International Emergency Economic Powers Act, 50 U.S.C. Section 1701 et seq., and the sanction regulations promulgated pursuant thereto by the OFAC, as well as laws relating to prevention and detection of money laundering in 18 U.S.C. Sections 1956 and 1957.

"**Approved Purchase Agreement**" means a bona fide, arm's length written purchase and sale agreement for the sale of the Property which has been reasonably approved by Lender and satisfies the following minimum requirements: (a) such agreement has been entered into in the ordinary course of Borrower's business and is between Borrower and a buyer that is reasonably approved by Lender and not affiliated with Borrower or Guarantor; and (b) the buyer's obligations to purchase the Property is not subject to any contingencies or conditions precedent other than those standard and customary conditions or which have been otherwise reasonably approved by Lender.

"**Bank Secrecy Act**" means the Bank Secrecy Act, 31 U.S.C. Sections 5311 et seq.

"**Bankruptcy Case**" means the bankruptcy case of Crown Jewel Properties, LLC, Case No. 2:21-bk-17872-NB.

"**Bankruptcy Court**" means the U.S. Bankruptcy Court for the Central District of California, Los Angeles Division, in which the Bankruptcy Case is pending.

"**Bankruptcy Party**" has the meaning assigned in <u>Section 10.1</u>.

"**Borrower**" has the meaning assigned in the first paragraph of this Agreement.

"**Borrower Entity**" has the meaning assigned in <u>Section 12.1(4)</u>.

"**Borrower Investor**" has the meaning assigned in <u>Section 14.7(2)</u>.

"**Borrower Party**" means Borrower, [Borrower's Member and Borrower's Manager] **[CHECK:  SUBJECT TO REVIEW OF BORROWER ORGANIZATIONAL DOCUMENTS]**.

"**Borrower's Manager**" means [_____], which is the sole manager of Borrower **[CHECK:  SUBJECT TO REVIEW OF BORROWER ORGANIZATIONAL DOCUMENTS]**.

"**Borrower's Member**" means [_____], which is the sole member of Borrower **[CHECK:  SUBJECT TO REVIEW OF BORROWER ORGANIZATIONAL DOCUMENTS]**.

"**Borrower's Operating Agreement**" means the operating agreement or limited liability company agreement of Borrower, as the same has been or may be amended from time to time.

"**Business Day**" means a day other than a Saturday, a Sunday, or a legal holiday on which national banks located in the State of California are not open for general banking business.

"**Cash Liquidity Balances**" means lien-free and otherwise unencumbered by any lien, charge or security interest or other encumbrance or type of preferential arrangement (a) cash balances maintained in the conventional forms of demand deposits and money market account deposits, (b) monies held in cash reserves and other cash equivalents acceptable to Lender, (c) readily marketable direct full faith and credit obligations of the United States of America or obligations unconditionally guaranteed by the full faith and credit of the United States of America, in each case due within one year, and (d) certificates of deposit issued by any bank with combined capital, surplus and undivided profits of at least $500,000,000 (as of the date such certificate of deposit is acquired), doing business in and incorporated under the laws of the United States of America or any State thereof, and whose deposits are insured through the Federal Deposit Insurance Corporation, in each case due within one year.  Notwithstanding the foregoing, Cash Liquidity Balances shall not include any reserves maintained by Borrower with respect to the Project and shall not include any funds held in reserves or impounds maintained by Lender.

"**Chapter 11 Plan**" means that certain Chapter 11 Plan, dated January 10, 2022 with respect to the Bankruptcy Case.

"**Closing Date**" means the date of the funding of the Loan to or for the benefit of Borrower.

"**Collateral**" means the Project and all other "Mortgaged Property" described in the Mortgage or any of the other Loan Documents, and any other property that at any time secures the Loan or any portion thereof.

"**Compliance Certificate**" means a certificate executed by Guarantor, in scope and detail satisfactory to Lender, certifying to Lender that Guarantor's then-current Tangible Net Worth and Cash Liquidity Balances are in compliance with <u>Section 6.20</u>.

"**Control**" with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, through the ownership of voting securities, membership interests, partnership interests, by contract or otherwise, and the terms "Controlled", "Controlling" and "Common Control" shall have correlative meanings.

"**Debt**" means, for any Person, without duplication:  (a) all indebtedness of such Person for borrowed money, for amounts drawn under a letter of credit, or for the deferred purchase price of property for which such Person or any of its assets is liable or subject, (b) all unfunded amounts under a loan agreement, letter of credit, or other credit facility for which such Person or any of its assets would be liable or subject, if such amounts were advanced under the credit facility, (c) all amounts required to be paid by such Person as a guaranteed payment to partners, members or other equity holders, or as a preferred or special dividend, including any mandatory redemption of shares or interests, (d) all indebtedness guaranteed by such Person, directly or indirectly, (e) all obligations under leases that constitute capital leases for which such Person or any of its assets is liable or subject, and (f) all obligations of such Person under interest rate swaps, caps, floors, collars and other interest hedge agreements, in each case whether such Person or any of its assets is liable or subject, contingently or otherwise, as obligor, guarantor or otherwise, or in respect of which obligations such Person otherwise assures a creditor against loss.

"**Debt Service**" means, with respect to any particular period of time, the aggregate interest and fixed principal payments due under the Loan.  The foregoing calculation shall exclude payments applied to escrows or reserves required by Lender under the Loan Documents.

"**Default Rate**" means the lesser of (a) the maximum per annum rate of interest allowed by applicable law, and (b) five percent (5%) per annum in excess of the Interest Rate.

"**Environmental Laws**" has the meaning set forth in the Hazardous Materials Indemnity Agreement.

"**Environmental Liability**" shall mean any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties, attorney or consultant fees or indemnities) resulting from or based upon (a) non-compliance with any Environmental Law or any Environmental Permit, (b) exposure to any Hazardous Materials, (c) release or threatened release of any Hazardous Materials, (d) any investigation, remediation, removal, clean-up or monitoring required under Environmental Laws or required by a Governmental Authority (including without limitation Governmental Authority oversight costs that the party conducting the investigation, remediation, removal, clean-up or monitoring is required to reimburse) or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.  For avoidance of doubt and without limiting the generality of the foregoing, the foregoing includes any "Losses" as defined in the Hazardous Materials Indemnity Agreement.

"**Environmental Permits**" shall mean any and all permits, licenses, approvals, registrations, notifications, exemptions and other authorizations required under any Environmental Law.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and all rules and regulations promulgated thereunder.

"**Event of Default**" has the meaning assigned in Article 10.

"**Existing Site Assessment**" has the meaning assigned in the Hazardous Materials Indemnity Agreement.

"**Exit Points**" has the meaning assigned in Section 2.3(5).

"**Extended Stated Maturity Date**" has the meaning assigned in Section 2.5.

"**Extension Option**" has the meaning assigned in Section 2.5.

"**Final Order**" means an order or judgment of the Bankruptcy Court entered on the Bankruptcy Court's docket as to which there is no stay pending appeal or other injunction or court order in place that would stay or otherwise limit the enforceability of such order, and as to which the time to file an appeal has expired and (i) no timely filed appeal is pending, or (ii) if such an appeal has been timely filed, then such appeal has been dismissed or resolved by the highest court to which the order was appealed and any remanded or further proceedings following such appeal have been resolved by Final Order.

"**Financial Institution**" means a United States Financial Institution as defined in 31 U.S.C. Section 5312, as periodically amended.

"**First Interest Period**" has the meaning assigned in Section 2.2.

"**Franchise Agreement**" means, collectively, (i) that certain Franchise Agreement between Borrower and Embassy Suites Franchise LLC dated June 14, 2012, (ii) that certain Franchise Agreement between Borrower and Hampton Inns Franchise LLC dated June 16, 2012, and (iii) that certain Franchise Agreement between Borrower and Homewood Suites Franchise LLC dated June 14, 2012, in each case as amended from time to time.

"**Franchisor**" means, collectively, Embassy Suites Franchise LLC, Hampton Inns Franchise LLC, and Homewood Suites Franchise LLC.

"**General Intangibles**" means all intangible personal property of Borrower arising out of or connected with the Property or the Project and all renewals and replacements thereof and substitutions therefor, including, without limitation, things in action, contract rights and other rights to payment of money.

"**Governmental Authority**" means any board, commission, department or body of any municipal, county, state or federal governmental unit, or any subdivision of any of them, that has or acquires jurisdiction over the Property and/or the Project or the use, operation or improvement of the Property or the Project.

"**Guarantor**" means James Eleopoulos, an individual.

"**Guaranty**" means the Limited Recourse Guaranty executed by Guarantor in favor of Lender in connection with the Loan.

"**Hazardous Materials**" has the meaning set forth in the Hazardous Materials Indemnity Agreement.

"**Hazardous Materials Indemnity Agreement**" means the Hazardous Materials Indemnity Agreement executed by Borrower and the Guarantor in favor of Lender with respect to the Project.

"**Improvements**" means all buildings, structures and improvements of every nature whatsoever now or hereafter situated on the Property, including, but not limited to, all gas and electric

fixtures, radiators, heaters, engines and machinery, boilers, ranges, elevators and motors, plumbing and heating fixtures, carpeting and other floor coverings, water heaters, awnings and storm sashes, and cleaning apparatus which are or shall be attached to the Property or said buildings, structures or improvements.

"**Indebtedness**" means, the outstanding principal amount of the Loan set forth in, and evidenced by, this Agreement and the Note (including, without limitation, all Advances advanced or hereafter advanced under this Agreement), together with all accrued and unpaid interest thereon, late charges, and all other obligations and liabilities due or to become due to Lender in respect of the Loan and/or pursuant to the Note, this Agreement, each and every Security Instrument (whether now or hereafter executed), the Additional Security Instrument or any of the other Loan Documents (excluding the Guaranty), and all other amounts, sums and expenses paid by or payable to Lender pursuant to the Loan Documents (excluding the Guaranty) and any and all obligations and liabilities of Borrower, including without limitation, any increases in the maximum principal amount of the Loan, contained in any written renewal, extension, amendment, modification, consolidation, restatement of, or substitution or replacement for, all or any part of the Note, this Agreement or any of the other Loan Documents (excluding the Guaranty).

"**Index**" and "**Then Current Index**" means the 30-day American Interbank Offered Rate Term-30 Index ("**Ameribor Rate**") which is published for loans in United States Dollars by the American Financial Exchange and is obtained by Lender from Bloomberg Financial Services Systems with the code AMBOR30T (or, if no longer available, any similar or successor publication selected by Lender), provided that in no event shall the "**Index**" or "**Then Current Index**" be less than the Index Floor. The "**Index**" or "**Then Current Index**" shall initially be determined on the Closing Date and shall thereafter be adjusted on or within two (2) Business Days of each Interest Adjustment Date to be the Ameribor Rate determined by Lender to be in effect on such date.  If Lender determines (which determination shall be conclusive absent manifest error) that either of the following has occurred: (i) the Ameribor Rate ceases to exist or is no longer available; or (ii) a public announcement by the regulatory supervisor for the administrator of the Ameribor Rate, or a determination made by Lender, that the Ameribor Rate is no longer representative, then commencing on the next reset date, the interest rate hereunder shall be replaced by an rate Lender determines in its sole discretion to be most comparable to the then-current interest rate (the "**Benchmark Replacement**").  If the Benchmark Replacement as determined pursuant to this section would be less than the Index Floor, the Benchmark Replacement will be deemed to be the Index Floor for the purposes of this Agreement, the Note and the other Loan Documents.  In connection with the implementation of a Benchmark Replacement, Lender will have the right to make Benchmark Replacement Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Benchmark Replacement Conforming Changes will become effective without any further action or consent of Borrower. "**Benchmark Replacement Conforming Changes**" means, with respect to any Benchmark Replacement, any technical, administrative or operational changes, such as changes to the definitions of "Business Day," "Interest Period," or timing and frequency of determining rates and making payments of interest, that Lender decides may be appropriate to reflect the adoption and implementation of such Benchmark Replacement and to permit the administration thereof in a manner substantially consistent with market practice (or, if the Lender decides that adoption of any portion of such market practice is not administratively feasible or if Lender determines that no market practice for the administration of such Benchmark Replacement exists, in such other manner of administration as Lender decides is necessary in connection with the administration of this Agreement, the Note and the other Loan Documents).  If an Interest Adjustment Date falls on a date which is not a Business Day, then the first Business Day immediately succeeding such Interest Adjustment Date shall be used for purposes of determining the "**Index**" or "**Then Current Index**".

"**Index Floor**" shall mean that in no event shall the Index or the Then Current Index be less than one-quarter percent (0.25%).

"**Initial Stated Maturity Date**" shall mean [_____ 1], 2023.

"**Interest Adjustment Date**" means [_____ 1], 2022, and thereafter on the first (1st) day of each calendar month until all principal and interest and other amounts due under the Loan Documents are paid in full.

"**Interest Period**" means (a) the First Interest Period, and (b) for each Interest Period thereafter, the 1-month period commencing on the first day of the calendar month following the end of the preceding Interest Period through the last day of such calendar month.

"**Interest Rate**" means the rate or rates at which the outstanding principal amount of the Loan bears interest from time to time in accordance with the provisions of <u>Section 2.2(1)</u>.

"**Interest Reserve**" has the meaning assigned in <u>Section 3.1</u>.

"**Lease**" shall mean any lease, occupancy agreement, sublease, sub-sublease, letting, license, concession or other agreement (whether written or oral and whether now or hereafter in effect) pursuant to which any Person is granted a possessory interest in, or right to use or occupy all or any portion of, any space in the Property, and every modification, amendment, assignment, termination, consent to assignment or other agreement relating to such lease, sublease, sub-sublease or other agreement entered into in connection with such lease, sublease, sub-sublease or other agreement and every guarantee of the performance and observance of the covenants, conditions and agreements to be performed and observed by the other party thereto.

"**Legal Requirements**" means any and all (a) present and future laws, rules, statutes, codes, ordinances, orders, decrees, injunctions, regulations, directives and permits of any Governmental Authority applicable to Borrower, Guarantor or the Project; (b) covenants, conditions, and restrictions, and any declarations, deeds, Leases or other instruments which relate to the Project; (c) terms and provisions of any presently or subsequently effective operating agreement, articles or organization, bylaws and articles of incorporation or partnership, limited partnership, joint venture, trust, or other form of business association agreement of Borrower or any Restricted Party; (d) obligations of Borrower under or with respect to the Leases, Governmental Approvals and Material Agreements, and all conditions thereof binding upon Borrower or the Project; (e) any law, ordinance, code, order, rule or regulation of any Governmental Authority relating in any way to the acquisition and ownership of the Project, or the development, construction, use, occupancy and operation of the Project, including those relating to subdivision, zoning, building, use and occupancy, fire prevention, health, safety, sanitation, handicapped access, historic preservation and protection, tidelands, wetlands, flood control, access and earth removal.

"**Lender**" has the meaning assigned in the first paragraph of this Agreement.

"**Lien**" means any interest, or claim thereof, in the Collateral securing an obligation owed to, or a claim by, any Person other than the owner of the Collateral, whether such interest is based on common law, statute or contract, including the lien or security interest arising from a deed of trust, mortgage, deed to secure debt, assignment, encumbrance, pledge, hypothecation, preference, security agreement, conditional sale or trust receipt or a lease, consignment or bailment for security purposes, mechanics', materialmen's and similar liens and encumbrances, and any option to purchase, right of first refusal, right of first offer or similar right. The term "Lien" shall include reservations, exceptions, encroachments, easements, rights of way, covenants, conditions, restrictions, leases and other title exceptions and encumbrances affecting the Collateral.

"**Loan**" means the loan to be made by Lender to Borrower under this Agreement and all other amounts evidenced or secured by the Loan Documents.

"**Loan Amount**" has the meaning assigned in Section 2.1.

"**Loan Documents**" means: (a) this Agreement, (b) the Note, (c) the Security Instrument, (d) the Additional Security Instrument, (e) the Hazardous Materials Indemnity Agreement, (f) the Guaranty; (g) UCC financing statements, (h) such assignments of contracts and other rights as may be required by Lender, (i) any letter of credit provided to Lender in connection with the Loan, and (j) all other agreements, documents, certificates and instruments evidencing, securing, governing or otherwise pertaining to the Loan, as each of the same may be amended, supplemented or restated from time to time.

"**Loss Proceeds**" means amounts, awards or payments payable to Borrower or Lender in respect of all or any portion of the Project in connection with a casualty or condemnation thereof (after the deduction therefrom and payment to Borrower and Lender, respectively, of any and all reasonable out-of-pocket expenses incurred by Borrower and Lender in the recovery thereof, including all reasonable attorneys' fees and disbursements, the fees of insurance experts and adjusters and the costs incurred in any litigation or arbitration with respect to such casualty or condemnation) including proceeds from rental or business interruption insurance, and applicable deductibles.

"**Margin**" means eleven and three-quarters percent (11.75%).

"**Material Adverse Effect**" shall mean a material adverse effect on and/or material adverse developments with respect to (a) the business, operations, properties, assets, condition (financial or otherwise) or prospects Borrower or Guarantor taken as a whole (or on an individual basis with respect to Borrower or the Project or Property); (b) the ability of Borrower or the Guarantor to fully and timely perform their obligations; (c) the legality, validity, binding effect or enforceability against Borrower or Guarantor of this Agreement or any other Loan Document to which it is a party; or (d) the rights, remedies and benefits available to, or conferred upon, Lender under any Loan Document.

"**Material Agreements**" means each contract and agreement (other than Leases) relating to the Project, or otherwise imposing obligations on Borrower, under which Borrower would have the obligation to pay more than $50,000 per annum and that cannot be terminated by Borrower without cause upon thirty (30) days' notice or less without payment of a termination fee, or that is with an Affiliate of Borrower.

"**Maturity Date**" means the Stated Maturity Date, or such earlier date as may result from acceleration of the Loan in accordance with this Agreement.

"**Mechanic's Lien**" has the meaning assigned in Section 6.10.

"**Minimum Interest**" means an amount determined by Lender by subtracting the sum of all Monthly Interest Payments made in accordance with this Agreement prior to the date that the prepayment is made from $1,378,315.00.

"**Note**" means the Promissory Note of even date herewith, in the stated principal amount of $12,250,000.00, executed by Borrower, and payable to the order of Lender in evidence of the Loan, and any and all promissory notes delivered in substitution or exchange therefor and as the same may be amended, supplemented or restated from time to time.

SCHEDULE 1.1
-7-

"**<u>OFAC</u>**" means the Office of Foreign Assets Control, Department of the Treasury, and any successor Governmental Authority.

"**<u>Origination Points</u>**" has the meaning set forth in <u>Section 2.3(4)</u>.

"**<u>Patriot Act</u>**" means the USA PATRIOT Act of 2001, Pub. L. No. 107-56, and any successor statute.

"**<u>Payment Due Date</u>**" has the meaning assigned in <u>Section 2.2</u>.

"**<u>Permitted Debt</u>**" means with respect to Borrower, (i) the Indebtedness; (ii) Taxes not yet due and payable; (iii) trade payables not represented by a note, paid by Borrower within ninety (90) days of incurrence, which are incurred in the ordinary course of Borrower's ownership and operation of the Property, in amounts reasonable and customary for similar properties and not exceeding one percent (1.0%) of the Loan Amount.

"**<u>Permitted Encumbrances</u>**" means the outstanding liens, easements, restrictions, security interests and other exceptions to title set forth in the policy of title insurance insuring the lien of the Security Instrument and the Additional Security Instrument, together with the liens and security interests in favor of Lender created by the Loan Documents and any other lien approved by Lender in writing, in its sole and absolute discretion.

"**<u>Person</u>**" means any individual, corporation, partnership, joint venture, association, joint stock company, trust, trustee, estate, limited liability company, unincorporated organization, real estate investment trust, government or any agency or political subdivision thereof, or any other form of entity.

"**<u>Potential Default</u>**" means the occurrence of any event or condition which, with the giving of notice, the passage of time, or both, would constitute an Event of Default.

"**<u>Proceeds</u>**" means all awards, payments, earnings, royalties, issues, profits, liquidated claims, and proceeds (including proceeds of insurance and condemnation or any conveyance in lieu thereof) from the sale, conversion (whether voluntary or involuntary), exchange, transfer, collection, loss, damage, condemnation, disposition, substitution or replacement of any of the Collateral.

"**<u>Project</u>**" means the Property, and all amenities, fixtures, and personal property owned by Borrower and any Improvements now or hereafter located on the Property.

"**<u>Property</u>**" means the real property located in the County of San Diego, California upon which the Project is located, and which is more particularly described on <u>Exhibit A</u> to the Security Instrument.

"**<u>Property Taxes</u>**" means all annual real estate taxes, assessments and similar charges relating to the Project.

"**<u>Rents</u>**" has the meaning set forth in the Security Instrument.

"**<u>Restoration Threshold</u>**" means $50,000.

"**<u>Restricted Company</u>**" means (a) an "investment company" or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended; (b) a "holding company" or a "subsidiary company" of a "holding company" or an "affiliate" of either a

"holding company" or a "subsidiary company" within the meaning of the Public Utility Holding Company Act of 1935, as amended; or (c) any entity that is subject to any other federal or state law or regulation which purports to restrict or regulate its ability to borrow money.

"**Restricted Party**" has the meaning assign in Section 6.1(2).

"**Security Instrument**" means the Deed of Trust, Assignment of Rents and Leases, Security Agreement and Fixture Filing, of even date herewith executed by Borrower in favor of Lender, covering the Project, as the same may be amended, supplemented or restated from time to time.

"**Single Purpose Entity**" means a Person (other than an individual, a government, or any agency or political subdivision thereof), which (a) is formed or organized solely for the purpose of owning the Project, (b) does not engage in any business other than the ownership, management and operation of the Project, (c) does not have any assets other than those related to its interest in the Project, (d) does not incur, create or assume any Debt other than the Loan and Debt permitted under Section 6.9, (e) does not guarantee, hold itself out to be responsible for, or otherwise become liable on or in connection with any Debt or other obligation of any other Person, and does not pledge its assets for the benefit of any other Person, (f) does not enter into any contract or agreement with any stockholder, partner, principal, member or Affiliate of such Person or any Affiliate of any such stockholder, partner, principal, member or Affiliate except as may be permitted pursuant to Section 6.8 and, in any event, upon terms and conditions that are intrinsically fair and substantially similar to those that would be available on an arm's length basis with third parties other than an Affiliate, (g) does not make any loans or advances to any other Person (including any Affiliate), (h) conducts and operates its business in all material respects as presently conducted and operated, (i) maintains its books and records and bank accounts separately from those of its Affiliates, including its general partners or members, as may be applicable, (j) at all times holds itself out to the public as a legal entity separate and apart from any other Person (including any Affiliate), and promptly corrects any known misunderstandings regarding its separate identity, (k) files its own tax returns, (l) maintains adequate capital for its normal obligations, reasonably foreseeable in a business of its size and character and in light of its contemplated business operations (provided that there is sufficient cash flow from the Project to do so), (m) maintains its assets in such a manner that it is not costly or difficult to segregate, ascertain or identify its individual assets from those of any Affiliate or any other Person, (n) complies with all of the limitations on powers set forth in its organizational documentation as in effect on the Closing Date, (o) holds title to the Project and all of its other assets in its own name, (p) utilizes its own letterhead, invoices and checks, (q) allocates fairly and reasonably any overhead expenses that are shared with any Affiliate including paying for office space and services performed by any employee of any Affiliate, and (r) maintains a segregated operating account for the Project from which all Operating Expenses and Debt Service is paid.

"**Site Assessment**" has the meaning assigned in the Hazardous Materials Indemnity Agreement.

"**Specially Designated National and Blocked Persons**" means those Persons that have been designated by executive order or by the sanction regulations of OFAC as Persons with whom U.S. Persons may not transact business or must limit their interactions to types approved by OFAC.

"**Stated Maturity Date**" means (i) the Initial Stated Maturity Date, or (ii) the Extended Stated Maturity Date, if the Initial Stated Maturity Date has been extended pursuant to and in accordance with Section 2.5 hereof.

"**Tangible Net Worth**" means total assets (excluding the value of Guarantor's direct or indirect interest in Borrower, and excluding goodwill, patents, trademarks, trade names, organization

expense, treasury stock, unamortized debt discount and expense, deferred research and development costs, deferred marketing expenses, and other like intangibles) less total liabilities, including accrued and deferred income taxes (but excluding deferred taxes resulting from the completion of a tax deferred exchange), and any reserves against assets, accounted for in accordance with the method used to prepare Guarantor's financial statements provided to Lender in connection with the Loan, consistently applied.

"**Transfer**" means any sale (including any installment sale), conveyance, assignment, mortgage, pledge, lease (including any ground lease), encumbrance, alienation or grant of Lien (other than Permitted Encumbrances) on, grant of any option with respect to or grant of any other interest in the Project, any part thereof or any interest therein (including any legal, beneficial or economic interest in Borrower or any Restricted Party and any rights in or restricting the use or development of the Project), directly or indirectly, voluntarily or involuntarily, by operation of law or otherwise, and whether or not for consideration or of record.

"**U.S. Person**" means any United States citizen, any entity organized under the laws of the United States or its constituent states or territories, or any entity, regardless of where organized, having its principal place of business within the United States or any of its territories.

## SCHEDULE 4.1

## REQUIRED INSURANCE

**Property Insurance**.  Borrower shall keep the Project insured against damage by fire and the other hazards covered by a standard extended coverage and all-risk insurance policy for the full insurable value thereof on a replacement cost claim recovery basis, and shall maintain the following coverage (and such other property insurance as required by Lender):

1.    Special form coverage
2.    Deductible shall not exceed $25,000
3.    Business Interruption:  12 months gross income plus 6 months Extended Period of Indemnity ("**EPI**") (or actual loss sustained 12 months plus 6 months EPI)
4.    Intentionally Deleted
5.    Limited fungus coverage (when resulting from a covered peril)
6.    Building Amount coverage equal to the replacement cost of the improvements
7.    No coinsurance
8.    Equipment breakdown coverage (boiler & machinery coverage)
9.    Ordinance or Law:
    (a)    Loss to the undamaged portion of the building (full insured value)
    (b)    Demolition
    (c)    Increased cost of construction
10.    Sinkhole/Earth movement required for all assets
11.    Flood coverage is required for all assets in flood zones A, D & V or in other zones if required based on the observations of the inspecting engineer
12.    Wind/Hail required for all assets
13.    Borrower shall keep its Real Estate Environmental Liability Policy in full force and effect and shall maintain Lender as an additional insured thereunder
14.    If required by Lender after reviewing all environmental studies, adequate Environmental/Pollution Insurance.

**Liability Insurance**.  Borrower shall maintain the following liability insurance with respect to the Project, and such other liability insurance as required by Lender:

1.    Commercial general liability insurance
2.    General liability deductible shall not exceed $25,000
3.    Minimum of $1,000,000 per occurrence and $2,000,000 in the aggregate is required together with at least $5,000,000 excess and/or umbrella liability insurance
4.    Intentionally Deleted

**Insurance Certificates**.  All certificates of insurance shall include the following information (in addition to the applicable insurance described above):

1.    Borrower as named insured
2.    Buchanan Mortgage Holdings, LLC as Beneficiary, Loss Payee or Additional Insured (as applicable)
3.    Certificate Holder:  Buchanan Mortgage Holdings, LLC, c/o Buchanan Street Partners, 3501 Jamboree Road, Suite 4200, Newport Beach, CA  92660 (please send renewal certificates via mail or email to:  mmower@buchananstreet.com)
4.    Project address(es)

5.      Current policy term (expiration at least 30 days after Closing Date)

6.      Policy number and loan number

7.      Deductible may not exceed $25,000 (for general liability insurance, indicate on certificate if $0 deductible)

8.      Reported building value(s)

9.      Replacement cost

10.     Certificate must be signed by an authorized agent (signature required; no stamps)

11.     Annual premiums for coverage as approved (including any amounts unpaid)

## <u>SCHEDULE 5.1</u>

## <u>BORROWER'S ORGANIZATIONAL CHART</u>

## [TO BE INSERTED]

## SCHEDULE 5.3

## SCHEDULE OF LITIGATION

1.    The bankruptcy case of Crown Jewel Properties, LLC, Case No. 2:21-bk-17872-NB.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
16000 Ventura Blvd., Ste. 1000, Encino, CA 91436

A true and correct copy of the foregoing document entitled (specify):  **NOTICE OF MOTION AND MOTION FOR ENTRY OF AN ORDER AUTHORIZING POST-PETITION FINANCING PURSUANT TO 11 U.S.C. §364(d), AND, DISMISSING THIS BANKRUPTCY PROCEEDING PURSUANT TO 11 U.S.C. §§ 105(a) AND 1112(b) UPON CLOSING OF THE LOAN, AND GRANTING RELATED RELIEF; MEMORANDUM OF POINTS AND AUTHORITIES** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)** – Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On April 14, 2022, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Dare Law**    dare.law@usdoj.gov, ron.maroko@usdoj.gov
- **Douglas M Neistat**    dneistat@gblawllp.com, mramos@gblawllp.com;tkrant@gblawllp.com
- **J. Alexandra Rhim**    arhim@hrhlaw.com
- **Jeremy H Rothstein**    jrothstein@gblawllp.com, nknadjian@gblawllp.com;msingleman@gblawllp.com
- **United States Trustee (LA)**    ustpregion16.la.ecf@usdoj.gov

☐  Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:  On April 14, 2022, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐  Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on April 14, 2022, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☒  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| | | |
|---|---|---|
| April 14, 2022 | Marleigh Singleman | |
| _Date_ | _Printed Name_ | _Signature_ |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

_June 2012_                                                                                 **F 9013-3.1.PROOF.SERVICE**

2134414.1 - 32278.0003

## SERVICE LIST

**Debtor**
Crown Jewel Properties, LLC
1860 Obispo Avenue, Suite F
Signal Hill, CA 90755
*via Overnight Mail*

**Office of the U.S. Trustee**
United States Trustee
Attn: Dare Law
915 Wilshire Blvd, Suite 1850
Los Angeles, CA 90017
*via Overnight Mail*
*via ECF*

**Co-Debtor**
Golo, LLC
1860 Obispo Avenue, Suite F
Signal Hill, CA 90755
*via Overnight Mail*

## SECURED CREDITORS

Paradise Wire & Cable
Defined Benefit Pension Plan
Attn: Cheryl J. Hintzen-Gaines, Trustee
1819 E. Morten Ave., Suite 180
Phoenix, AZ 85020
*via Overnight Mail*

San Diego County Treasurer – Tax Collector
P.O. Box 129009
San Diego, CA 92112
*via Overnight Mail*

SMS Financial, LLC
3707 East Shea Blvd., Suite 100
Phoenix, AZ 85028
*via Overnight Mail*

San Diego County Treasurer – Tax Collector
1600 Pacific Highway, Room 162
Attn: BK Desk
San Diego, CA 92101
*via Overnight Mail*

SMS Investments VI, LLC
c/o Robert L. Stewart, Jr., Esq.
3707 East Shea Blvd., Suite 100
Phoenix, AZ 85028
*via Overnight Mail*

Ira J.Gaines
Ira J. Gaines Revocable Trust
1819 E. Morten Ave., Suite 180
Phoenix, AZ 85020
*via Overnight Mail*

David S. Nagelberg
David S. Nagelberg 2003 Revocable Trust
939 Coast Blvd. Unit 21 DE
La Jolla, CA 92037
*via Overnight Mail*

## 20 LARGEST UNSECURED CREDITORS

None

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                    **F 9013-3.1.PROOF.SERVICE**
2134414.1 - 32278.0003

## GENERAL UNSECURED CREDITORS

Jenna Development
1860 Obispo Avenue, Suite F
Signal Hill, CA 90755
*via Overnight Mail*

## NOTICE PURPOSES ONLY

J. Alexandra Rhim, Esq.
Hemar, Rousso & Heald, LLP
15910 Ventura Blvd., 12th Floor
Encino, CA 91436
*via Overnight Mail*

S.B.S Trust Deed Network
Attn: Colleen Irby
31194 La Baya Drive, Suite 106
Westlake Village, CA 91362
*via Overnight Mail*

Franchise Tax Board
Attn: Bankruptcy
P.O. Box 2952
Sacramento, CA 95812-2952
*via Overnight Mail*

Internal Revenue Service
Centralized Insolvency Operations
P.O. Box 7346
Philadelphia, PA 19101
*via Overnight Mail*

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.